UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

Moses Strauss et al.,

                          Plaintiffs,        CV-06-0702 (CPS)

     - against -                             MEMORANDUM OPINION
                                             AND ORDER

Credit Lyonnais, S.A.,

                          Defendant.

---------------------------------------X


        Plaintiffs, United States citizens, and the estates,

survivors and heirs of United States citizens, who have been

victims of terrorist attacks in Israel, bring this action against

defendant, Crédit Lyonnais, S.A.("Crédit Lyonnais") alleging that

defendant is civilly liable to the plaintiffs for damages

pursuant to 18 U.S.C. §2333(a) because it (1) aided and abetted

the murder, attempted murder, and serious bodily injury of

American Nationals located outside the United States in violation

of 18 U.S.C. §2332; (2) knowingly provided material support or

resources to a foreign terrorist organization ("FTO")[1] in

---

[1] Pursuant to Section 209 of the Immigration and Nationality Act, 8
U.S.C. §1189, the Secretary of State, in consultation with the Secretary of
Treasury and the Attorney General may designate an organization as a foreign
terrorist organization if:

        (a) the organization is a foreign organization;

        (b) the organization engages in terrorist activity or terrorism,
        or retains the capability and intent to engage in terrorist
        activity or terrorism; and

        (c) the terrorist activity or terrorism of the organization
        threatens the security of United States nationals or the national

violation of 18 U.S.C. 2339B; and (3) unlawfully and willfully

provided or collected funds with the intention that such funds

would be used, or with the knowledge that such funds be used for

terrorist purposes in violation of 18 U.S.C. 2339C. Now before

this Court is defendant's motion to dismiss all claims pursuant

to Federal Rule of Civil Procedure 12(b)(6). For the reasons set

forth below the defendant's motion is granted as to the first

claim and denied as to the second and third claims.


STATUTORY BACKGROUND

All three of the claims made by plaintiffs derive from

section 2333(a) of the Anti-Terrorism Act of 1992 which provides

civil remedies for the victims of terrorism. That section

provides:

> Any national of the United States injured in his or her
> person, property, or business by reason of an act of
> international terrorism or his or her estate,
> survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and
> shall recover threefold the damages he or she sustains
> and the cost of the suit, including attorney's fees.

18 U.S.C. 2331(a), in turn, defines international terrorism as

activities that:

> (a) involve violent acts or acts dangerous to human
> life that are a violation of the criminal laws of the
> United States or of any State, or that would be a
> criminal violation if committed within the jurisdiction
> of the United States or of any State;

security of the United States.

(b) appear to be intended –

    (i)to intimidate or coerce a civilian
population;

    (ii) to influence the policy of a government
by intimidation or coercion;

    (iii) to affect the conduct of a government
by mass destruction, assassination or
kidnapping; and

(c) occur primarily outside the territorial
jurisdiction of the United States, or transcend
national boundaries in terms of the means by which they
are accomplished, the persons they appear intended to
intimidate or coerce, or the locale in which their
perpetrators operate or seek asylum.

Violations of 18 U.S.C. §2339B and §2339C are recognized as
international terrorism under 18 U.S.C. 2333(a). *Boim v. Quranic
Literacy Institute and Holy Land Foundation for Relief and
Development*, 291 F.3d 1000, 1014-1015 (7th Cir. 2002); *Linde v.
Arab Bank*, 384 F.Supp 2d 571, 581 (E.D.N.Y. 2005).

Section 2339B provides that:

Whoever knowingly provides material support or
resources to a foreign terrorist organization, or
attempts or conspires to do so, [is guilty of a crime].
. . To violate this paragraph a person must have
knowledge that the organization is a designated
terrorist organization . . . has engaged in terrorist
activity . . . or that the organization has engaged in
or engages in terrorism.[2]

---

[2] Section 2339(g)(4) in turn defines material support by reference to
Section 2339A(b) which provides that:

(1) the term "material support or resources" means any property,
tangible or intangible, or service, including currency or monetary
instruments or financial securities, financial services, lodging,
training, expert advice or assistance, safe houses, false

Section 2339C provides in relevant part that

Whoever . . . by any means, directly or indirectly,
unlawfully and willfully provides or collects funds
with the intention that such funds be used, or with the
knowledge that such funds are to be used in full or in
part, in order to carry out . . . [an] act intended to
cause death or serious bodily injury to a civilian, or
to any other person not taking an active part in the
hostilities in a situation of armed conflict, when the
purpose of such act, by its nature or context, is to
intimidate a population or to compel a government or an
international organization to do or to abstain from
doing any act, shall be punished as prescribed in
subsection (d)(1).[3]

Plaintiffs also contend that liability under 2333(a) may be

premised upon a theory of civil "aiding and abetting."[4]

Plaintiffs point to the RESTATEMENT (SECOND) of TORTS §876 (1979)

which provides that:

For harm resulting to a third person from the tortious
conduct of another, one is subject to liability if he

---

documentation or identification, communications equipment,
facilities, weapons, lethal substances, explosives, personnel (1
or more individuals who may be or include oneself), and
transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to
impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or
assistance derived from scientific, technical or other specialized
knowledge.

[3] Section 2339C(e) further defines the term "provides" as including
"giving, donating, and transmitting" and the term "collects" as including,
"raising and receiving."

[4] Defendant also argues that a criminal aiding and abetting claim cannot
be sustained under Section 2333(a). However, plaintiffs' response makes clear
that they argue only that 2333(a) be construed to include a tort claim, and
not a criminal claim. Accordingly, I do not address criminal aiding and
abetting.

(a) does a tortious act in concert with the other or
pursuant to a common design with him; or

(b) knows that the other's conduct constitutes a breach
of duty and gives substantial assistance or
encouragement to the other to so conduct himself; or

(c) gives substantial assistance to the other in
accomplishing a tortious result and his own conduct,
separately considered, constitutes a breach of duty to
the third person.

FACTUAL BACKGROUND

The following facts are drawn from the complaint and are
presumed to be true for the purposes of this motion pursuant to
Rule 12(b)(6).

*THE PARTIES*

*Plaintiffs*

Twenty-two plaintiffs are individuals who were themselves
injured in thirteen different terrorist attacks that occurred in
Israel between March 28, 2001 and August 19, 2003 and who, as a
result, experienced physical and mental anguish and emotional
distress.[5] Nine plaintiffs are the representatives of individuals

---

[5] Compl. ¶¶ 15-21, 501, 521, 532 (Moses Strauss), 39-49, 501, 521 (Tzvi
Weiss), 61-62, 501, 521, 532 (Chana Nathansen), 63-64, 501, 521 (Matanya
Nathansen), 67-68, 501, 521 (Yehudit Nathansen), 70-71, 501, 521 (Shoshana
Nathansen), 109-112, 117, 120, 501, 520 (Eugene Goldstein); 114-120, 501, 520
(Lorraine Goldstein), 157-159, 501, 519 (Sarri Anne Singer); 172-182, 501, 518
(Steven Averbach), 219-222, 501, 517 (Daniel Rozenstein), 231-236, 501, 515
(Jacob Steinmetz), 286, 288-292, 501, 512 (Gloria Kushner), 311-314, 499, 501
(Temima Spetner Gould), 317-321, 499, 501 (Jason Kirschenbaum), 339-349, 499,
501 (Netanel Miller), 355-358, 499, 501 (Altea Steinherz), 365, 367-370, 497
(Chana Nachenberg), 402-404, 497 (Howard Green), 420-425, 497 (David Danzig),
436-438, 497 (Clara Ben-Zaken Laser), 441-442, 495 (Netanel Herkovitz), 403,

killed in those attacks.[6] The remaining plaintiffs are members of
the family of the victims, who have experienced non-physical
injuries including anxiety, severe mental anguish, extreme
emotional distress and loss of companionship as a result of their
relatives' injuries or death.[7]

*The Terrorist Attacks*

Plaintiffs identify thirteen separate attacks which caused
their injuries. Those attacks are as follows:

1.  On August 19, 2003 a HAMAS suicide bomber
    perpetrated an attack on a Jerusalem bus ("First
    Attack"). Compl. ¶¶5-6, 521.

2.  On June 20, 2003 two unidentified men perpetrated
    a shooting attack on Israeli highway Route 60 for
    which HAMAS claimed responsibility ("Second
    Attack"). Compl. ¶¶101-102, 105, 520.

3.  On June 11, 2003 Abdel Madi Shabneh, a HAMAS
    operative dressed as an Orthodox Jew, detonated a
    bomb on Egged bus #14A as it drove through the
    Mahane Yehudah market in Jerusalem ("Third
    Attack"). Compl. ¶¶140-142, 519.

4.  On May 18, 2003 Bassem Jamil Tarkrouri, also
    dressed as an Orthodox Jew, detonated a bomb on a
    commuter bus heading towards Jerusalem. HAMAS
    claimed responsibility ("Fourth Attack"). Compl.
    ¶¶169-171, 518.

---

405, 497 (Mina Dorin Green).

[6] Compl. ¶¶56, 501, 521, 532 (Tehilla Nathansen), 143, 501, 519 (Alan
Beer), 240, 245, 501, 513 (Janis Ruth Coulter), 240, 258, 501, 513 (Diane
Leslie Carter), 240, 266, 501, 513 (Benjamin Blutstein), 240 279, 501, 513
(David Gritz), 295, 501, 511 (Esther Bablar), 304, 501, 509 (Hannah Rogen),
361, 408, 497 (Judith Greenbaum).

[7] For the sake of brevity, and because the details of plaintiffs'
injuries are not at issue in this motion, they are omitted here.

5.    On April 30, 2003, a HAMAS suicide bomber, Asif
      Muhammad Hanif detonated explosives inside Mike's
      Place, a Tel Aviv restaurant ("Fifth Attack").
      Compl. ¶¶215-216, 517.

6.    On January 29, 2003 two unidentified masked men
      perpetrated a shooting attack on Israeli highway
      Route 60. HAMAS was, on information and belief,
      responsible for the attack ("Sixth Attack").
      Compl. ¶¶229-230, 515.

7.    On July 31, 2002 a bomb planted inside the Frank
      Sinatra cafeteria at Hebrew University's Mount
      Scopus campus in Jerusalem by Mohammed Odeh
      exploded. The attack was planned and carried out
      by HAMAS ("Seventh Attack"). Compl. ¶¶240-244,
      513.

8.    On May 19, 2002 a suicide bomber detonated a bomb
      in an open air market in Netanya, Israel. Both
      HAMAS and the Popular Front for the Liberation of
      Palestine claimed responsibility ("Eighth
      Attack"). Compl. ¶¶286-287, 512.

9.    On May 7, 2002 a HAMAS suicide bomber detonated a
      bomb in the Sheffield Club, an unlicensed social
      club and gaming parlor located in Rishon Letzion
      ("Ninth Attack") Compl. ¶¶293, 297, 511.

10.   On March 27, 2002, a HAMAS suicide bomber
      detonated a bomb in the Park Hotel in Netanya ("Tenth Attack"). C

11.   On December 1, 2001 Nabil Halabiya and Osama
      Mohammad Id Bahr, two HAMAS suicide bombers blew
      themselves up in a pedestrian mall in Jerusalem.
      Shortly thereafter, as part of a coordinated
      attack, a car bomb detonated near the mall. HAMAS
      claimed responsibility for the car bomb ("Eleventh
      Attack"). Compl. ¶¶308-309, 499.

12.   On August 19, 2001, Izz Ad-Din Shuhail Ahmad Al-
      Masri, a HAMAS suicide bomber detonated a bomb at
      the Sbarro's Pizzeria in Jerusalem ("Twelfth
      Attack"). Compl. ¶¶360, 362, 497.

13.   On March 28, 2001, Fadi Attallah Yusuf Amer, a
      HAMAS suicide bomber blew himself up outside a gas

station near Kfar Sava ("Thirteenth Attack").
Compl. ¶¶439, 495.

*Defendant*

Defendant, Crédit Lyonnais is a retail bank with its principal place of business in Paris, France. It conducts business in the United States and maintains an office in Miami, Florida.

*Background on HAMAS, the Union of Good and Comité de Bienfaisance et de Secours aux Palestinians a/k/a Comité Bienfaisance pour la Solidarite avec la Palestiene ("CBSP")*

In December 1987, Sheik Ahmed Yassin formed HAMAS as an offshoot of the Muslim brotherhood, a radical Islamic group founded in Egypt prior to World War II. The complaint alleges, and I assume it to be true for purposes of this motion that HAMAS operatives plan, assist and conduct acts of international terrorism in Israel, the West Bank, and the Gaza strip.

HAMAS's organization in the Palestinian Authority controlled territory (the "PACT") is alleged to be comprised of two interwoven components: a terrorist division and a group of charitable and social institutions which is, among other things, responsible for recruiting and training terrorists. This combination of charitable and social institutions is commonly referred to by HAMAS as the "Dawa." In order to raise funds for its operations, it is alleged that HAMAS has established "charity" committees across the PACT and abroad, including

committees in Ramallah, Jenin and Tulkarem. Plaintiffs claim that these committees are controlled by HAMAS agents and collect and distribute their funds on behalf of HAMAS. One of the roles of these groups is alleged to be their channeling of funds to pay expenses and otherwise assist the families of terrorist operatives arrested, injured or killed as a result of terrorist activities. These entities are also said to assist with the provision of housing subsides to the families of suicide bombers whose homes are demolished by the Israeli army after a bomber's identity has been confirmed.

It is alleged that HAMAS receives most of its financing through donations coordinated by prominent Saudi and Gulf State charities and a global network of charities known as the Union of Good operated by the Muslim Brotherhood. The Union of Good, known in Arabic as I'Tilafun Al-Khayr, is alleged to have been established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the violent Palestinian-Israeli confrontation, commonly known as the "Second Intifada." Its primary purpose is said to be to provide financial support for HAMAS and its agents in the PACT. According to the complaint, the Union of Good is comprised of more than fifty Islamic charitable foundations worldwide, including the Comité de Bienfaisance et de Secours aux Palestinians ("CBSP"), several of

which have been designated by the United States as Specially
Designated Global Terrorists. ("SDGTs")

*CBSP*

CBSP is a non-profit corporation organized in 1990 with its
headquarters in France. CBSP is a member of the Union of Good and
is part of HAMAS's fund-raising infrastructure. The two leading
figures of CBSP are said to be Mahmoud Hussein al-Bughani, its
former chairman, and Khaled Muhammad Ahmad al-Shouli, its current
chairman and director.

*Terrorist Designations of Relevant Parties*

*HAMAS*

In 1989 the Government of Israel declared HAMAS a "terrorist
organization" and an "unlawful organization" because of its
terrorist acts. Notice of the designation was placed in the
official Israeli government publication, the *Announcements and
Advertisements Gazette.*

On January 23, 1995, then President Clinton issued Executive
Order No. 12947, finding that "grave acts of violence committed
by foreign terrorists that threaten to disrupt the Middle East
peace process constitute an unusual and extraordinary threat to
national security, foreign policy, and economy of the United
States." The order thereafter identified certain groups,

including HAMAS, as "specially designated terrorist organizations" and froze all property and interests in property of the designated terrorist organizations.

On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a FTO pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996. The designation of HAMAS as a FTO has been renewed every two years since.

Following the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224 which designated HAMAS as a "Specially Designated Global Terrorist" ("SDGT") and froze all property and interests in property of HAMAS.

*Union of Good*

The Union of Good is headed by Dr. Yussaf al-Qaradawi, a well known Muslim scholar. The board of directors includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub and Bassam Jarrar.

Dr. Al-Qaradawi speaks on a weekly television program on *Al Jazeera* and has publicly issued a fatwa (on Islamic religious edict) encouraging suicide bombing attacks against Israel.

In 2001, Dr. Al-Qaradawi is said to have publicly described the activities of the Islamic charitable societies as a "new type of jihad, financial jihad, through which financial support is guaranteed to the martyr's families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during conflict."

*CBSP*

In 1997 the Government of Israel declared CBSP an "unlawful organization" because of its affiliation with HAMAS and the support it provided to HAMAS front organizations. Notice of the designation was placed in the *Announcements and Advertisements Gazette.*

In July 2001 the French police began an investigation of CBSP.

In January 2002 the Palestinian Authority froze wire transfers from Khaled Muhammad Ahmad al-Shouli, CBSP's chairman, to a HAMAS front organization known as Al-Mujama al-Islami, an organization established by the late Sheik Yassin, regarded as the spiritual leader of HAMAS.

In May 2002 the state prosecutor in the French city of Nancy asked the Regional Service of the Judiciary Police to investigate CBSP after receiving a briefing from a French governmental agency, "Traitement du renseignment et action contre les circuits

financiers clandestins" ("Tracfin") or "agency for intelligence gathering and action against clandestine financial networks.")

In the spring of 2003 the French newspaper *Le Figaro* reported that the public prosecutor's office in Paris had referred its concerns about CBSP to its Counter-Terrorist National Division based on another report by the Tracfin.

On August 22, 2003 pursuant to Executive Order 13224, President Bush identified CBSP as a HAMAS fund-raising entity and placed it on the Office of Foreign Assets Control ("OFAC") list as a SDGT. The President's statement read as follows:

> At my direction the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

Pursuant to this designation, OFAC issued a "Blocking Notice" freezing all of CBSP's funds, accounts, and real property. All transactions involving property in which CBSP had any interest were prohibited without specific authorization from OFAC. Plaintiffs allege that CBSP is controlled by HAMAS.

*Jenin Charity Committee and Tulkarem Charity Committee*

In February 2002 the Israeli Government declared the Jenin Charity Committee and the Tulkarem Charity Committee unlawful

organizations because they regularly transfer or provide money for the benefit of the families of HAMAS "martyrs," HAMAS prisoners in Israeli jails and deported HAMAS members. The Tulkarem Committee is alleged to be headed by a HAMAS terrorist.

In a July 2004 criminal indictment of the Holy Land Foundation ("HLF") filed in the Northern District of Texas both the Jenin Charity Committee and the Tulkarem Charity Committee were identified as HAMAS controlled organizations.

*Orphan Care Society of Bethlehem ("Orphan Care Society")*

The Orphan Care Society was outlawed by the Government of Israel in February 2002. It is alleged that most of its principal functionaries, including its director, Dr. Ghassan Harmass, are HAMAS terrorists. The Orphan Care Society is alleged to pay subsidies to the children of HAMAS martyrs and imprisoned HAMAS members. Plaintiffs allege that the Orphan Care Society is controlled by HAMAS.

*Al-Islah Charitable Society in Ramallah Al-Bireh (Al-Islah)*

The Government of Israel declared Al-Islah an "unlawful organization" in February 2002. Al-Islah is alleged to regularly transfer money for the benefit of the families of HAMAS "martyrs" and to subsidize the renovation of homes destroyed by Israel that belong to the families of suicide bombers. It is also said to

support the families of "martyrs," HAMAS prisoners in Israeli jails and deported HAMAS members. Plaintiffs allege that Al-Islah is controlled by HAMAS.

*Other Terrorist Organizations*

Plaintiffs also identify the Ramallah-Al Bireh Charitable Soceity, the Hebron Islamic Association, Al-Mujama Al-Islami, the Al-Salah Society, the Islamic Charitable Society in the Gaza Strip and the Muslim Youth Association of Hebron as institutions belonging to HAMAS's financial arm operating in the PACT. Plaintiffs allege that all of these groups are controlled by HAMAS and that several of these entities have been declared unlawful by the government of Israel.[8]

*CBSP's Accounts at Crédit Lyonnais*

CBSP opened accounts at Crédit Lyonnais in 1990. In 2000 the defendant began to notice unusual transfers of funds as described below occurring in CBSP's main accounts. Crédit Lyonnais did not, however, close CBSP's accounts or freeze any funds at that time. In 2002 Crédit Lyonnais began the process of closing CBSP's accounts. In September 2003 Crédit Lyonnais completed the process of closing CBSP's accounts at the bank.

---

[8] Plaintiffs do not specify which institutions were declared unlawful by the Israeli government, or when such declarations occurred.

The plaintiffs allege that between 2000 and 2003 Crédit Lyonnais knowingly transferred funds from CBSP to institutions within HAMAS's financial division, including the Orphan Care Society, Al-Islah, the Ramallah Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, the Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, Al-Salah Society and the Muslim Youth Association of Hebron (collectively, "HAMAS controlled organizations").

## DISCUSSION

Defendant seeks dismissal of plaintiffs' complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In considering a motion pursuant to Rule 12(b)(6), a court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)(citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. V. Town of Darien*, 56

F.3d 375,378 (2d Cir. 1995). Dismissal is appropriate only when
it "appears beyond a doubt that the plaintiff can prove no set of
facts which would entitle him or her to relief." *Sweet v.
Sheahan*, 235 F.3d 80,83 (2d Cir. 2000). Additionally, a
complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) if
the Court finds that the plaintiff's claims are barred as a
matter of law. *Conopco, Inc. v. Roll Intern.,* 231 F.3d 82, 86
(2d Cir. 2000). A court is permitted to take into account the
contents of documents attached to or incorporated in the
complaint. *Colmas v. Harsett, 886 F.2d, 8, 13 (2d Cir. 1989).*[9]

*IMPROPER PLAINTIFFS*

　　Defendant argues at the outset that the claims of plaintiff

---

[9] A press release issued by the defendant in connection with an action
filed against it under the ATA in a New Jersey District Court was attached to
the Complaint. The press release provides as follows:

> Crédit Lyonnais, which was summoned to appear before a court
> in New Jersey by an American family, the victim of a terrorist
> attack during their stay in Israel, wishes to make the following
> statements of fact.

> In 1990, accounts in the name of "Comité de Bienfaisance pour la
> Solidarité avec la Palestine" [Committee for Palestianian Charity
> and Aid] were opened in France in strict observance of applicable
> regulations. The association was designated non-profit, in
> accordance with French law 1901.

> In late 2000, in view of unusual activity occurring in the
> association's main account, Crédit Lyonnais reported such activity
> as required by law.

> In January 2002, in keeping with the bank's own internal
> regulations, Crédit Lyonnais began a process of closing these
> accounts, which was finalized in September 2003.

> It should be pointed out that the association in question, which
> still does not appear on any European lists of enterprises linked
> to terrorism, was not mentioned on American lists until August
> 2003.

Julie Averback and Arie Miller must be dismissed because they are not United States citizens. Plaintiff responds by noting that 18 U.S.C. § 2333(a) explicitly permits suits not only by any national of the United States but also by "his or her estate, heirs or survivors." Defendant responds that section 2333(a) does not permit suits by heirs or survivors of U.S. nationals to recover damages for personal injuries caused by terrorists, but is limited to suits by heirs or survivors of U.S. nationals who have been killed by terrorists. Defendant provides no legal support for this interpretation of the 2333(a).

Defendant's interpretation must be rejected as contrary to the plain meaning of the statute which permits suit on behalf of "any national of the United States *injured* in his or her person." Had the statute been intended to limit recovery as defendant suggests it would have provided for recovery only by heirs or survivors "of U.S. nationals killed" by reason of international terrorism. The plain meaning of the statute is supported by the statute's legislative history. As originally drafted, §2333 allowed recovery only by "any national of the United States . . ." *Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts & Admin. Practice of the Senate Comm. on the Judiciary,* 101st Congress 8 (1990) ("Senate Hearing"). In questioning whether the addition of the words "heirs and survivors" was necessary or whether the statute already impliedly permitted such

suits the senators discussed the "ability of family members to file suit on behalf of a slain *or injured* relative." (emphasis added) Senate Hearing at 46. Thus, the statute clearly assumed and clearly states that suits could be brought not only by the relatives of victims killed by terrorist attacks, but also by the relatives of victims injured by the attacks. Accordingly, the suits of Julie Averbach and Arie Miller who sue, respectively, as the wife and father of United States citizens injured in terrorist attacks, are not barred.

*Time Barred Claims*

Defendant alleges that the claims arising from the Eleventh, Twelfth and Thirteenth Attacks are barred by the applicable statute of limitations. Pursuant to 18 U.S.C. 2335(a) suits under section 2333 must be commenced within 4 years of the date the cause of action accrued. The Eleventh, Twelfth, and Thirteenth attacks occurred respectively on December 1, 2001, August 9, 2001 and August 13, 2001. The complaint in this action was filed on February 16, 2006, more than four years after the latest of those attacks.[10]

---

[10] Defendant's memorandum of law contains an argument that claims based on the Eleventh, Twelfth and Thirteenth Attacks were not preserved by an earlier suit in a New Jersey district court by some of the plaintiffs in this suit against Crédit Lyonnais on the basis of injuries sustained in the First Attack. (That suit was subsequently voluntarily dismissed). Plaintiffs do not take issue with this argument, but rely instead on two other grounds for tolling the statute of limitations, as discussed below.

Plaintiffs argue that the statute of limitations should be tolled under the concealment exception set forth in 19 U.S.C. ¶2335(b) which provides that:

> The time of the absence of the defendant from the United States or from any jurisdiction in which the same or similar action arising from the same facts may be maintained by the plaintiff, or of any concealment of the defendant's whereabouts, shall not be included in the 4-year period set forth in subsection (a).

Plaintiffs argue based on the legislative history of this provision that a defendant's concealment of its "whereabouts" encompasses concealment of either its identity or its acts. Specifically plaintiffs cite the Senate Report on the ATA, S.Rep. 102-342 (Report on P.L. 102-572, Federal Courts Administration Act of 1992, July 27, 1992) which states that

> This section provides for a 4-year statute of limitations, but in recognition of the peculiar characteristics of terrorism, it tolls the statute of limitation during any periods when the terrorists have concealed their acts or identities or remain outside of the United States.

Research by the parties and by this Court has produced no decision interpreting this "concealment" provision. However, the parameters of section 2335(b)'s concealment doctrine need not be determined here because the complaint makes no allegation that defendant concealed its identity as CBSP's bank or its transfer of funds for CBSP to various HAMAS controlled organizations. Accordingly, the statue of limitations cannot be tolled and the plaintiffs' claims are untimely and must be dismissed with leave

to amend. *see* e.g., Cohen *v. Flushing Hosp. & Med. Center*, 68
F.3d 64, 69 (2d Cir. 1995)(where a complaint fails to allege that
the defendant concealed a material fact, the statute of
limitations is not tolled and the complaint must be dismissed).[11]

Plaintiffs also contend that the statute of limitations
should be tolled on the basis of the diligence-discovery rule.
Defendant contends, first, that the diligence-discovery rule does
not apply to the ATA, and, second, that even if it does apply,
plaintiffs cannot show that they are entitled to a tolling of the
statute of limitations under that rule. Because I conclude that
plaintiffs have not shown that they are entitled to tolling under
the diligence-discovery rule, I need not decide whether
diligence-discovery is applicable in the ATA context.

The diligence-discovery rule tolls the statute of
limitations "where a plaintiff demonstrates that his injury was
inherently unknowable at the time he was injured." *Barret v.
Marcus*, 689 F.2d 324, 327 (2d Cir. 1982). Although application of
the diligence-discovery rule is generally limited to medical
malpractice cases, it "may be appropriate in non-malpractice

---

[11] Although plaintiffs make no allegation of concealment in their
complaint, in their memorandum of law they allege that because Crédit Lyonnais
"continues to deny its role in aiding and abetting the acts of international
terrorism that injured [p]laintiffs Crédit Lyonnais has 'concealed' its
identity and involvement in these acts." However, even assuming that a refusal
to admit liability could operate to toll a statute of limitations, in the
present case, Crédit Lyonnais' refusal to admit liability stems from its
contention that its actions were not illegal, not a contention that those
actions never occurred. Accordingly, its refusal to admit liability does not
constitute a concealment of its identity or of its actions in regard to CBSP.

cases where plaintiffs face comparable problems in discerning the fact and cause of their injuries." However, in order to be entitled to a tolling on this basis plaintiffs must show that diligence would not have disclosed the defendant's role. *Guccione v. United States*, 670 F. Supp. 527, 537 (S.D.N.Y. 1987). In the present case plaintiffs have not explained why they could not have discovered the defendant's identity within the 4-year statute of limitations period, except to state conclusorily in their memorandum of law that, "[p]laintiffs' claims in this case are based on acts of international terrorism that were supported by a vast financial services network, provided by a number of banks, including Crédit Lyonnais, that was largely hidden and unknown to those in the Western World." Pl. Reply Br. 49. Plaintiffs were clearly aware shortly after being injured that HAMAS was responsible for the attacks which injured them, since after the attacks HAMAS either took responsibility or the identity of the individual HAMAS agent responsible for perpetrating the attacks was discovered. As plaintiffs themselves have alleged, evidence of CBSP, the Jenin Charity Committee, the Tulkarem Charity Committee, Al-Isla, and the Orphan Care Society's funding of HAMAS was available as early as 1997 when the Israeli government designated the first of these groups as a terrorist organization on the basis of its financial support for HAMAS. With due diligence there is no reason plaintiffs could not

have discovered where these organizations maintained bank
accounts. Moreover, plaintiffs have not explained why they
discovered the information necessary to sue within the statute of
limitations for attacks Eleven, Twelve, and Thirteen, but did
discover this information in time to bring suit for the First
through Tenth Attacks. Because, even if diligence-discovery
tolling is applicable in this case, plaintiffs have not made a
showing that they could not have discovered the identity of the
defendant within the prescribed period, the statute of
limitations is not tolled.[12]

*FIRST CLAIM*

In the first claim plaintiffs allege that Crédit Lyonnais
aided and abetted the murder or serious bodily injury of U.S.
nationals in violation of 18 U.S.C. §2332 by its provision of
services to CBSP.

---

[12] Plaintiffs' rely on *Liuzzo v. United States*, 485 F. Supp 1274
(E.D.Mich 1980) in which the statute of limitations was tolled, and the
children of a civil rights worker murdered by the Ku Klux Klan, was allowed to
bring suit against the government after the FBI's role in her murder was
disclosed. However, in that case it was clear that the plaintiffs could not
have discovered the role of the government through due diligence. In that
case, at the time of the murder, then President Johnson spoke on national
television confirming that all of the Ku Klux Klan member involved had been
arrested due to the diligence of the FBI agents. Accordingly, plaintiffs had
no reason to suspect, nor could they have discovered, that FBI agents were in
fact involved in the murder. In contrast, in the present case, plaintiffs have
offered no reason why they did not suspect that terrorist funds might be
passed through banks, nor why they could not have, with due diligence
discovered which banks were maintaining accounts for these terrorists.

Defendant argues that no aiding and abetting liability exists under 2333(a). In support of that argument, defendant cites the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 166 (1994) for the proposition that absent explicit statutory language there is no implied aiding and abetting liability. Plaintiffs, however, point to the Seventh Circuit's decision in *Boim*, 291 F.3d at 1018-21, and the opinion of Judge Gershon in *Linde*, 384 F.Supp. 2d at 583 (adopting the *Boim* reasoning and its conclusion) distinguishing *Central Bank* and holding that aiding and abetting liability is available under 2333(a).[13] However, I need not resolve the parties dispute over whether there is aiding and abetting liability under 2333(a), because, as discussed below, even assuming there is aiding and abetting liability plaintiffs have not alleged sufficient facts to support an aiding and abetting claim.

---

[13] As the *Boim* court explained:

The *Central Bank* analysis provides guidance but is not determinative here for a number of reasons. First, *Central Bank* addressed extending aiding and abetting liability to an implied right of action, not an express right of action as we have here in section 2333. Second, Congress expressed an intent in the terms and history of section 2333 to import general tort law principles, and those principles include aiding and abetting liability. Third, Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of terrorism cases, and criminal liability attaches to aiders and abettors of terrorism. *see* 18 U.S.C. §2. Fourth, failing to extend section 2333 liability to aiders and abettors is contrary to Congress's stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation.

The Restatement (Second) of Torts §876(b) provides that, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." The maintenance of a bank account and the receipt or transfer of funds does not constitute substantial assistance. See, *Williams v. Bank Leumi Trust Company*, 1997 WL 289865, *5 (S.D.N.Y. 1997)("the mere fact that all the participants in the alleged scheme used account at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability); *Renner v. Chase Manhattan Bank*, 2000 WL 781081, *12 (S.D.N.Y. 2000)(same); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., 1999 WL 558141,* *8 (S.D.N.Y. 1999)(repeated execution of wire transfers for millions of dollars did not constitute substantial assistance); *Ryan v. Hunton & Williams*, 2000 WL 1375265, *9 (E.D.N.Y. 2000)("The affirmative acts of opening accounts, approving various transfers and then clsoing the accounts . . . do not constitute substantial assistance," notwithstanding allegation that bank was on notice as a result of various red flags); *Dickens v. Chemical Bank*, 573 F.Supp 1129, 1132 (S.D.N.Y. 1983)("the simple act of maintaining a checking account" does not constitute substantial assistance). Thus, for

example, in *In re Terrorist Attacks on Sept. 11, 2001*, 349
F.Supp.2d at 833, the court "found no basis" under 2333(a) aiding
and abetting liability "for injuries funded by money passing
through [a bank] on routine banking business." Because the sum
total of plaintiffs' allegations concerning defendant's
substantial assistance to terrorists consists of allegations that
defendant knowingly maintained accounts for CBSP and knowingly
transferred money to HAMAS-controlled entities, plaintiffs have
not alleged sufficient facts to sustain an aiding and abetting
claim. The first claim is accordingly dismissed with leave to
amend within thirty days.

*SECOND CLAIM*

In claim two plaintiffs allege that Crédit Lyonnais
knowingly provided material support or resources to a FTO in
violation of 18 U.S.C. §2339(B)(a)(1). Crédit Lyonnais argues
that this claim must be dismissed because plaintiffs have not
sufficiently alleged (1) that the support was provided *directly*
to an FTO; (2) that the support was *material;* or (3) that Crédit
Lyonnais provided support *knowingly*.

*Requirement that Support be Direct*

Crédit Lyonnais argues that plaintiffs' claims under 2339B
must be dismissed because plaintiffs have failed to adequately

allege that Crédit Lyonnais provided material support *directly* to

an FTO, but rather have alleged only that it provided material

support to organizations with alleged ties to the FTO HAMAS.

In *National Council of Resistance of Iran v. Department of

State*, 251 F.3d 192, 200 (D.C.Cir. 2001), the DC Circuit

explained that an organization could not escape FTO status merely

by adopting an alias. Using the mathematical metaphor of the

transitive property, the court explained that, "[l]ogically,

indeed mathematically, if A equals B and B equals C, it follows

that A equals C. If the NCRI is the [MEK] and the [MEK] is a

foreign terrorist organization, then the NCRI is a foreign

terrorist organization also." Thereafter, in *National Council of

Resistance of Iran v. Department of State II,* 373 F.3d 152 (D.C.

Cir. 2004) the D.C. Circuit clarified that the transfer of FTO

status from one organization to another is not limited by the

transitive property. The court explained:

> Just as it is silly to suppose "that Congress empowered
> the Secretary to designate a terrorist organization . .
> . only for such periods of time as it took such
> organization to give itself a new name, and then let it
> happily resume the same status it would have enjoyed
> had it never been designated" NCRI, 251 F. 3d at 200,
> so too is it implausible to think that Congress
> permitted the Secretary to designate an FTO to cut off
> its support in and from the United States, but did not
> authorize the Secretary to prevent that FTO from
> marshaling all the same support via juridically
> separate agents subject to its control. For instance,
> under NCRI's conception, the Government could designate
> XYZ organization as an FTO in an effort to block United
> States support to that organization, but could not,
> without a separate FTO designation, ban the transfer of

> material support to XYZ's fund-raising affiliate, FTO
> Fundraiser, Inc. The crabbed view of alias status
> advanced by NCRI is at war not only with the
> antiterrorism objective of AEDPA, but common sense as
> well.

*Id.* at 157-158. Thus, the Court held that "ordinary principles of agency law are fairly encompassed by the alias concept under AEDPA," *Id. at 157,* and that "the requisite relationship for alias status is established at least when one organization so dominates and controls another that the latter can no longer be considered meaningfully independent from the former." *Id.* at 158. Factors to be considered include whether the organizations share leadership, *Id.* at 159, whether they commingle finances, publications, offices, etc. *Id.,* and whether one operates as a division of the other. *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 403 (2960).

In the present case, plaintiffs allege that Crédit Lyonnais provides financial services to various institutions, including the Orphan Care Society, Al-Islah, the Ramallah Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, the Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Charitable Society in the Gaza Strip, Al-Salah Society and the Muslim Youth Association of Hebron. Plaintiffs allege that these are "HAMAS controlled entities." see e.g. Compl. ¶531, 532. More specifically, the plaintiffs allege that the Jenin Charity Committee, Tulkarem Charity Committee, and

Ramallah committees are controlled by HAMAS agents and collect

and distribute their funds on behalf of HAMAS by paying expenses

for and assisting with the provision of housing subsides to the

families of suicide bombers recruited by HAMAS. Thus, the

plaintiffs have adequately alleged that these various charitable

committees are agents of HAMAS because plaintiffs have alleged

that the committees are  controlled by HAMAS, share leadership

with HAMAS, and have as their purpose the support of HAMAS.

Accordingly, plaintiffs have adequately alleged that support

provided to these organizations is support provided to an FTO.

*Requirement that Support be Material*

Liability under §2339B requires that the support or

resources provided to the FTO be "material." Material support or

resources is in turn defined by Section 2338A(b) as:

> any property, tangible or intangible, or service,
> including currency or monetary instruments or financial
> securities, *financial services*, lodging, training,
> expert advice or assistance, safe houses, false
> documentation or identification, communications
> equipment, facilities, weapons, lethal substances,
> explosives, personnel . . ., and transportation, except
> medicine or religious materials. [18 U.S.C.
> §2339B(g)(4) (incorporating the definition of material
> support or resources used in Section
> 2339A(b))](emphasis added).

Crédit Lyonnais argues that the term "financial services"

does not encompass what it calls "routine banking services" such

as opening and maintaining bank accounts, collecting funds, and

transmitting funds. Where, as here, a statute does not define a

relevant term, a court looks to its ordinary meaning. *see e.g.*
*Rousey v. Jacoway*, 125 U.S. 1561, 1562 (2005). Where a term has
no one unambiguous meaning a court next looks to evidence of
congressional intent such as legislative history and the
structure of the statute in question. No legislative history
specifically discusses the meaning of the term "financial
services."

Defendant argues that Congress's enactment of the reporting
provisions in Section 2339B(a)(2) and the civil penalty
provisions in Section 2339B(b) indicate that Congress could not
have intended to make a bank's merely maintaining of a customer
account or providing other basic banking services grounds for a
"material support" criminal prosecution or civil liability under
Section 2333(a).

Section 2339B(a)(2) requires that

Except as authorized by the Secretary, any financial
institution that becomes aware that it has possession
of, or control over, any funds in which a foreign
terrorist organization, or its agent, has an interest,
shall – (A) retain possession of, or maintain control
over such funds; and (B) report to the Secretary the
existence of such funds in accordance with regulations
issued by the Secretary.

Section 2339B(b) provides civil liability for the failure to
maintain possession of such funds or for failure to report the
existence of such funds:

Any financial institution that knowingly fails to
comply with subsection (a)(2) shall be subject to a
civil penalty in an amount that is the greater of – (A)

> $50,000 per violation; or (B) twice the amount of which
> the financial institution was required under subsection
> (a)(2) to retain possession or control.

Defendant argues that Congress would not have created civil
liability for the reporting provisions if the mere maintenance of
accounts and provision of basic banking services was a criminal
violation of 2339B(a)(1), since the two statutes would be
duplicative. However, while Congress could well have intended
that a bank in possession of FTO funds have not only an
obligation to freeze and report the funds (under threat of civil
liability), but also to create criminal and civil liability for
banks that are providing basic banking services to FTOs.
Accordingly, the mere existence of the reporting provision and
its accompanying civil liability does not determine the meaning
of the term "financial services."

Crédit Lyonnais further argues that the case law of this
Circuit dictates that basic banking services such as account
maintenance be excluded from the definition of financial
services. Crédit Lyonnais argues that in *In re Terrorist Attacks
on September 11, 2001*, 349 F.Supp.2d 765 (S.D.N.Y.), *on
reconsideration in part*, 392 F.Supp.2d 539 (S.D.N.Y. 2005), the
court found that allegations that the banking defendants raised,
facilitated and transferred money to terrorist organizations and
maintained accounts for terrorist organizations did not qualify
as "material support" because "there exists no basis for a bank's

liability for injuries funded by money passing through it on
routine banking business." *Id.* at 833. However, defendant
misreads the *Terrorist Attacks* decision. The court relied on the
routine nature of the banking services to conclude that the
defendant bank had no knowledge of the client's terrorist
activities, not that the provision of banking services knowingly
to fund terrorist activities was permissible. *Id.* at 835
("Providing routine banking services, *without having knowledge* of
the terrorist activities, cannot subject Arab Bank to
liability")(emphasis added); *Linde v. Arab Bank*, 384 F.Supp 2d
571, 587-588 (E.D.N.Y. 2005)("given plaintiff's allegations
regarding the knowing and intentional nature of the Bank's
activities there is nothing 'routine' about the services the Bank
is alleged to provide"). By contrast where "the Bank knows that
the groups to which it provides services are engaged in terrorist
activities" even the provision of basic banking services may
qualify as material support." *Id.*, 384 F.Supp. 2d at 588.

*Requirement that Support be Provided Knowingly*

Finally, Crédit Lyonnais argues that plaintiffs have not,
and cannot allege that its alleged provision of material support
to an FTO was done *knowingly*, as required by Section 2339B.
Defendant argues that under 2339B a defendant has knowingly
provided material support only if it *knew* of the terrorist

activities and *intended* to further them. Crédit Lyonnais relies largely on a Florida district court's decision in *United States v. Al-Arian*, 308 F.Supp. 2d 1322 (M.D.Fla. 2004) for this proposition. However, that decision departs from the preponderance of existing authority and I do not find it persuasive. *U.S. v. Paracha*, 2006 WL 12768 (S.D.N.Y. 2006); *Linde,* 384 F.Supp.2d at 571; *U.S. v. Sattar*, 314 F.Supp.2d 279 (S.D.N.Y. 2004); *U.S. v. Hammoud*, 381 F.3d 316, 328 (4ᵗʰ Cir. 2004); *Humanitarian Law Project v. U.S. Dep't of Justice*, 352 F.3d 382, 404-405 (9ᵗʰ Cir. 2003), *reh'g en banc granted*, 382 F.3d 1154 (9ᵗʰ Cir. 2004); *U.S. v. Marzook*, 383 F.Supp.2d 1056 (N.D.Ill. 2005).

The requirement added by the Florida court that the defendant have specifically intended to further terrorist activities finds no basis in the statute's language. The statute requires only that the defendant "knowingly provide material support or resources to a foreign terrorist organization" and makes no mention of an intent to further the organization's goals. 18 U.S.C. § 2339B.

Moreover, such a reading is contrary to Congress's intent. When Congress enacted section 2339B, section 2339A already prohibited the act of providing material support or resources to further illegal terrorist activities when done by an individual "knowing or intending that they are to be used in preparation

for, or in carrying out" enumerated terrorist activities. See
Violent Crime Control and Law Enforcement Act of 1994, Pub.L.
103-322, §120005(a), 108 Stat.2022 (Sept. 13, 2004). Thus,
Congress's choice to omit the word "intending" from 2339B, while
using it in 2339A demonstrates that it did not intend that 2339B
to include an intent requirement. *Paracha*, 2006 WL 12768; see
also, *Securities Industry Ass'n v. Board of Governors of Federal
Reserve System,* 716 F.2d 92, 96 (2d Cir. 1983)(quoting *FTC v. Sun
Oil Co.*, 371 U.S. 505, 514-15 (1963) (terms carefully employed by
Congress in one place, and excluded in another, should not be
implied where excluded)).

This reading of Section 2339B is also supported by its
legislative history which shows that the provision was enacted in
response to Congress's concern that terrorist organizations could
raise funds "under the cloak of a humanitarian or charitable
exercise," and accordingly was meant to "severely restrict the
ability of terrorist organizations to raise much needed funds for
their terrorist acts within the United States." H.R. Rep. 104-
393, at 43 (1995). Because "Congress determined that foreign
organizations that engage in terrorist activity are so tainted by
their criminal conduct that any contribution to such an
organization facilitates that conduct . . . Congress was
compelled to attach liability to all donations to foreign
terrorist organizations" regardless of the giver's intent. *Boim*,

291 F.3d at 1027 (7th Cir. 2002). Thus, "[r]eading in this
additional requirement, as defendant urges . . . would contravene
the fundamental concepts of statutory construction." *Marzook*, 383
F. Supp. 2d at 1070.

In all events, Congress rejected the *Al-Arian* reading of
2339B when it amended 2339B in 2004 to include the statement
that, "[t]o violate this paragraph a person must have knowledge
that the organization is a designated terrorist organization . .
. or that the organization has engaged in or engages in terrorist
activity . . or terrorism. Pub.L. 108-458, § 6603(c). Although,
this case concerns the pre-2004 version of 2339B, the amendment
was not intended to change the knowledge standard under 2339B,
but was only intended to clarify the standard which Congress had
always intended to apply. *Linde*, 384 F.Supp.2d at 587, n. 10
(Congress's 2004 amendment did not change the statute from one
requiring specific intent to one no longer requiring specific
intent, but only clarified the mens rea requirement);
*Humanitarian Law Project v. Gonzales*, 380 F.Supp.2d 114, 1147
(C.D. Cal. 2005).

Defendant argues however that plaintiffs' claims must be
dismissed even if 2339B requires only that defendant have known
that it was providing support to an FTO or to a terrorist
organization. Defendant argues that the designations for various
governments of CBSP, the Jenin Charity Committee, the Tulkarem

Charity Committee, the Orphan Care Society and Al-Islah as terrorist organizations, news reports to that effect, investigations of CBSP by the French government and Crédit Lyonnais' press releases concerning CBSP do not suffice to show that the bank knew of the terrorist designations. Defendant argues that it had no reason to know of the designations because they were made by the government of Israel or because the designations occurred after the bank engaged in the relevant financial services.[14] Furthermore, defendant argues that the referenced French investigations did not find CBSP to be a terrorist organization and the press releases indicated that Credit Lyonnais was concerned about money laundering by CBSP, not terrorism.

Crédit Lyonnaiss provided financial services to five organizations which plaintiffs allege it knew and had reason to know were terrorist groups: CBSP, the Jenin Charity Committee, the Tulkarem Charity Committee, the Orphan Care Society and Al-Islah. Plaintiffs allege that Crédit Lyonnais had knowledge of these groups terrorist activities because in 1997 the Israeli government designated CBSP an unlawful organization because of its support of HAMAS, in 2002 designated the Jenin Charity

_____

[14] Defendant is correct that designations of organizations as terrorist groups which occurred after the relevant bank transfers cannot demonstrate that Crédit Lyonnais had knowledge of the group's terrorist identity when it provided material support to an FTO. Accordingly, those designations are not discussed here.

Committee, the Tulkarem Charity Committee, and Al-Islah unlawful organizations because of their support for HAMAS, and outlawed the Orphan Care Society.

Defendant contends that there is no evidence that it knew of these Israeli designations. Plaintiffs argue convincingly however, that drawing all inferences from the factual allegations of the complaint and the document attached to it in their favor, it is reasonable to believe that when the bank noticed "unusual activity" on CBSP's accounts in 2000, in the form of large transfers of money to the West Bank and Gaza strip during a highly publicized Intifada, the bank would have investigated the organizations receiving the large transfers, including designations of terrorist organizations made by the government whose country was experiencing the terrorism. The bank's arguement however, that it was suspicious that CBSP was engaged in money laundering and not in terrorism, and accordingly, had no reason to investigate CBSP's terrorist connections. It notes a French newspaper article from January 2006 which reports that the suspicious activity noticed by the bank was "very large movements related to the nature of the association were noted" in the form of "more frequent payments and higher amounts" and that, accordingly, the bank referred the matter to the Tracfin, a French unit responsible for "fighting [both] money laundering and the financing of terrorism." Def. Ex. D. Defendant offers no

reason why the Court should, at this stage, consider this extrinsic document which is not mentioned in nor attached to the complaint. In any event, the article does not rule out the competing inference that upon discovering suspicious banking activity the bank would have investigated the recipients of the suspicious transfers and upon discovering that they were located in the West Bank and Gaza would have discovered their terrorist connections. Indeed, money laundering and terrorism are often linked as evidenced by the fact that the Tracfin is responsible for fighting both.

Moreover one might reasonably infer that the public investigations of CBSP in 2002, 2002, and 2003, and the press discussions of those articles might have induced the bank to investigate its customer, or at least, upon noticing suspicious activity in CBSP's account to suspect that it might be terrorist related activity. Defendant argues that it could not have knowledge of CBSP's terrorist activity because although it was thrice investigated by the French government it was never found to be a terrorist organization by the French government. However, the French government's standards for designating terrorist organizations may be different from those of the United States. Indeed, although the United States designated CBSP a SDGT in 2003, the French Government, at least as of January 2006 had not designated CBSP a terrorist organization. Accordingly, the fact

that the French government has not found CBSP to be a terrorist organization is not dispositive of the question whether the bank knew that CBSP was a terrorist organization under the standards of this country.

*THIRD CLAIM*

In their third claim plaintiffs allege that defendant "unlawfully and willfully provide[d] or collecte[d] funds with the intention that such funds be used or with the knowledge that such funds are to be used, in full or in part," in order to carry out a terrorist act. 18 U.S.C. §2339C. Defendant argues that this claim must be dismissed because (1) routine banking does not constitute providing or collecting funds and (2) plaintiffs have not sufficiently alleged the defendant acted *knowingly* and *intentionally*.

*Meaning of Providing and Collecting Funds*

Section 2339C prohibits providing or collecting funds for terrorist organizations. Defendant argues that the statutory terms "provide" and "collect" cannot encompass Crédit Lyonnais's maintenance of bank accounts, and processing of deposits and withdrawals but requires active donations to terrorist organizations or active fund-raising on behalf of a terrorist organization.

The statute defines "providing" to include "giving, donating and transmitting" and "collecting" to include both "raising and receiving." 18 U.S.C. §2339C(e)(4), (5). Defendant points to the rule of *noscitur a sociis* – loosely paraphrased as a word is known by the company it keeps, as mandating that a list of words may reveal a more narrow intended meaning for each word than might apply to each word considered in isolation. *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003). Applying this rule, defendant argues that because "transmit" is grouped with "give" and "donate," it must be understood as having a similar charitable meaning."[15] Similarly, defendant argues that "receive" must be understood to have the same meaning as "raise." Pointing to the Merriam-Webster definition of "raise" as "to get together for a purpose," defendant argues that liability under Section 2339C exists only when an entity "actively raises funds." *Merriam-Webster Online, http://www.m-w.com*.

However, the *noscitur a sociis* rule is "intended to prevent ascribing to one word a meaning so expansive that it conflicts with other terms of the provision. " *Dolan v. U.S. Postal Service*, 126 S.Ct. 1252, *1262 (U.S. 2006). It "does not require [the Court] to construe every term in a series narrowly because

---

[15] Defendant cites the Merriam-Webster dictionary as defining "give" as "to make a present of" and "donate" as "to make a gift of." *Merriam-Webster Online, http://www.m-w.com*

of the meaning given to just one of the terms," where, as here, nothing in the text demands a more limited construction. *Id.* at 1262 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 586 (1995) (Thomas, J. dissenting)). Thus, the rule cannot be applied to eviscerate the meaning of a statutory term. A separate rule of statutory interpretation mandates that "distinct words have distinct meanings" such that "all of the words used in a legislative act are to be given force and meaning" *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 355 (2005)(citations omitted); *U.S. v. Roberts*, 2006 WL 751879, *3 (2d Cir. 2006). The interpretation urged by defendant would render the terms "transmit" and "receive" meaningless because it would give those words identical meanings to other words already present in the statute. According to the Merriam-Webster definition to "receive" is "to come into possession of; to act as a receptacle or container for." *Merriam-Webster Online, http://www.m-w.com.* Accordingly, it includes not only actively collecting funds but also passively receiving them. Similarly, "transmit" must mean more than merely to give or donate. Merriam Webster defines "transmit" as "to send or convey from one person or place to another." *Merriam-Webster Online, http://www.m-w.com.* By transferring funds from CBSP to the Jenin Charity Committee, the Tulkarem Charity Committee, Al-Islah, and the Orphan Care Society, Crédit Lyonnais conveyed the funds from one

organization to another, and indeed, one place to another. Thus, the term "transmit" encompasses the passing on of funds.

Defendant also argues that the legislative history of 2339C substantiates the conclusion that it is not directed at the routine operation of bank deposit accounts or other basic banking services, but is focused on preventing the collecting or raising of money for terrorist purposes. H.R.Rep. No. 107-307, at 6-7 (2001); 147 Cong. Rec. E2397 (daily ed. Dec. 19, 2001) § 2339C "implements the International Convention for the Suppression of the Financing of Terrorism, which requires signatories to prosecute or extradite people who contribute to, or collect money for, terrorist, groups"); *Implementation of the International Convention for the Suppression of Terrorist Bombings and the International Convention for the Suppression of the Financing of Terrorism; Hearing on H.R. 3275 Before the Subcomm. On Crime of the H.Comm. on the Judiciary*, 107th Cong. 10 (2001), (statement of Samuel M. Witten, Acting Deputy Legal Adviser, Dep't of State)("the convention will obligate States to criminalize conduct related to the raising of money and other assets to support terrorist activities). While the referenced legislative history does focus on the activities of the most important participants in terrorist fund-raising, this focus on the worst offenders does not indicate that Congress meant to limit the plain meaning of 2339C to such offenders. Although the

legislative history focuses on active solicitation of funds, Congress ultimately enacted the statute with the broader "transmit" and "receive" language, indicating an intent to create far reaching liability.

The sole New York district court judge apart from the undersigned to consider this issue found that allegations, like the ones here, that a bank received funds as deposits and transmitted funds to terrorist organizations sufficient to create liability under § 2339C. *Linde*, 384 F.Supp. 2d at 588 (holding that "the banking activities of receiving deposits and transmitting funds between accounts" where the "the accounts (and funds) belong to groups engaged in terrorist activity" or are "charity fronts that operate as agents of HAMAS" creates liability under § 2339C).

*Meaning of Knowing and Intentional*

Defendant argues that § 2339C, like § 2339B requires that a defendant have acted both with knowledge of an organization's terrorist purpose and intent to further that cause. However, because the statute on its face allows for liability where a defendant provides or collects funds "with the intention that such funds be used *or* with the knowledge that such funds are to be used for terrorist purposes" it is not necessary for plaintiffs to allege that defendant intended to transmit or

receive the funds for terrorist purposes. 18 U.S.C. §2339C (emphasis added); *Linde,* 384 F.Supp.2d at 586, n. 9("2339C only require[s] knowledge or intent that the resources given to terrorists are to be used in the commission of terrorist acts," but not "the specific intent to aid or encourage the particular attacks that injured plaintiffs."); *but see, Boim v. Quranic Literacy Inst. & Holy Land Foundation*, 291 F.3d 1000, 1023-24 (7th Cir. 2002).

Defendant argues that even under a knowledge requirement, plaintiff cannot show that defendant knew of any terrorist purposes. For the reasons set forth in the discussion of liability under Section 2339B, plaintiffs have sufficiently alleged that defendant knew of the Jenin Charity Committee, Tulkarem Charity Committee, CBSP, the Orphan Care Society and Al-Islah's terrorists purposes.


*PROXIMATE CAUSE*

Section 2333(a), under which all of plaintiffs' claims are brought provides for recovery by individuals injured "by reason of" international terrorism. Defendant correctly argues that principles of statutory interpretation demand that this language be read as requiring plaintiffs to show that defendant's actions were the proximate cause of plaintiffs' injuries. Because courts had previously interpreted the phrase "by reason of" to require

proximate cause, and Congress must be presumed to "know[] the interpretation federal courts had given the words earlier Congresses had used," in using the words "by reason of" Congress must have "intended them to have the same meaning that courts had already given them." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

A showing of proximate cause requires plaintiffs to demonstrate that defendant's actions were "a substantial factor in the sequence of responsible causation," and that the injury was "reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003). Defendant argues that plaintiffs cannot prevail merely by showing that defendant provided material assistance or funding to the terrorist organization responsible for perpetrating the attacks which injured the plaintiffs but must demonstrate, for example, that the funds supplied by the defendant were used to buy the specific weapons and train the specific men who killed or injured the plaintiffs.

Taking into account the legislative history of these statutes and the purpose behind them, however, it is clear that proximate cause may be established by a showing only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries. Congress intended these provisions to impose, "liability at any

point along the causal chain of terrorism." S. Rep. No. 102-342 at 22. In enacting the material support statute Congress made an express finding of fact that, "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-32, §301(a)(7), 110 Stat. 1214, 1247 (1996). As the Ninth Circuit has noted, "money is fungible; giving support intended to aid an organization's peaceful activities free up resources that can be used for terrorist acts. *Humanitarian Law Project v. Reno,* 205 F.3d at 1136.

Because money is fungible, it is not generally possible to say that a particular dollar caused a particular act or paid for a particular gun. If plaintiffs were required to make such a showing, 2333(a) enforcement would be difficult that the stated purpose would be eviscerated. Rather, where the provision of funds to a terrorist organization is a substantial factor in carrying out terrorist acts, it is thus the proximate cause of the terrorist attacks engaged in the organization. *Linde*, 384 F.Supp.2d at 585 (holding that in order to prevail on claims under 2333(a) it was sufficient for plaintiffs to show that "the

Bank provided these services to the particular group responsible for the attacks giving rise to their injuries.").[16]

*PRINCIPLES OF INTERNATIONAL COMITY*

Defendant argues that international comity, "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation," *Hilton v. Guyot*, 159 U.S. 113, 163 (1895) requires that liability not be imposed on a French bank for maintaining a customer who has been repeatedly investigated by the French government and never found to be a terrorist organization. However, defendant has pointed to no case law, nor can this Court find any, which holds that an American Court must decline to apply the laws of this country to a defendant over which the court has jurisdiction because the laws of the defendant's own country are more lenient. If the laws of the United States and the French laws were in "true conflict," in other words, if it was impossible to comply with the laws of both, then this Court would engage in a balancing analysis which would consider whether the French interests outweigh Congress's

---

[16] Defendant argues that "the fact that practically the same group of plaintiffs had filed a separate lawsuit in this Court to recover treble damages for injuries arising from many of the same terrorist attacks, against National Westminster Bank . . . underscores plaintiffs' inability to plead that CL's [Crédit Lyonnais'] conduct was the proximate cause of their injury." Def. Br. 44. However, "it is fundamental that there may be more than one proximate cause of an injury." *Moore v. M.P. Howlett, Inc.*, 704 F.2d 39, *43 (2d Cir. 1983). Accordingly, the fact that many of the plaintiffs in this case have alleged that National Westminster Bank proximately caused their injuries, does not prevent the plaintiffs from also alleging that Crédit Lyonnais did so as well.

interest in enacting the laws at issue here. *In re Maxwell Communications Corp.*, 93 F.3d 1036, 1049-50 (2d Cir. 1996). In the present case, the laws of the United States and of France are not in conflict. Although French Law does not require that Crédit Lyonnais cease to provide banking services to CBSP or that it cease transactions with the Orphan Care Soceity, Al-Islah, the Jenin Charity Committee and the Tulkarem Charity Committee, it also does not mandate that Crédit Lyonnais continue providing such services. Accordingly, Crédit Lyonnais is free, and indeed obligated, to follow the more stringent American law.

<u>CONCLUSION</u>

For the reasons set forth above, defendant's motion to dismiss is granted as to the first claim, and denied as to the second and third claims.

The Clerk is directed to furnish a filed copy of the within to the parties and to the magistrate judge.

SO ORDERED.

Dated:    Brooklyn, New York
          October 5, 2006


                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                         United States District Judge