UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

MOSES STRAUSS, et al.,

                              Plaintiffs,

                                                      **MEMORANDUM**
        -against-                                     **AND ORDER**

CREDIT LYONNAIS, S.A.,                                06-CV-702 (CPS) (KAM)

                              Defendant.

------------------------------------------------------------------------ X

MATSUMOTO, United States Magistrate Judge:

          In the above-referenced action, referred to the undersigned for general pretrial

supervision pursuant to 28 U.S.C. § 636(b), plaintiffs, United States citizens, and several estates,

survivors and heirs of United States citizens, who are victims of terrorist attacks in Israel

allegedly perpetrated by the Islamic Resistance Movement ("HAMAS"),[1] allege that defendant

Credit Lyonnais, S.A. ("Credit Lyonnais") is civilly liable for damages pursuant to 18 U.S.C. §

2333(a) for: (1) aiding and abetting the murder, attempted murder, and serious bodily injury of

American nationals located outside the United States in violation of 18 U.S.C. § 2332; (2)

knowingly providing material support or resources to a foreign terrorist organization[2] in

───────────────

        [1] HAMAS is an acronym for "Harakat al-Muqawama al-Islammiyya," also known as
"The Islamic Resistance Movement." (Doc. no. 52, Amended Complaint, dated 11/6/06, at ¶ 1 n.
1.)

        [2] Pursuant to 8 U.S.C. § 1189, the Secretary of State may designate an organization a
foreign terrorist organization if:

        (a) the organization is a foreign organization;
        (b) the organization engages in terrorist activity or terrorism, or retains the capability and
        intent to engage in terrorist activity or terrorism;

violation of 18 U.S.C. § 2339B; and (3) financing acts of terrorism, in violation of 18 U.S.C. § 2339C. On October 5, 2006, Judge Sifton granted defendant's motion to dismiss the first claim, but denied its motion as to the second and third claims.[3]

Presently before the court are cross-motions to compel. On October 18, 2006, plaintiffs filed a Motion to Compel Responses to Their First Set of Interrogatories and Document Requests. (*See* doc. no. 49, Plaintiffs' Memorandum of Law in Support of Their Motion for an Order Overruling Objections and Compelling Further Responses to Plaintiff's First Set of Interrogatories and Document Requests, dated 10/18/06 ("Pls' Motion").) In response, Credit Lyonnais submitted a Memorandum of Law in Opposition to Plaintiffs' Motion, dated 11/16/06 ("Def's Opp."), Declaration of Jonathan I. Blackman, Esq. and Exhibits, Unreported Cases Cited in Defendant's Memorandum, and Expert Declaration of Chantal Cutajar and Exhibits. (*See* doc. no. 61.) In reply, plaintiffs submitted a Reply Memorandum of Law in Support of Their Motion to Compel, Declaration of Aaron Schlanger, Esq. and Exhibits, and Expert Declaration of Robert M. Chesney, Esq. and Exhibits. (*See* doc. no. 62.)

On October 18, 2006, Credit Lyonnais also filed a Motion to Compel Production of Documents and Answers to Its First Set of Interrogatories and Document Requests. (*See* doc. no. 63, Att. 1, Defendant's Memorandum of Law in Support of Credit Lyonnais S.A.'s Motion to Compel Production of Documents and Answers to Interrogatories, dated 10/18/06 ("Def's Motion").) In support of its motion, defendant also submitted Unreported Decisions Cited in

_____

(c) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

[3] *See Strauss v. Credit Lyonnais, S.A.*, No. CV-06-702, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006).

Memorandum of Law in Support of Defendant's Motion and a Declaration of Lawrence B.

Friedman, Esq. (*See* doc. no. 63.) In response, plaintiffs submitted a Memorandum of Law in

Opposition to Defendant's Motion to Compel (doc. no. 64, Plaintiff's Memorandum of Law in

Opposition, dated 11/16/06 ("Pls' Opp."), Atts. A and B). In reply, defendant filed a Reply

Memorandum of Law in Support of its Motion to Compel, Unreported Decisions Cited in Reply

Memorandum of Law and a Declaration of Jonathan I. Blackman, Esq. (*See* doc. no. 65.)

After considering the foregoing submissions and for the reasons set forth herein,

both motions are granted in part and denied in part.

BACKGROUND

Plaintiffs are individuals and estates, survivors and heirs of individuals who were

injured or killed in thirteen separate terrorist attacks, allegedly perpetrated by HAMAS in Israel

between March 28, 2002 and August 19, 2003.[4] (Doc. no. 52, Amended Complaint, dated

11/6/06 ("Am. Compl."), at ¶¶ 5-447.) Plaintiffs allege that Credit Lyonnais is a financial

institution incorporated and headquartered in France. (*Id.* at ¶ 1.) Plaintiffs further allege that

Credit Lyonnais "conducts business in the United States and maintains an office at 601 Brickell

Key Drive, Miami, Florida, 33131. Credit Lyonnais is registered with state banking authorities

in Florida, and its Miami office is listed as its registered address."[5] (*Id.* at ¶ 450.) Plaintiffs

---

[4] In the Amended Complaint, plaintiffs describe in detail the thirteen attacks and
plaintiffs' alleged injuries caused by those attacks. The court need not recite those allegations
for the purposes of deciding the instant motions.

[5] Although defendant has not asserted lack of personal jurisdiction as an affirmative
defense (*see* doc. no. 56, Answer to Amended Complaint, dated 12/4/06), defendant states in its
opposition to plaintiffs' motion to compel that Credit Lyonnais "does <u>not</u> conduct business in the

further allege that Credit Lyonnais maintains bank accounts in France for Le Comite de

Bienfaisance et de Secours aux Palestinians ("CBSP"), and that although CBSP describes itself

as a charitable organization, it is part of HAMAS's fundraising infrastructure and a member of

the Union of Good. (*See id.* at ¶ 490.) The Union of Good, plaintiffs maintain, is an

organization established by the Muslim Brotherhood and comprised of more than fifty Islamic

charitable organizations worldwide, and is a "principal fundraising mechanism for HAMAS."

(*Id.* at ¶¶ 473-475.)

Plaintiffs base their claims on section 2333(a) of the Antiterrorism Act of 1992

(the "ATA"), codified at 18 U.S.C. § 2331 *et seq.*, which provides civil remedies for United

States nationals injured in international terrorist attacks. Section 2333(a) states in relevant part:

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism, or
> his or her estate, survivors, or heirs, may sue therefor in any
> appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the costs of the suit,
> including attorney's fees.

18 U.S.C. § 2333(a).

"International terrorism," in turn, is defined by 18 U.S.C. § 2331(a) as activities

---

United States. . . ." (Def's Opp. at 23) (emphasis in original). Because defendant did not raise
lack of personal jurisdiction as an affirmative defense in its Answer, the court deems that defense
waived and, accordingly, will not consider the issue of personal jurisdiction in this decision. *See*
Fed. R. Civ. P. 12(h)(1). Moreover, Judge Sifton found:

> Defendant, Credit Lyonnais is a retail bank with its principal place of
> business in Paris, France. It conducts business in the United States and
> maintains an office in Miami, Florida.

*Strauss*, 2006 WL 2862704, at *3.

that:

> (a) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (b) appear to be intended –
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion;
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination or kidnaping; and
>
> (c) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

Title 18 U.S.C. § 2339B criminalizes support of formally designated terrorist organizations.  It provides, in relevant part, that:

> Whoever knowingly provides material support or resources[6] to a foreign terrorist organization, or attempts or conspires to do so, shall be fined . . . or imprisoned . . . or both . . . .  To violate this paragraph, a person must have knowledge that the organization is a designated

---

[6] "Material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism . . . .

18 U.S.C. § 2339B(a)(1).

Section 2339C, entitled "Prohibitions against the financing of terrorism," prohibits the financing of terrorists, provides in relevant part:

Whoever . . . by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out . . . [an] act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act, shall be punished . . . .

18 U.S.C. § 2339C(a)(1).

In addressing defendant's motion to dismiss in *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 613 (E.D.N.Y. 2006), and in the instant case, 2006 WL 2862704, at *1, Judge Sifton found that "[v]iolations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)." *See also Linde v. Arab Bank*, 384 F. Supp. 2d 571, 580-581 (E.D.N.Y. 2005) (finding that "plaintiffs have alleged that they were 'injured by reasons of an act of international terrorism,' as required by Section 2333(a)"); *Boim v. Quranic Literacy Institute and Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1014-1015 (7th Cir. 2002).

Plaintiffs allege that for more than thirteen years, defendant Credit Lyonnais "maintained an account for CBSP in Paris and provided HAMAS with material support in the form of financial services." (Am. Compl. at ¶ 529.) Plaintiffs further allege that, through

CBSP, Credit Lyonnais "has knowingly transferred significant sums of money to HAMAS-controlled entities" and "knowingly provided material support . . . to a designated FTO [Foreign Terrorist Organization], and has provided substantial assistance to HAMAS in the commission of acts of international terrorism in Israel, including the terrorist attacks that injured the plaintiffs."  (*Id.* at ¶¶ 532, 535.)  Accordingly, plaintiffs contend that Credit Lyonnais is civilly liable to them for damages pursuant to 18 U.S.C. § 2333(a), for providing "material support and resources" to a Specially Designated Global Terrorist ("SDGT") (in violation of § 2339B) and providing or collecting funds "with the knowledge that such funds are to be used" to support terrorism (in violation of § 2339C) (*Id.* at ¶¶ 543-556.)

## PLAINTIFFS' MOTION TO COMPEL

A.  Plaintiffs' Discovery Requests.

On June 30, 2006, plaintiffs served Credit Lyonnais with their First Request for the Production of Documents.  (*See* Plaintiffs' Document Requests, annexed to Pls' Motion as Exh. B.)  At issue are Document Requests Nos. 1-3, 11-13 and 15, in which plaintiffs request:

- No. 1:  All account records maintained by, or in the custody and control of Defendant that concern CBSP, including account opening records, bank statements, wire transactions, deposit slips and all correspondence between Defendant and CBSP.

- No. 2:  All documents and communications by or to Defendant concerning CBSP, including all internal reports and the contents of any internal investigations undertaken by Defendant that reference CBSP.

- No. 3:  All non-privileged documents and communications by or to the Defendant from or to banking regulatory authorities in the United States, the Republic of France, or the European Union . . . concerning CBSP and or accounts maintained by the Defendant on CBSP's behalf.

- No. 11:  All documents concerning Defendant's decision in January 2002 to close CBSP's accounts maintained by Credit Lyonnais including any documents that were the catalyst or basis of any decision to close or freeze said accounts.

- No. 12:  All documents concerning Defendant's actual closure in January 2002 of CBSP's accounts maintained by Credit Lyonnais including any documents that were the catalyst or basis of any decision to close or freeze said accounts.

- No. 13:  All documents concerning Credit Lyonnais's anti-money laundering efforts, "Know Your Customer" procedures, or other measures Credit Lyonnais used to prevent the rendering of financial services to Terrorists and Terrorist Organizations.

- No. 15:  Copies of all internal Credit Lyonnais documents related to the following subjects and/or departments: [enumerating departments and procedures for account opening, security, customer accounts, compliance, internal audits, bank secrecy and terror financing designations or warnings].

(*Id.*)

On July 5, 2006, plaintiffs served Credit Lyonnais with their First Set of Requests for Admissions and Related Interrogatories "regarding the authenticity of seven (7) documents that Plaintiffs . . . produced to the Bank."  (Pls' Motion at 6; *see also* Plaintiffs' Requests for Admissions and Interrogatories, annexed to Pls' Motion as Exh. A.)  Those documents, plaintiffs allege, "reflect transactions initiated by . . . CBSP" and "involve wire transfers to organizations identified by the United States Department of Justice as controlled by HAMAS, an."  (Pls' Motion at 6; *see also* Pls' Motion, Exhs. C1-7.)  Specifically, plaintiffs request that Credit Lyonnais either admit, deny, or set forth in detail the reasons why it is unable to either admit or deny, the truth of the following facts:

- No. 1: Each document is a record of regularly conducted business activity of the Bank within the meaning of Rule 803(6) of the Federal

Rules of Evidence.

- No. 2: Each document is an accurate reproduction of an original document that is maintained in your files.

- No. 3: The document accurately identifies an account or accounts of a customer or customers of defendant.

- No. 4: The document accurately sets forth the details of a transaction processed by defendant.

(*Id.* at Exh. A.)

In response, Credit Lyonnais objected to both plaintiffs' Document Requests and Requests for Admissions and Interrogatories on the grounds that, *inter alia*, the requests,

> seek the disclosure of commercial and financial information in violation of Article 1 bis of French law No. 68-678 ("Article 1 bis"), which prohibits such disclosure in connection with a foreign judicial proceeding, except pursuant to an enforceable international treaty or agreement. Under Article 1 bis, [Credit Lyonnais] would be exposed to liability under French law unless disclosure proceeds in accordance with the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), 23 U.S.T. 2555, TIAS 7444, 847 UNTS 231, to which France and the United States are parties. Such liability would be avoided by following Hague Convention procedures, which should therefore be followed here.

(*Id.* at Exh. D, ¶ 9.) In addition, Credit Lyonnais also objected to all discovery requests,

> to the extent they seek the disclosure of information and/or production of documents in violation of applicable French laws prohibiting the disclosure of information relating to a criminal investigation. The knowing disclosure of the existence and/or substance of a criminal investigation with the objective of adversely affecting criminal proceedings constitutes a criminal offense under French law and is sanctionable by imprisonment and substantial monetary penalties under Article L 434-7-2 of the French Criminal Code.

(*Id.* at Exh. D, ¶ 12.) As discussed herein, Articles 11 and L 434-7-2 of the French Criminal Code prohibit disclosure of information relating to a criminal investigation to persons "likely to

be involved as perpetrators, co-perpetrators, accomplices or receivers in the commission of these infractions . . . for the purpose of interfering with the progress of the investigations or the search for the truth . . . ." (Expert Declaration of Chantal Cutajar in Support of Credit Lyonnais's Opposition to Plaintiffs' Motion to Compel, dated 11/14/06 ("Cutajar Decl."), at ¶ 37; French Criminal Code Article 434-7-2, attached as Exh. 26 to the Cutajar Decl.)

Credit Lyonnais also objected to plaintiffs' discovery requests on the grounds that they "seek the disclosure of information in violation of applicable French bank customer secrecy obligations" and "applicable French anti-money laundering laws." (Def's Opp. at 4-5.) Credit Lyonnais further noted that failure to comply with the above regulations "constitutes a criminal offense under French law and is sanctionable by imprisonment and a substantial monetary penalty under Article 226-13 of the French Criminal Code." (*Id.*)

In order to avoid civil and criminal liability under these statutes, Credit Lyonnais twice "requested [CBSP] to release [Credit Lyonnais] from its secrecy obligations in order to permit disclosure of information in [Credit Lyonnais's] possession related to CBSP." (*Id.* at 4.) On July 20 and September 14, 2006, the bank's French counsel sent letters to CBSP's counsel, and has yet to receive any substantive response. (*See id.* at 5.) Instead, CBSP's counsel simply objected to disclosing correspondence between counsel for CBSP and counsel for Credit Lyonnais. (*See id.* at 6.) Credit Lyonnais has also sought the French government's guidance regarding plaintiffs' discovery demands by sending two letters and leaving one follow-up phone message with the French Ministry of Justice, but similarly has received no response. (*See id.*)

Plaintiffs now seek to compel Credit Lyonnais to respond to Document Requests 1-3, 11-13 and 15, and Requests for Admission and Related Interrogatories Nos. 1-4.

B.    Applicability Of French Civil And Criminal Laws.

      1.    Defendant gave adequate notice of the existence and applicability of French civil and criminal laws.

As a preliminary matter, the Court first addresses plaintiffs' contention that defendant failed to give adequate notice of its objection based on foreign law, and failed to demonstrate that the foreign law applies to the requested discovery.  (*See* Pls' Motion at 8-9.) Rule 44.1 of the Federal Rules of Civil Procedure provides, "A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice."  The party must "provide the opposing party with reasonable notice that an argument *will be raised*."  *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 585-86 (2d Cir. 2005) (emphasis added).  Once a discovery motion is made, the objecting party faces a higher burden "of demonstrating that such law *actually bars* the production or testimony at issue . . . ."  *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (emphasis added).  "In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law."  *Id.*  The party must describe, "*inter alia*, the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case."  *Rationis*, 426 F.3d at 586.

In this case, Credit Lyonnais gave sufficient notice of its argument that French civil and criminal laws apply to plaintiffs' requested discovery.  In its responses to both plaintiffs' Document Requests and Requests for Admissions and Related Interrogatories, Credit Lyonnais noted that "disclosure of commercial and financial information" would violate Article 1 bis of French law No. 68-678 (Pls' Motion, Exh. D at ¶ 9), French bank customer secrecy

regulations pursuant to Article L 511-33 of the French Monetary and Financial Code (*see id.* at ¶ 10), applicable French anti-money laundering laws (*see id.* at ¶ 11), and French laws prohibiting the disclosure of information relating to a criminal investigation (*see id.* at ¶ 12). Credit Lyonnais's objections to discovery constituted adequate written notice that it was invoking foreign law. *See Alfadda*, 149 F.R.D. at 34; *compare In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 209 (2d Cir. 2003) (holding that defendant had failed to comply with Rule 44.1 because defendant never raised the applicability of foreign laws during district court proceedings).

Furthermore, in its objection to plaintiffs' motion to compel, Credit Lyonnais adequately supported its position that "the discovery sought is indeed prohibited by foreign law." *Alfadda*, 149 F.R.D. at 34. In her expert declaration for Credit Lyonnais, Chantal Cutajar attaches translated portions of French law upon which Credit Lyonnais relies and explains:

> First, CREDIT LYONNAIS is subject to the obligations of bank secrecy under French law . . . . [A]bsent such a waiver [by its customer], CREDIT LYONNAIS is legally bound to maintain the confidentiality of customer information, and would be subject to criminal liability if it failed to do so. Second, CREDIT LYONNAIS is subject to obligations of professional confidentiality intended to protect the vital interests of France and to ensure the efficacy of the French legislative and regulatory procedures aimed at combating money laundering and the financing of terrorism . . . . Third, persons in France who provide to French legal authorities information regarding preliminary criminal investigations are also subject to obligations of professional confidentiality, and are subject to criminal penalties if they violate those obligations.

(Cutajar Decl. at ¶ 7.) Cutajar continues, "If CREDIT LYONNAIS fails to observe bank secrecy, it is liable to three types of sanctions, all of which may be inflicted concurrently: sanctions of a criminal nature (1), of a disciplinary nature (2) and of a civil nature (3)." (*Id.* at ¶

14.)

Here, plaintiffs, in part, seek precisely the sort of information protected by French bank secrecy obligations, anti-money laundering and anti-terrorism laws, and information related to criminal investigations: *e.g.*, admissions regarding the authenticity of wire transfer and other account records and, *inter alia*, "[a]ll non-privileged documents and communications by or to the Defendant from or to banking regulatory authorities in the United States, the Republic of France, or the European Union . . . concerning CBSP and/or accounts maintained by the Defendant on CBSP's behalf." (Pls' Motion, Exh. B, Request No. 3.) Credit Lyonnais has met both its burden of placing plaintiffs on notice of its objection based on French law, and demonstrating that the foreign law applies to at least some of the requested discovery.

2. <u>French civil and criminal laws are not rendered inapplicable by plaintiffs' possession of documents and information in the United States.</u>

Plaintiffs argue unavailingly that French bank secrecy obligations do not apply to Credit Lyonnais documents already in plaintiffs' possession and located in the United States. (*See* Pls' Motion at 10-11.) Plaintiffs rely on *In re Lernout & Hausie Sec. Litig.*, 218 F.R.D. 348 (D. Mass. 2003), *adopted and amended to correct clerical error*, 2004 WL 3217802 (D. Mass. July 2, 2004), for the proposition that once a party has seen the documents at issue, the producing party can no longer withhold those documents on grounds of foreign confidentiality law. In *Lernout*, plaintiffs brought suit against KPMG-B, a Belgian entity, in the United States. *See id.* at 349. During the United States litigation, plaintiffs also became civil claimants in separate criminal proceedings against KPMG-B pending in Belgium. *See id.* at 350. As part of the criminal case, Belgian prosecutors gave plaintiffs access to workpapers for the years 1998-2001, a subset of the documents plaintiffs were seeking in their U.S. litigation. *See id.* Plaintiffs

were allowed to review the workpapers, but were not allowed to copy them, and filed a motion to compel production of those same papers in their federal civil action. *See id.* KPMG-B objected to producing the documents in the civil action on the grounds that the documents were protected by the Belgian Criminal Code, which prevents auditors and "all other persons whose state or profession renders them depositories of the secrets entrusted to them" from disclosing those secrets. *Id.* The court found that although certain exceptions to the Belgian Code applied, "the most compelling argument . . . is that in light of their recent review of the audit workpapers in Belgium, such documents have already been disclosed, [and] are therefore no longer confidential . . . ." *Id.* at 350-51. The court further noted that plaintiffs may "eventually . . . receive copies of these documents from the Belgian prosecutors." *Id.* at 351. The court therefore granted plaintiff's motion to compel, stating, "It seems absurd that plaintiffs should have to resort to the time-consuming and uncertain process of letters rogatory to obtain documents they have already seen . . . ." *Id.*

Here, Credit Lyonnais correctly asserts that *Lernout* is inapposite for two reasons. First, the issue for the *Lernout* defendants was maintaining the confidentiality of documents already authenticated, not admitting to the authenticity of confidential information; and second, prosecutors provided the KPMG-B documents to the plaintiffs in the Belgian proceeding, unlike Credit Lyonnais, which has never allowed plaintiffs to review the requested documents, much less ever voluntarily produced them.

Plaintiffs also contend that French laws do not apply to documents located in the United States. Plaintiffs cite Restatement (Third) of Foreign Relations Law of the United States § 442, which provides:

(1)(a) A court or agency in the United States . . . may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is *outside the United States*.

(b) Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions . . . .

(c) In deciding whether to issue an *order directing production of information located abroad*, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine the important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

(2) If disclosure of *information located outside the United States* is prohibited by a law, regulation, or order of a court or other authority of the state in which the information or prospective witness is located,

. . .

(c) a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production . . . .

(Emphasis added.) Plaintiffs point to the phrases "outside the United States" (§ 442(1)(a)); "order directing production of information located abroad" (§ 442(1)(c)); and the court's power to impose sanctions for failure to comply with an order for "disclosure of information located outside the United States" even if prohibited by foreign law (§ 442(2)), as evidence that Section 442 applies only to those documents physically located abroad.

Plaintiffs further note that in *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522 (1987), the defendants, two

French manufacturers, did not object to producing "material or information that was located in the United States," but only to producing material or information located in France and subject to French blocking statutes. *Aerospatiale*, 482 U.S. at 526 n.4. Plaintiffs here assert that because the Court in *Aerospatiale* considered "the scope of the district court's power to order *foreign discovery* in the face of objections by foreign states," documents located within the United States (even if they originate from foreign sources) are accorded less protection. *Id.* at 544 n.28 (emphasis added).

Plaintiffs' reasoning regarding the bank documents located in the United States is flawed. First, Restatement § 442(1)(c) identifies as a factor whether the "information *originated* in the United States," not whether the information currently is *located* in the United States. (Emphasis added.) Simply because Section 442 and the Court in *Aerospatiale* address documents located outside the United States does not mean that documents, obtained involuntarily from, or without the consent of, a foreign bank or its customer, and now located in the United States, should be accorded any less protection based solely on the location of the documents. The court is unaware of any precedent which ignores the bank-customer relationship simply because the documents at issue are currently located in the United States. *See Maxwell Communication Corp. v. Societe Generale*, 93 F.3d 1036 (2d Cir. 1996) (deferring to British bankruptcy laws because the American interests were "not very compelling," and, although one wire transfer was routed through the British bank's New York office, the wire transfers "at the heart of such a suit . . . related primarily to England")

The mere possession by plaintiffs in the United States of some of the disputed documents does not dispose of the parties' discovery dispute. There is no dispute that the

documents at issue originated outside the United States.  Accordingly, the court next considers

the factors set forth in the Restatement (Third) of Foreign Relations Law and in *Minpeco v.

Conticommodity Services, Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987).


C.      The Factors In Rst § 442(1)(c) and *Minpeco* Compel Credit Lyonnais to Produce the
        Requested Information.

In determining whether to compel production of documents located abroad from

foreign parties, courts in the Second Circuit consider the following five factors elucidated by the

Supreme Court in *Aerospatiale* and set forth in Restatement of Foreign Relations Law of the

United States § 442(1)(c):

> (1) the importance to the . . . litigation of the documents or other
> information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;
>
> (4) the availability of alternative means of securing the information;
> and
>
> (5) the extent to which noncompliance with the request would
> undermine important interests of the United States, or compliance with
> the request would undermine the important interests of the state where
> the information is located.

*British Int'l Ins. Co., Ltd. v. Seguros La Republica, S.A.*, No. 90 Civ. 2370, 2000 WL 713057, at

*8-9 (S.D.N.Y. June 2, 2000) (citing *Aerospatiale*, 482 U.S. at 544 (quoting tentative draft of

Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c), subsequently

adopted as Restatement (Third) of Foreign Relations Law of the United States, § 442(1)(c))).

Courts in the Second Circuit also consider "the hardship of compliance on the party or witness

from whom discovery is sought [and] the good faith of the party resisting discovery." *Minpeco*, 116 F.R.D. at 523; *Reino De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2005 WL 1813017, at *3 (S.D.N.Y. Aug. 1, 2005).

In support of defendant's position, defendant relies on what the court in *Minpeco* identified as the four principal factors for courts to consider when conducting a foreign discovery analysis. (*See* Def's Opp. at 14.) The *Minpeco* court, however, identified *seven* factors relevant to a foreign discovery analysis, and then highlighted four of those as the "principal factors":[7]

> (1) the competing interests of the nations whose laws are in conflict,
>
> (2) the hardship of compliance on the party or witness from whom discovery is sought,
>
> (3) the importance to the litigation of the information and documents requested, and
>
> (4) the good faith of the party resisting discovery.

*Minpeco*, 116 F.R.D. at 523 (emphasis added). Two of those factors – the competing national

---

[7] In addition to the four "principal" factors, the *Minpeco* court also identified three additional factors, which this court will designate as the three "minor" *Minpeco* factors:

> [1] the extent to which the required conduct is to take place outside of the United States, [2] the nationality of the [entity], and [3] the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

*Minpeco*, 116 F.R.D. at 522. The court notes that it has already considered one of the three minor *Minpeco* factors – "the nationality of the [entity]" – as it has identified Credit Lyonnais as a financial institution incorporated and headquarted in France. (*See infra* at 3.) Because the parties did not provide information regarding minor factor (1), whether the requested bank records that originated in France could be retrieved electronically by Credit Lyonnais at its Miami location, nor minor factor (2), whether enforcement by the United States or France can "reasonably be expected to achieve compliance" with each nation's law, the court is unable to consider these two minor *Minepco* factors. *Minpeco*, 116 F.R.D. at 522.

interests of each nation, and the importance to the litigation of the requested discovery – are also identified in the Restatement.  In reconciling these factors, the Southern District of New York explained:

> This Circuit thus considers two factors – hardship of compliance and good faith – not listed by the Supreme Court . . . . [T]his Court will consider each of these seven factors, giving the most weight to the fifth [*Aerospatiale*] factor – the balance of national interests – "as it directly addresses the relations between sovereign nations."

*Reino De Espana*, 2005 WL 1813017, at *3 (quoting *Madanes v. Madanes*, 186 F.R.D. 279, 286 (S.D.N.Y. 1999)).

This court similarly will follow Second Circuit cases which apply all five factors enumerated by the Supreme Court and the Restatement, and the two additional "principal" factors identified in *Minpeco*: the hardship of compliance on the party from whom discovery is sought, and the resisting party's good faith.  *Minpeco*, 116 F.R.D. at 523; *see In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002) ("[T]he Second Circuit applies a balancing test distilled from the Restatement of the Foreign Relations Law of the United States, and has endorsed consideration of the [*Minpeco*] factors . . . . The [*Minpeco*] analysis is broad, and may encompass additional considerations – whether they are enumerated separately or considered as part of the four *Minpeco* factors."); *Reino De Espana*, 2005 WL 1813017, at *3 (considering all seven factors); *Madanes*, 186 F.R.D. at 285-286; *British Int'l Ins. Co. Ltd.*, 2000 WL 713057, at *8-9.

Having already considered the third factor – noting that the information sought by plaintiffs' discovery requests did not originate in the United States – the court will consider the remaining six factors, beginning with the first.

1.    <u>The requested information is crucial to the litigation.</u>

Consistent with the Federal Rules of Civil Procedure, Restatement § 442(1)(c) requires that the court examine the relevance of the requested discovery to the litigation:

> In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested . . . .

Rst. § 442(c).

In this case, plaintiffs seek documents and information revealing Credit Lyonnais's knowledge of CBSP's alleged terrorist connections and the extent of the bank's financial services in support of CBSP's alleged terrorist acts. Indeed, Credit Lyonnais concedes that "the documents and information sought by plaintiffs are undeniably of potential importance to the outcome of this litigation." (Def's Opp. at 21.) The information plaintiffs seek regarding the CBSP account(s) is crucial and thus relevant to plaintiffs' claims pursuant to 18 U.S.C. §§ 2333(a), 2339B and 2339C, which require plaintiffs to demonstrate that (1) they were injured by an act of international terrorism (pursuant to Section 2331(a)); (2) defendant "knowingly provided material support and/or resources" to a designated terrorist (in violation of Section 2339B); and (3) defendant "willingly provid[ed] or collect[ed] funds" used to carry out terrorist acts (in violation of Section 2339C). *See* 18 U.S.C. §§ 2339B, 2339C; *see also Linde*, 384 F. Supp. 2d at 588.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at trial if the discovery appears

reasonably calculated to lead to the discovery of admissible evidence." Because the scope of

civil discovery in the United States is broader than that of many foreign jurisdictions, some

courts have applied a more stringent test of relevancy when applying the Federal Rules to

foreign discovery. *See Aerospatiale*, 482 U.S. at 542, 546 (noting that the requested documents

were "vital" to the litigation, and advising U.S. courts that "[w]hen it is necessary to seek

evidence abroad, the district court must supervise pretrial proceedings particularly closely to

prevent discovery abuses"); *see also Richmark Corp. v. Timber Falling Consultants*, 959 F.2d

1468, 1475 (9th Cir. 1992) ("[W]here the outcome of the litigation 'does not stand or fall on the

present discovery order,' . . . courts have generally been unwilling to override foreign secrecy

laws.") (quoting *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 999

(10th Cir. 1972)); Rst. § 442, comment (a) (the discovery must be "directly relevant and

material"); *but see Compaigne Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips

Petroleum Co.*, 105 F.R.D. 16, 32 n.8 (S.D.N.Y. 1984) ("In ordering production of these

documents, this Court does not need to find, nor can it find at this point, that the requested

documents are 'vital' . . . ."); *Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 515 (N.D. Ill. 1984)

(noting that *Aerospatiale* indicated that the requested discovery should be "vital," but declining

to articulate a standard).

        Given plaintiffs' allegations regarding Credit Lyonnais's provision of financial

services to CBSP for more than thirteen years, including accepting deposits from and/or

distributing funds to alleged terrorist organizations on behalf of CBSP (Am. Comp. ¶¶ 529-536),

the court finds that the discovery sought is both relevant and crucial to the litigation of plaintiffs'

claims. Because the documents and information sought by plaintiffs are highly relevant and

important to the claims and defenses in this action, the court finds that this second factor weighs heavily in plaintiffs' favor.

        2.    <u>The discovery requests are narrowly tailored.</u>

        Rst. § 442(1)(c) also provides, "[A] court or agency in the United States should take into account . . . the degree of specificity of the request . . . ." Although the parties have agreed to brief only the issue of French laws at this time (*see* Def's Opp. at 2, n.1), and not issues such as relevance or overbreadth, the court, having determined that the requests seek relevant information, must also examine the specificity of the discovery requests in performing an analysis under Rst. § 442.

        Here, the court finds that the requested discovery is relevant, vital and narrowly tailored to the litigation. *See Compagnie Francaise*, 105 F.R.D. at 32 n.8; *Graco*, 101 F.R.D. at 515. As noted above, at issue are Document Requests Nos. 1-3, 11-13 and 15, and Requests for Admissions and Interrogatories Nos. 1-4. Plaintiffs' discovery requests are sufficiently focused on the vital issues in this case: whether and to what extent Credit Lyonnais knowingly provided "material support and resources" to Specially Designated Terrorist Organizations, and/or "financial services" to a terrorist organization. 18 U.S.C. §§ 2339B, 2339C. Plaintiffs' discovery requests seek, *inter alia*, documentation of the relationship between defendant and CBSP, the nature and extent of the services that defendant provided to CBSP, the collection or distribution of funds by Credit Lyonnais that may have been used by CBSP and/or its associates to support terrorism, and Credit Lyonnais's knowledge of CBSP's alleged terrorist connections. Plaintiffs require this information to establish liability pursuant to 18 U.S.C. §§ 2339B, 2339C. *Cf. Trade Dev. Bank v. Continental Ins. Co.*, 469 F.2d 35, 40-41 (2d Cir. 1972) (denying

defendant's discovery requests for the identities of Swiss bank account customers because such identities were irrelevant to whether a bank employee had used customer accounts "in furtherance of his fraudulent scheme"); *In re Two Grand Jury Subpoenas Duces Tecum Served Upon Union Bank of Switzerland*, 158 Misc. 2d 222, 226 (Sup. Ct. 1993) (denying the government's discovery requests, in part, because the District Attorney "conceded that the subpoenaed material is not crucial to his Grand Jury presentation"). Plaintiffs have established that their discovery demands are specifically tailored to their claims.

3.      Availability of alternative methods: plaintiffs are not required to seek discovery initially or exclusively through the Hague Convention.

Section § 442(1)(c) of the Restatement also requires the court to consider the "availability of alternate means of securing the information . . . ." The court notes that plaintiffs do not have direct or ready access to Credit Lyonnais's records through means other than discovery demands. Only Credit Lyonnais can provide plaintiffs with responses to their requested discovery.

Credit Lyonnais argues that plaintiffs "may be able to obtain the discovery they seek through letters of request pursuant to the Hague Convention. . . ." (Def's Opp. at 2.) Both France and the United States are signatories to the Hague Convention, which provides internationally agreed-upon means for conducting discovery in foreign states and which defendant here urges plaintiffs to use. As a signatory to the Hague Convention, France generally has agreed to produce documents sought by foreign courts by responding to letters rogatory from the requesting party.[8]

_____

[8]  *See* Hague Conference on Private International Law, *available at*: http://hcch.e-vision.nl/index_en.php?act=conventions.status&cid=41.

-23-

The United States Supreme Court, in *Aerospatiale*, determined that parties

seeking discovery need not resort to the Hague Convention as their first and exclusive means for

securing foreign discovery, explaining:

> An interpretation of the Hague Convention as the exclusive means for
> obtaining evidence located abroad would effectively subject every
> American court hearing a case involving a national of a [signatory]
> state to the internal laws of that state. Interrogatories and document
> requests are staples of international . . . litigation, no less than of other
> suits, yet a rule of exclusivity would subordinate the court's
> supervision of even the most routine of these pretrial proceedings to
> the actions or, equally, to the inactions of foreign judicial authorities.

482 U.S. at 539. The Court thus found that "the Hague Convention [does] not deprive the

District Court of the jurisdiction it otherwise possessed to order a foreign national party before it

to produce evidence physically located within a signatory nation." *Id.* at 539-540.

The Court "decline[d] to hold as a blanket matter that comity requires resort to Hague Evidence

Convention procedures without prior scrutiny in each case of the particular facts, sovereign

interests, and likelihood that resort to those procedures will prove effective." *Id.* at 544.

Addressing the applicability of French blocking statutes, the Court continued,

> It is clear that American courts are not required to adhere blindly to
> the directives of [a foreign blocking statute]. Indeed, the language of
> the statute, if taken literally, would appear to represent an
> extraordinary exercise of legislative jurisdiction by the Republic of
> France over a United States district judge, forbidding him or her to
> order any discovery from a party of French nationality, even simple
> requests for admissions or interrogatories that the party could respond
> to on the basis of personal knowledge . . . . Extraterritorial assertions
> of jurisdiction are not one-sided.

*Id.*

Therefore, plaintiffs in this case need not seek discovery initially or exclusively

through the Hague Convention, but, instead, may appropriately seek from this court an order

compelling discovery.  The court notes, however, that although plaintiffs are not required to resort to the Hague Convention, they are not discouraged from doing so.

4.      The mutual interests of the United States and France in combating terrorism outweigh the French interest, if any, regarding the disputed discovery.

The comity factor – requiring analysis of the competing interests of the United States and France – "is of the greatest importance in determining whether to defer to the foreign jurisdiction."  *Id.*  The court finds that this factor weighs strongly in favor of plaintiffs.  The interests of the United States and France in combating terrorist financing, as evidenced by the legislative history of the ATA, codified at 18 U.S.C. § 2331 *et seq.*, Presidential Executive Orders, and both countries' participation in international treaties and task forces aimed at disrupting terrorist financing, outweigh the French interest, if any, in precluding Credit Lyonnais from responding to plaintiffs' discovery requests.  Indeed, France's interest in having Credit Lyonnais respond to plaintiffs' discovery requests is evident from France's execution of international treaties facilitating international cooperation to combat terrorism, and its requirement that banks monitor and report customer ties to terrorists.

(a)      The United States's interest.

"The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located," is the most important of the five factors in Rst. § 442(1)(c).  *See British Int'l Ins. Co., Ltd.*, 2000 WL 713057, at *9; *Madanes*, 186 F.R.D. at 286; *Minpeco*, 116 F.R.D. at 522.

Axiomatically, the United States has "a substantial interest in fully and fairly adjudicating matters before its courts."  *Minpeco*, 116 F.R.D. at 523-524; *see also Alfadda*, 149

F.R.D. at 34; *In re Westinghouse*, 563 F.2d at 999.  When that interest is combined with the

United States's goals of combating terrorism, it is elevated "to nearly its highest point."

*Dammarell v. Islamic Republic of Iran*, No. Civ. A. 01-2224, 2005 WL 756090, at *20 (D.D.C.

Mar. 29, 2005) (finding that injuries resulting from "a state-sponsored terrorist attack on a

United States embassy and diplomatic personnel . . . heighten the interest of a domestic forum

and diminish the interest of the foreign state").

    The legislative history of the ATA, Executive Orders signed by two United States

Presidents, and the participation by the United States in international treaties and an international

task force, reveal this country's profound and compelling interest in combating terrorism at

every level, including disrupting the financial underpinnings of terrorist networks.  Section

2333(a) was first introduced in the wake of *Klinghoffer v. Palestine Liberation Organization*,

739 F. Supp. 854 (S.D.N.Y. 1990), in which heirs of an American national killed in a terrorist

attack in the Mediterranean sued the Palestinian Liberation Organization.  (*See* Brief for United

States as Amicus Curiae Supporting Respondents at *6, *Boim v. Quranic Literacy Inst. and Holy

Land Found. for Relief and Dev.*, 291 F.3d 1000 (7th Cir. 2002) (No. 01-1969).)  The

*Klinghoffer* court concluded that it had subject matter jurisdiction because United States

admiralty laws applied to plaintiff's tort claims.  *See Klinghoffer*, 739 F. Supp. at 858-59.  As

plaintiffs' expert explains, "[T]he narrowness of the grounds on which [jurisdiction] was

resolved[,] made it clear to observers that legislation would be needed to expand federal court

jurisdiction in order to facilitate comparable suits by other victims of terrorism outside the

United States."  (Expert Declaration of Robert M. Chesney, Esq. in Support of Plaintiffs' Motion

to Compel, dated 12/18/06 ("Chesney Decl."), at 9.)

To address the need to expand federal jurisdiction, Senator Charles Grassley introduced the Antiterrorism Act of 1990 in April of that year. (*See id.*) Senator Grassley,

> proposed the creation of 18 U.S.C. § 2333(a), which in relevant part would provide that "[a]ny national of the United States injured in his person, property, or business by reason of an act of international terrorism may sue therefore in any appropriate district court of the United States . . . ."

(Chesney Decl. at 9 (quoting 136 CONG. REC. S4568-01 (1990).) Alan Kreczko, a State Department official, testified before the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice that the proposed Antiterrorism bill would "add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad." (Chesney Decl. at 9.) Similarly, when Senator Grassley introduced the bill on the floor of the Senate, he explained that it would "strengthen our ability to both deter and punish acts of terrorism . . . . We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds." (*Id.* at 12.) Congress passed the Antiterrorism Act of 1990 and the bill was enacted as Pub. L. No. 101-519, § 132(b)(4), 104 Stat. 2250, 2251. (*See id.*) Due to a procedural error, the Antiterrorism Act of 1990 was repealed in April 1991, and re-introduced and reenacted in the same form, becoming the Antiterrorism Act of 1992. (*See id.* at 12-13.)

In denying Credit Lyonnais's motion to dismiss plaintiffs' second and third claims, Judge Sifton recognized, from the legislative history of the Antiterrorism Act and related legislation, the overriding national interest in eliminating financial support of terrorism, finding that "Congress intended these provisions [under Section 2333(a) of the ATA] to impose, 'liability at any point along the causal chain of terrorism.'" *Strauss*, 2006 WL 2862704, at *18

(quoting S. Rep. No. 102-342 at 22). "In enacting the material support statute Congress expressly found that, 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.'" *Id.* (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996).) Judge Sifton further found that "even the 'provision of basic banking services may qualify as material support'" for liability under 18 U.S.C. § 2339B. *Id.* at *12 (quoting *Linde*, 384 F. Supp. 2d at 588).

Similarly, in *Linde*, Judge Gershon denied defendant's motion to dismiss as to a majority of plaintiffs' claims pursuant to 18 U.S.C. § 2333(a), and found that Congress intended to broadly apply the provisions in the Antiterrorism Act. *See Linde*, 384 F. Supp. 2d at 587. As in this case, the *Linde* plaintiffs were U.S. citizens injured in terrorist attacks in Israel, allegedly perpetrated by HAMAS. *See id.* at 575. Pursuant to 18 U.S.C. § 2333(a), plaintiffs sued Arab Bank, a Jordanian financial institution, for knowingly providing financial services for several charities alleged to be HAMAS fronts, in violation of 18 U.S.C. §§ 2339A-C. *See id.* at 578-579. The court found that "[s]ection 2333 does not limit the imposition of civil liability only to those who directly engage in terrorist acts." *Id.* at 582. The court determined, "None of these provisions [i.e., Sections 2339A-C] . . . requires specific intent to commit specific acts of terrorism." *Id.* at 586.

Following the enactment of the ATA, the national concern with global terrorism and its sources of financing persisted. On January 23, 1995, then-President Clinton issued Executive Order No. 12947, Prohibiting Transactions with Terrorists who Threaten to Disrupt the Middle East Peace Process, 60 Fed. Reg. 5,079 (Jan. 23, 1995), pursuant to the International

Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* President Clinton found that "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 60 Fed. Reg. at 5,079. He identified twelve foreign terrorist organizations, including HAMAS, for designation as "Specially Designated Terrorists" and froze the property and interests in property of these organizations in the United States. *Id.* at 5,081.

Executive and Congressional interests in averting terrorist financing continued through the next decade. The national interest in thwarting terrorist financing became paramount when applied to recognized terrorist organizations, particularly in the wake of the September 11, 2001 terrorist attacks. Two weeks after the September 11 terrorist attacks, President Bush issued Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001), pursuant to his powers under the IEEPA, and specifically targeted terrorist financing. Executive Order 13224 increased the array of financial sanctions enforceable against foreign terrorist organizations. *See* 66 F.R. 49079. By prohibiting transactions with any organizations designated an SDGT, the President stated,

> We're putting banks and financial institutions around the world on notice, we will work with their governments, ask them to freeze or block terrorist's ability to access funds in foreign accounts. If they fail to help us by sharing information or freezing accounts, the Department of the Treasury now has the authority to freeze their bank's assets and transactions in the United States.[9]

---

[9] "President Freezes Terrorists' Assets: Remarks by the President, Secretary of the Treasury O'Neill and Secretary of State Powell on Executive Order," White House: Office of the Press Secretary, Sep. 24, 2001, *available at*:
http://www.whitehouse.gov/news/releases/2001/09/20010924-4.html.

Citing "the pervasiveness and expansiveness of the financial foundation of foreign terrorists," the President prohibited persons and organizations from "assist[ing], sponsor[ing], or provid[ing] financial, material, or technological support for, or financial or other services to or in support of" persons or organizations designated as SDGTs.  66 Fed. Reg. 49,079-49,080.  The President annexed a list of SDGTs to his order, and gave the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, the power to designate additional persons and/or entities as SDGTs.  *See id.* at 49,080.

Congress also has expressed its general concern with global terrorist financing, and with the particular role of charities in raising and transferring funds to terrorist organizations.  In a 2002 hearing before the Senate Subcommittee on International Trade and Finance, Chairman Evan Bayh stated:

> Cutting off the financing of terrorist organizations is a critically
> important component of the war against terror and to protect America
> . . . . This hearing has been called to send a very clear signal that . . .
> we will do everything humanly possible to stop this illicit financial
> activity, and that we will expect our allies to do the same.

(Pls' Motion at 16 (quoting Statement of Chairman Evan Bayh, *The Role of Charities and NGOs in the Financing of Terrorist Activities, Before the U.S. Senate, Committee on Banking, Housing and Urban Affairs, Subcommittee on International Trade and Finance*, Aug. 1, 2003, at 1-2).)

Thereafter, during a 2003 Congressional House hearing, Representative Sue Kelly stated that the President's decision to freeze key assets of HAMAS leaders and certain related international charities "sends a clear message to the world that organizations linked to this heinous group will not be tolerated."  (Pls' Motion at 6, quoting Statement of Chairwoman Sue W. Kelly, *Hearing on The HAMAS Asset Freeze and Other Government Efforts to Stop Terrorist*

*Funding, Before the U.S. House of Representatives Subcommittee on Oversight and Investigation, Committee on Financial Services*, September 24, 2003, at 1-2.)

The American interest in disrupting terrorist networks with global assistance from American allies is unmistakable. On August 22, 2003, the United States Department of the Treasury designated "five Hamas related charities and six senior Hamas leaders as Specially Designated Global Terrorists, . . . [froze] any assets in the U.S. and prohibit[ed] transactions with U.S. nationals." Significantly, the Department of the Treasury specifically identified CBSP as an SDGT and froze all of its domestic assets, explaining that CBSP is the "primary fundraiser[] for HAMAS in France." (*See* "U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities," Dep't of the Treasury News Release, JS-672, dated 8/22/03, *available at*: http://www.ots.treas.gov/docs/4/48937.html; *see also* Chesney Decl. at 7-8.) Accordingly, not only does the United States have a demonstrated interest in halting terrorist financing, both domestically and internationally, but the United States also has explicitly found that Credit Lyonnais's client, CBSP, is a "primary" conduit for terrorist funds. (*Id.*) Thus, Credit Lyonnais's noncompliance with plaintiffs' discovery requests "would undermine the important interests of the United States." Rst. § 442(1)(c). Moreover, the United States Treasury Department expressed its intention to seek assistance from France and other allies in stating, "The United States will continue to work with our allies to encourage the recognition of Hamas as a terrorist organization and to shut down their sources of funding and support." (Dep't of the Treasury News Release, JS-672, dated 8/22/03, *supra*.)

Furthermore, the United States has consistently demonstrated its commitment to combating terrorist financing and to enlisting the help of foreign nations. In furtherance of that

goal, the United States and other nations, including France, have committed to international cooperation. Both the United States and France are signatories to the United Nations's International Convention for the Suppression of the Financing of Terrorism, which recommends that nations "adopt[] effective measures for the prevention of the financing of terrorism . . . ."[10] Both countries are also members of the Financial Action Task Force ("FATF"), which likewise seeks international cooperation in combating terrorist financing.[11]

Thus, France has demonstrated its common national interests with the United States in thwarting terrorist financing by signing and joining the same convention and task force. The Preamble to the U.N. Resolution recognizes that the signatory states are:

> deeply concerned about the worldwide escalation of acts of terrorism in all its forms and manifestations, . . . [and] convinced of the urgent need to enhance international cooperation among States in devising and adopting effective measures for the prevention of the financing of terrorism, as well as for its suppression through the prosecution and punishment of its perpetrators . . . .[12]

The U.N. Resolution made it "an offense . . . [to] provide[] or collect[] funds . . . in the knowledge that they are to be used" for terrorist acts.[13]

The FATF, an international body which "sets standards and develops and promotes policies to combat . . . terrorist financing," issued forty recommendations to its

---

[10]  International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* April 10, 2002; *available at*: http://www.un.org/law/cod/finterr.htm.

[11]  Financial Action Task Force on Money Laundering, The Forty Recommendations, June 20, 2003 (incorporating the amendments of October 22, 2004), *available at*: http://www.fatf-gafi.org/dataoecd/7/40/34849567.PDF.

[12]  *Supra*, note 10, at Preamble.

[13]  *Supra*, note 10, at Article 2.

members on June 20, 2003.  Recommendation number 36 provides,

> Countries should rapidly, constructively and effectively provide the
> widest possible range of mutual legal assistance in relation to money
> laundering and terrorist financing investigations, prosecutions, and
> related proceedings.  In particular, countries should . . . [n]ot refuse to
> execute a request for mutual legal assistance on the grounds that laws
> require financial institutions to maintain secrecy or confidentiality.[14]

Credit Lyonnais attempts to counter the weight of the foregoing authority by
criticizing plaintiffs and arguing that, in prosecuting their claims and seeking to enforce these
national interests, plaintiffs have anointed themselves "'private attorneys general' responsible for
enforcing the nation's antiterrorism laws."  (Def's Opp. at 20.)  Defendant's criticism is
unfounded.  As noted above, the Antiterrorism Act of 1990 was introduced in response to
Congressional concern that private plaintiffs would not be able to maintain a cause of action
against terrorist organizations.  (*See supra* at 26-27; Chesney Decl. at 9-12.)  Indeed, Section
2333(a) provides, "Any national of the United States injured in his or her person, property, or
business by reason of an act of international terrorism, . . . may sue therefor in any appropriate
district court of the United States."  18 U.S.C. § 2333(a).  When introducing the bill which
created Section 2333(a), Senator Grassley explained:

> This bill will serve as a further incentive to those with the deep
> pockets, such as the airline industry, to spend resources and go after
> terrorists: This bill establishes an express cause of action to gain
> compensation as fruit of their efforts . . . .With the enactment of this
> legislation, we set an example to the world of how the United States
> legal system deals with terrorists. If terrorists have assets within our
> jurisdictional reach, American citizens will have the power to seize
> them . . . . This legislation reaffirms our commitment to the rule of
> law: the people of the United States will be able to bring terrorists to
> justice the "American Way" . . . .

---

[14] *Supra,* note 11.

136 CONG. REC. S4568-01.  As an additional incentive to "harness the initiative and resources

of the private sector in pursuit of the larger aims of U.S. counter terrorism policy" (Chesney

Decl. at 9), Congress provided that plaintiffs "shall recover threefold the damages he or she

sustains and the cost of the suit, including attorney's fees."  18 U.S.C. §2333(a).

Furthermore, comment (e) to Rst. § 442 provides, "*In private actions*, it is open to

a court in the United States to invite the United States attorney or other appropriate official to

advise it of the interests of the U.S. government." (Emphasis added.)  The Department of Justice

("DOJ") has provided such advice.  In an amicus brief before the Seventh Circuit, the DOJ stated

that after the *Klinghoffer* decision, "Congress and the State Department wanted through Section

2333(a) to ensure that torts from terrorist activity would be actionable even if they occurred on

land in a foreign country."  (*See* Brief for United States as Amicus Curiae Supporting

Respondents at *13, *Boim*, 291 F.3d 1000 (7th Cir. 2002) (No. 01-1969).)  The government

quoted Joseph H. Morris, a former Department of Justice attorney and General Counsel of the

United States Information Agency, who testified at the 1990 Congressional hearings regarding §

2333(a) as follows:

> American victims seeking compensation for physical, psychological,
> and economic injuries naturally turn to the common law of tort.
> American tort law in general would speak quite effectively to the facts
> and circumstances of most terrorist actions not involving acts of state
> by foreign governments.

(*Id.*)  The government also noted that Senator Grassley explained its necessity: "Unfortunately,

victims who turn to the common law of tort or Federal statutes, find it virtually impossible to

pursue their claims because of reluctant courts and numerous jurisdictional hurdles . . . ."  (*Id.*)

Therefore, Congress has explicitly granted private parties the right to pursue common tort claims

-34-

against terrorist organizations and those that provide material support or financing to terrorist organizations.  *See*, *e.g.*, *Minpeco*, 116 F.R.D. at 523 (finding a private right of action in enforcing antitrust and commodities fraud laws to ensure the stability of U.S. financial markets, and noting, "[I]t is difficult to imagine a private commercial lawsuit which could be more infused with the public interest").  Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism vindicate the national and international public interest.

> (b)　　The French interest.

Pursuant to Rst. § 442, the court should also weigh "the extent to which . . . compliance with the [discovery] request would undermine the important interests of the state where the information is located."  Where "there is a true conflict between American law and that of a foreign jurisdiction," New York conflict of law rules require the court to conduct a comity analysis.  *Maxwell*, 93 F.3d at 1050 (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993)).  The Supreme Court long ago explained,

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 143 (1895).  Here, there is a "true conflict of laws" because adhering to this court's discovery order would seemingly violate French civil and criminal laws. Accordingly, the court will next consider the rights and interests of France in determining the instant motion.

Comment (c) to Rst. § 442 provides guidance for this analysis:

> In making the necessary determination of foreign interests under Subsection (1)(c), a court or agency in the United States should take into account[,] . . . expressions of interest by the foreign state, as contrasted with expressions by the parties; . . . the significance of disclosure in the regulation by the foreign state of the activity in question; . . . indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought . . . [and] the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in giving effect to formal or informal international agreements, and in orderly international relations.

Comment (e) to the same section states that, because Section 442 applies to pretrial procedures, "somewhat less deference to the law of the other state may be called for."

Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." "Among other sources, the Court may consider the opinions of experts, but it is not bound by their testimony, even if uncontradicted." *British Int'l Ins. Co. Ltd.*, 2000 WL 713057, at *7 (further citations omitted). Therefore, the court will consider the expert opinions submitted by both parties, and the French laws cited therein.

As an initial matter, the court notes that the French government has failed to respond to Credit Lyonnais's three attempts to contact it for guidance in this case. (Def's Opp. at 6.) Likewise, CBSP, whose accounts were closed by Credit Lyonnais in 2002 and 2003, has not demonstrated any interest in preserving the confidentiality of its now inactive bank account records. As of the date of this order, there is no indication in the record that CBSP has

responded substantively to the bank's repeated attempts at contact. (*See id.* at 5-6; Exhs. E and F to the Declaration of Jonathan Blackman, Esq.) The court presumes that if either the French government or CBSP objected to the production by Credit Lyonnais of information regarding CBSP's accounts, they would have so stated. Although CBSP's disinterest in protecting its rights to bank secrecy may not constitute a waiver of that right, CBSP's lack of response demonstrates a lack of vigilance and interest in preserving its right to financial secrecy.[15] Similarly, where the French government's interests in its bank secrecy and other laws potentially affecting discovery are not asserted, the court need not give weight to those interests. *See United States v. First National City Bank*, 396 F.2d 897, 904 (2d Cir. 1968) (ordering production of bank records despite the application of German bank secrecy laws in part because the German government did not object); *cf. Minpeco*, 116 F.R.D. at 523 (denying plaintiffs' motion to compel where "the Swiss government has submitted to the court two official statements in this case which express its general position as to the importance of Swiss banking secrecy laws to the interests of Switzerland . . . ."); *Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers*, 357 U.S. 197, 200-201 (1958) (declining to order production where the Swiss government confiscated the records to prevent their discovery).

Notwithstanding the absence of any articulated interest by the French government, Credit Lyonnais asserts, "France has an obvious and undeniable national interest in protecting bank customer privacy and enforcing its internal banking, money laundering and

---

[15] An additional factor militating against CBSP's interest in preserving the confidentiality of its bank records is the fact that Credit Lyonnais closed CBSP's accounts in 2002 and 2003.

terrorism laws, as well as its laws regarding criminal investigations." (Def's Opp. at 17.) [16]

First, according to the expert declaration submitted by Credit Lyonnais, Article L 511-33 of the Monetary and Financial Code provides that the bank "is bound by professional secrecy," which may only be waived by a "person affected by information of a confidential nature . . . ." (Cutajar Decl. at ¶¶ 10, 12.) Violation of bank customer secrecy is punishable by criminal penalties (Article 226-13 of the Criminal Code imposes one year of imprisonment and 15,000 euros), disciplinary penalties (Article L 613-21 of the Monetary and Financial Code imposes, *inter alia*, sanctions, reprimands and/or forced resignation), and civil penalties imposing contractual and tort liability. (*See id.* at ¶¶ 14-23.) Second, as provided by Articles 1 and 1 bis of French Law No. 68-678 (the so-called "French blocking statute"), Credit Lyonnais is also subject to laws prohibiting the disclosure to foreign public authorities of "documents or information of an economic, commercial, industrial, financial or technical nature, the disclosure of which would affect the sovereignty, security or essential economic interests of France . . . ," violation of which is punishable by six months imprisonment and a fine of 18,000 euros (pursuant to Article 3 of the Criminal Code.) (*Id.* at ¶¶ 24-26.) Third, Credit Lyonnais "is subject to laws prohibiting the disclosure of information covered by judicial secrecy," as provided by Articles 11 and 434-7-2 of the Code of Criminal Procedure, violation of which is punishable by two years imprisonment

---

[16] The Court notes that there is a certain inconsistency in Credit Lyonnais's argument that plaintiffs do not have standing as "private attorneys general" to enforce the anti-terrorism laws of the United States, while, in the next breath, Credit Lyonnais advocates on behalf of France's national interest. Defendant claims, "[P]laintiffs have no plausible ground to claim to represent the interests of a foreign sovereign." (Def's Opp. at 20.) However, defendant then states, "Credit Lyonnais is not arguing that the Court should defer to the privacy interest of <u>CBSP</u>, but rather that it should accord 'due respect' to France's interest . . . ." (*Id.* at 19 (emphasis in original).) Defendant should not be heard to advocate on behalf of one sovereign and simultaneously decry its opponent for doing the same.

and a fine of 30,000 euros (pursuant to Article 434-7-2 of the Criminal Code), or two years imprisonment and a fine of 4,500 euros (pursuant to Article 58 of the Criminal Code). (Def's Opp. at 11; Cutajar Decl. at ¶¶ 35-37.) Lastly, Credit Lyonnais is "subject to professional confidentiality obligations arising under French anti-money laundering and anti-terrorism laws," codified at Articles L 561-1 to L 563-5 of the Monetary and Financial Code. Penalties for disclosing such information to a third party is punishable by a fine of 22,500 euros (pursuant to Article L 574-1 of the Monetary and Financial Code) or one year of imprisonment and a fine of 15,000 euros (pursuant to Article 226-13 of the Criminal Code). (Def's Opp. at 11; *see also* Cutajar Decl. at ¶¶ 29-34.)

Defendant's expert, however, does not indicate whether civil and criminal liability is likely if defendant were to comply with an order of this court that the requested discovery be provided. Moreover, Credit Lyonnais does not identify, or state whether it has, specific documents that it claims are subject to the foregoing statutes.

The court will examine each statute invoked by defendant in turn. As a general matter, the Supreme Court has noted that "it is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate the [foreign] statute." *Aerospatiale*, 482 U.S. at 544 n.29.

First, courts in this Circuit have already examined the French bank secrecy law and blocking statute, and denied their applicability to preclude discovery. French bank secrecy law, codified at Article L 511-33 of the Monetary and Financial Code, "is not intended to apply to litigation in which the bank is a party." *Bodner v. Paribas*, 202 F.R.D. 370, 376 (E.D.N.Y.

2000) (citing *Alfadda*, 1993 WL 33445, at *3). Thus, because Credit Lyonnais is a party, the French bank secrecy law is inapplicable. Similarly, courts have refused to give effect to the French blocking statute, French Law No. 68-678. As the Supreme Court noted, "It is clear that American courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge," and thus the French blocking statute is not a basis for denying discovery. *Aerospatiale*, 482 U.S. at 544 n. 29; *see also Compagnie Francaise*, 105 F.R.D. at 30 (declining to apply the French blocking statute and noting, "[T]he legislative history of the statute gives strong indications that it was never expected to nor intended to be enforced against French subjects but was intended rather to provide them with tactical weapons and bargaining chips in foreign courts"); *Minpeco*, 116 F.R.D. at 528 (denying motion to compel but noting that "this is not a situation in which the party resisting discovery has relied on a sham law such as a blocking statute to refuse disclosure"); *Bodner*, 202 F.R.D. at 374 (compelling discovery despite French banks', including Credit Lyonnais, objections that disclosure would violate the blocking statute); *Adidas Ltd. v. SS Seatrain Bennington*, Nos. 80 Civ. 1911 & 82 Civ. 0375, 1984 WL 423, at *3 (S.D.N.Y. May 30, 1984) (declining to apply the French blocking statute).

Second, Criminal Code 410-1, which imposes penalties on those parties who violate the French blocking statute, French Law No. 68-678, prohibits parties from communicating to foreign public authorities – "[w]ith the exception of international agreements and treaties . . . ." (Cutajar Decl. at ¶ 24.) Courts have noted, however, that there is no significant risk of prosecution for violations of the French blocking statute. *See Minpeco*, 116

F.R.D. at 527-28; *Compaigne Francaise*, 105 F.R.D. at 30; *Bodner*, 202 F.R.D. at 375. Moreover, as discussed below, France has pledged to participate with the international community in combating terrorist financing by signing the United Nations International Convention for the Suppression of the Financing of Terrorism and joining the FATF, both of which emphasize the importance of international cooperation.[17]  Those "international agreements" mandate disclosure of bank customer information to signatory countries, and thus arguably provide an exception to French Criminal Code 410-1.

Third, the prohibition against disclosing "information covered by judicial secrecy," as provided in Articles 11 and 434-7-2 of the Code of Criminal Procedure, is not at issue in this case.  As plaintiffs correctly note, and defendant's expert affirms, Article L 434-7-2 only imposes sanctions if disclosures are made to persons "likely to be involved as perpetrators, co-perpetrators, accomplices or receivers in the commission of these infractions . . . for the purpose of interfering with the progress of the investigations or the search for the truth . . . ." (Cutajar Decl. ¶ 37; French Criminal Code Article 434-7-2, attached as Exh. 26 to the Cutajar Decl.)  Plaintiffs here are neither "perpetrators, accomplices or receivers" of any crime nor would disclosure be made for the purpose of interfering "with the progress of the investigations or the search for the truth."  (*Id.*)  In the context of this civil action, the search for the truth warrants the bank's responses to plaintiffs' discovery demands.  Credit Lyonnais has not disclosed the existence of any criminal proceeding or investigation to any likely perpetrators, co-perpetrators or accomplices, and this court would not require such disclosure.  *See Abdell v. City of New York*, No. 05 Civ. 8453, 2006 WL 2664313, at *5 (S.D.N.Y. Sept. 14, 2006) (noting the

---

[17]  *See supra*, notes 10 and 11.

"peril [of permitting discovery] is exacerbated where the ongoing case is criminal, since the information disclosed could end up in the hands of the criminal defense attorneys and jeopardize the prosecution"); *Sec. and Exch. Comm'n v. Downe*, No. 92 Civ 4092, 1993 WL 22126, at *13 (S.D.N.Y. Jan. 26, 1993) ("Courts have granted stays of discovery in order to protect the integrity of the pending criminal investigations, even where an indictment has not yet been returned.") French Criminal Code Article 434-7-2 does not apply to the instant dispute.

Fourth, France's interest in enhancing its anti-money laundering and anti-terrorist financing laws is not inconsistent with the disclosures sought by plaintiffs and already made, in part, by Credit Lyonnais. In deciding defendant's motion to dismiss, Judge Sifton noted that the French government commenced an investigation of CBSP in 2001, and that the French press reported in 2003 that the public prosecutor's office in Paris referred concerns about CBSP to France's Counter Terrorist National Division. *See Strauss*, 2006 WL 2862704, at *5. Moreover, as plaintiffs note, although Credit Lyonnais is obligated not to disclose any suspicious activity reports it sends to a French government agency known as TRACFIN (Traitement du renseignement et action contre les circuits financiers clandestins, or "agency for intelligence gathering and action against clandestine financial networks"), Credit Lyonnais has already publicly disclosed the existence of the CBSP accounts, a report by Credit Lyonnais to TRACFIN concerning CBSP, and actions by Credit Lyonnais to close the CBSP accounts. Indeed, on January 6, 2006, Credit Lyonnais issued a press release, apparently without civil or criminal sanctions, stating:

> In late 2000, in view of unusual activity occurring in [CBSP's] main account, Credit Lyonnais reported such activity as required by law. In January 2002, in keeping with the bank's own internal regulations, Credit Lyonnais began a process of closing these accounts, which was

finalized in September 2003.[18]

Thus, Credit Lyonnais's purported obligations to preserve bank customer secrecy (Article L 511-33), and comply with French anti-money laundering and anti-terrorism laws (Articles L 561-1 to L 563-5), judicial secrecy laws (Articles 11 and 434-7-2) and the French blocking statute (French Law No. 68-678), do not preclude the bank from responding to plaintiffs' discovery demands, except as provided herein. Credit Lyonnais is not required to produce its communications with French law enforcement and French judicial officers regarding criminal investigations; however, the underlying documents regarding CBSP shall be produced.

In addition, and most importantly, France, like the United States, also has expressed and demonstrated a profound and compelling interest in eliminating terrorist financing. That France has an interest in eradicating the financing of terrorism by imposing monitoring and reporting obligations on its banks regarding customers who finance, or may be suspected of financing, terrorist acts around the world, is established by the fact that France has signed international treaties that mandate such monitoring and disclosure and explicitly direct the member countries to cooperate in legal proceedings against suspected terrorist financing groups. Along with the United States, France is a signatory to the United Nation International Convention for the Suppression of the Financing of Terrorism. Article 12 of the Convention provides,

> 1. States Parties shall afford one another the greatest measure of
> assistance in connection with criminal investigations or criminal or
> extradition proceedings in respect of the offenses set forth in article 2,
> including assistance in obtaining evidence in their possession
> necessary for the proceedings.

---

[18] Credit Lyonnais's Jan. 6, 2006, press release, attached as Exh. A to the Am. Compl.

> 2. States Parties may not refuse a request for mutual legal assistance
> on the ground of bank secrecy.[19]

Although Article 12 prescribes assistance and cooperation among signatory nations in

connection with criminal investigations and extradition proceedings, plaintiffs' action seeking

compensation for victims of international terrorist attacks and discovery from a bank alleged to

be providing material support to terrorists, is not inconsistent with the French and American

interests in international cooperation to detect and fight global terror.

France is also a participant in the Financial Action Task Force, which "calls upon

all countries to take the necessary steps to bring their national systems for combating . . . terrorist

financing into compliance with the new FATF Recommendations."[20]   Judge Sifton has

determined that all banks, including Credit Lyonnais, having international operations or

relationships with correspondent banks have a duty to adopt know-your-customer, anti-money

laundering, and anti-terrorist financing standards as defined and enforced by the FATF.  *See*

*Weiss*, 453 F. Supp. 2d at 619.  Recommendation 36 states, "Countries should rapidly,

constructively and effectively provide the widest possible range of mutual legal assistance in

relation to . . . terrorist financing investigations, prosecutions and related proceedings."[21]

Following its obligations as an FATF participant, according to defendant's expert,

France "created a legislative arsenal intended to combat money laundering and the financing of

terrorism in compliance with the recommendation of the FATF."  (Cutajar Decl. at ¶ 29.)   The

French Monetary and Financial Code, Articles L. 561-1 to L. 563-3 and Articles R 562-1 to R

---

[19]  *Supra*, note 10, at Article 12.

[20]  *Supra*, note 11.

[21]  *Id.*

564-4, "imposes on banks, in particular, compliance with the obligations of vigilance, the purpose of which is to ensure knowledge of the client and of the operations that he or she is carrying out ('Know Your Customer')." (*Id.* at ¶ 30.) If the bank "has a suspicion . . . [or] believes that the funds or the requested operation involves funds that might come, in particular, from the financing of terrorism, the bank[] must make a statement to the Financial Intelligence Cell, TRACFIN." (*Id.*) Once TRACFIN determines that the operation "likely . . . constitute[s] an infraction of money laundering or the financing of terrorism, TRACFIN will immediately refer it to the district attorney of the Republic who will then diligently proceed with an inquiry . . . . CREDIT LYONNAIS is also subject to obligations of secrecy relating to any such judicial inquiry." (*Id.* at ¶ 34.) The efforts of Credit Lyonnais to know its customer, CBSP, strikes at the heart of plaintiffs' claims.

On December 27, 2001, the European Union adopted Council Regulation (EC) No. 2580/2001, which states that:

> 1.     (a) all funds, other financial assets and economic resources belonging to, or owned or held by, a natural or legal person, group or entity included in the list [of designated terrorists] shall be frozen;
>
>      (b) no funds, other financial assets and economic resources shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity included in the list . . . .
>
> 2.     . . . . [I]t shall be prohibited to provide financial services to, or for the benefit of, a natural or legal person, group or entity included in the list . . . .[22]

---

[22] European Union, Council Regulation (EC) No. 2580/2001/EC of 27 Dec. 2001, *available at*: http://eur-lex.europa.eu/smartapi/cgi/sga_doc?smartapi!celexapi!prod!CELEXnumdoc&lg=EN& numdoc=32001R2580&model=guichett.

On September 14, 2003, the EU amended the list of designated terrorist organizations to include HAMAS.[23]

France, therefore, "following the example of the United States and the European Union," and pursuant to its obligations as an FATF participant, requires its banks to monitor any assets potentially available to HAMAS. (Cutajar Decl. at ¶ 29.)[24] As indicated by comment (c) to Rst. § 442, France has therefore "express[ed] interest" in the issues in this action and the related discovery, and also underscored its national interest in fighting global terrorist financing, which arguably overrides the French concern for confidentiality with respect to its bank customers. Granting plaintiffs' motion to compel would thus "give effect to formal . . . international agreements." Rst. § 442, comment (c).

The French interest in fighting global terrorism is even more relevant here, where Credit Lyonnais has previously acted upon its suspicion that CBSP warranted investigation of its ties to money laundering and/or terrorism. As cited above, Credit Lyonnais issued a press release announcing that it had closed CBSP's accounts in September 2003, and stated:

> In 1990, accounts in the name of the "Comite de Bienfaisance pour la Solidarite avec la Palestine" [Committee for Palestinian Charity and Aid or CBSP] were opened in France in strict observance of applicable regulations. The association in question was designated non-profit, in accordance with French law 1901 . . . . It should be pointed out that the association in question, which still does not appear on any

---

[23] European Union, Council Decision 2003/646/EC of 14 Sept. 2003, *available at*: http://europa.eu.int/smartapi/cgi/sga_doc?smartapi!celexapi!prod!CELEXnumdoc&lg=EN&num doc=32003D0902&model=guichett. For an updated list, *see* European Union, Council Decision 2006/379/EC of 29 May 2006, *available at*: http://eur-lex.europa.eu/LexUriServ/site/en/oj/2006/l_144/l_14420060531en00210023.pdf.

[24] Notably, Credit Lyonnais "is not arguing that the Court should defer to the privacy interests of CBSP." (Def's Opp. at 18.)

European lists of enterprises linked to terrorism, was not mentioned on American lists until August 2003.[25]

As Judge Sifton noted, the Israeli press reported that the Government of Israel, in 1997, declared CBSP an "unlawful organization" due to its affiliation with, and support of, HAMAS and HAMAS front organizations. *Strauss*, 2006 WL 2862704, at *5. Judge Sifton determined that "it is reasonable to believe" that when Credit Lyonnais noticed "unusual activity" on CBSP's accounts in 2000, in the form of large transfers of money to the West Bank and Gaza Strip during the highly publicized Intifada, the bank would have investigated the organizations receiving the transfers, "including designations of terrorist organizations made by the government who was experiencing terrorism." *Id.* at *14. Despite the assertion by Credit Lyonnais that its suspicion of money laundering was the basis of its referral of the matter to TRACFIN, an agency responsible both for fighting money laundering and terrorist financing, plaintiffs should not be deprived of discovering information related to CBSP's financial transactions through its account at Credit Lyonnais, and the bank's knowledge regarding CBSP's association with the donors to and recipients of funds from CBSP's accounts. As Judge Sifton stated, "[M]oney laundering and terrorism are often linked as evidenced by the fact that Tracfin is responsible for fighting both." *Id.*

Accordingly, ordering Credit Lyonnais to provide plaintiffs with discovery would not "undermine the important interests of the state where the information is located," but rather, enforce them. Rst. § 442; *cf. Minpeco*, 116 F.R.D. at 523 (denying discovery where foreign state objected); *Societe Internationale*, 357 U.S. at 200-201 (denying discovery where foreign state confiscated the documents).

---

[25] *See supra*, note 18.

5.       Credit Lyonnais will not face substantial hardship by complying with plaintiffs'
         requests.

         In addition to the five factors prescribed in the Restatement, under the analysis

suggested in *Minpeco*, courts may also consider the hardship a foreign party might suffer if

compelled to respond to a discovery order issued by a federal court in the United States.  *See*

*Minpeco*, 116 F.R.D. at 522-523; *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 554.

         Credit Lyonnais argues that, because the "French laws prohibiting [Credit

Lyonnais's] production of the discovery sought by plaintiffs are valid and enforceable," it would

face substantial hardship by complying with plaintiffs' requests.  (Def's Opp. at 22.)  The bank

"and its personnel would incur substantial civil, administrative and criminal liability – including

fines, imprisonment and the prospect of lawsuits – if they were to violate those laws . . . ."  (*Id.*)

Credit Lyonnais also asserts that it would "suffer enormous professional and reputational

hardship if it betrayed its customer's confidence by disclosing the customer's protected

information in violation of French bank secrecy laws."  (*Id.*)  Glaringly absent from the

submission by Credit Lyonnais is any indication that civil or criminal prosecutions by the French

government or civil suits by CBSP are likely, rather than mere possibilities.

         "[I]n examining the hardship on the party from whom compliance is sought,

courts . . . look at the likelihood that enforcement of the foreign law will be successful."

*Minpeco*, 116 F.R.D. at 526.  "Although neither side ha[d] provided helpful information

regarding frequency of enforcement and punishments imposed under [the Swiss penal law]," the

*Minpeco* court denied plaintiffs' motion to compel, in part because the successful defense of the

Swiss bank, from which discovery was sought, was "highly speculative" because the statutory

defenses available to it were inapplicable.  *See id.*

By contrast, in *First National*, the court examined the likelihood that the German bank would suffer significant civil penalties, but found both that the chance was "slight and speculative" and that the bank had "a number of valid defenses."  *First National*, 396 F.2d at 905.  The court also noted that the German government had not "expressed any view on this case or indicated that, under the circumstances presented here, enforcement of the subpoena would violate German public policy or embarrass German-American relations."  *Id.* at 904.

The prospect that the foreign litigant would face criminal penalties rather than civil liabilities weighs in favor of the objecting party.  *See First National*, 396 F.2d at 901 (according the possibility of civil sanctions less weight than the possibility of criminal prosecution); *Minpeco*, 116 F.R.D. at 524 ("[C]ourts in this circuit have considered the foreign nation's interest in prohibiting disclosure weaker . . . where the consequence of disclosure is at most civil liability.").  If, however, the objecting litigant is a party to the action, courts accord that party's hardship less weight.  *See Minpeco*, 116 F.R.D. at 526-527 (declining to order discovery in part because the objecting party was "no longer a primary defendant . . . and stands, instead, as to the plaintiffs, in the posture of a non-party witness").  The *Minpeco* court also found that because the bank was not a party to the litigation, the hardship likely to be imposed upon it "weigh[ed] more heavily in the balance."  *Id.; see also Alfadda*, 149 F.R.D. at 38-39 ("[A]ny potential hardship faced by a primary defendant in litigation may be weighed less heavily by the court.").   Moreover, courts have already considered and found unpersuasive the potential imposition of the same penalties Credit Lyonnais cites here.  The Supreme Court examined Articles 1-3 of French Penal Code Law No. 80-538, the French blocking statute, and

ordered discovery notwithstanding the penalties that could be imposed, stating, "It is clear that American courts are not required to adhere blindly to the directives of such a statute." *Aerospatiale*, 482 U.S. at 544. In *Bodner*, the court examined both the French blocking statute and French bank secrecy law (Article 226-13 of the French Criminal Code), both of which Credit Lyonnais seeks to apply here. *See Bodner*, 202 F.R.D. at 373 n.2. The court held that "those laws would not prevent the plaintiffs from receiving information sought on this motion . . . ." *Id.* at 376. Likewise, in *Compagnie Francaise*, the court also examined the blocking statue and held, "There is little evidence that the statute has been or will be enforced . . . . Even if criminal penalties were likely to be imposed, however, it would not necessarily be sufficient to warrant nondisclosure in this case." *Compagnie Francaise*, 105 F.R.D. at 30 (citing *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345 (7th Cir. 1983) and *In re Grand Jury Proceedings*, 532 F.2d 404, 407 (5th Cir. 1976)). The Seventh Circuit held,

> The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production . . . . Rather what is required is a sensitive balancing of the competing interests at stake.

*First Nat'l Bank of Chicago*, 699 F.2d at 345; *see also Bodner*, 202 F.R.D. at 375 ("As held by numerous courts, the French Blocking Statute does not subject defendants to a realistic risk of prosecution.").

Although Credit Lyonnais has demonstrated that French bank secrecy laws have been enforced (*see* Cutajar Decl. at ¶¶ 11-13, 17-18, 35), the bank has failed to demonstrate that either CBSP or the French government would likely seek to sanction the bank for complying with a United States court order compelling disclosure of documents and information regarding

CBSP's accounts. CBSP has shown no interest in protecting, much less asserting, its privacy right, as established by its lack of response to Credit Lyonnais's two letters. (*See* Def's Opp. at 5-6.) Unlike in *Minpeco*, Credit Lyonnais both is a party to the litigation, and, as in *First National*, the French government has failed to submit any objections to producing the requested information, in response to three inquiries by Credit Lyonnais. *See Minpeco*, 116 F.R.D. at 526; *First National*, 396 F.2d at 904; *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 549 (ordering production despite submissions by the foreign state's Ministry of Justice stating that the requested discovery was "strictly confidential" and would violate the state's civil and criminal statutes). Despite Credit Lyonnais's assertions that the "professional and reputational consequences" would be severe if it "betrayed its customer's confidence," Judge Sifton has noted that the FATF, of which France is a member, has warned financial institutions that they could be exposed "to significant reputational, operational and legal risk" if they engage in business relationships with "high risk" customers such as charities collecting funds related to terrorist activities. *Weiss*, 453 F. Supp. 2d at 619.

Furthermore, on March 10, 2006, the court entered a confidentiality order in this case (doc. no. 7), which further lessens Credit Lyonnais's potential hardship. *See Ssangyong v. Vida Shoes Int'l, Inc.*, No. 03 Civ. 5014, 2004 WL 1125659, at *13 (S.D.N.Y. May 20, 2004) (finding that the possibility of hardship "will be greatly lessened if [the court] make[s] a strict confidentiality order"); *Trade Dev. Bank*, 469 F.2d at 41 n.3; *Bodner*, 202 F.R.D. at 376 (finding that "the use of an appropriate protective order" lessened defendant's potential hardship).

Credit Lyonnais has not demonstrated any likelihood that it will be pursued civilly or criminally if it responds to plaintiffs' discovery requests, particularly where the French

interest in preventing terrorist financing through monitoring and reporting is so clearly

demonstrated, and neither France nor CBSP have indicated that it objects to the bank responding

to plaintiffs' discovery. Thus, "the goals of the plaintiffs in this case clearly are consistent with

the objectives of the French Government, as evidenced by that government's laudable efforts" in

participating in both the U.N. Convention and the FATF, as well as implementing domestic laws

incorporating international recommendations to combat terrorist financing. *Bodner*, 202 F.R.D.

at 376-377.

      6.    <u>Credit Lyonnais has acted in good faith.</u>

      The last factor courts in this Circuit consider in determining whether to order

production is "the good faith shown by the party resisting discovery." *Minpeco*, 116 F.R.D. at

528; *see also Reino De Espana*, 2005 WL 1813017, at \*9. "Generally, courts only consider the

good faith of a party resisting discovery in deciding whether to impose sanctions after a

production order is violated . . . . The Second Circuit, however, has also considered good faith at

the order stage." *Compagnie Francaise*, 105 F.R.D. at 31 (citing *Trade Dev. Bank*, 469 F.2d at

40-41). Bad faith delays and dilatory tactics will weigh against the objecting party. *Societe*

*International*, 357 U.S. at 208. In this case, Credit Lyonnais has made at least two efforts to

contact CBSP for its consent for Credit Lyonnais to respond to plaintiffs' discovery requests, and

at least three efforts to contact the French Ministry of Justice for guidance. (*See* Def's Opp. at 5-

6.) By sending two letters each to CBSP and the French government, and leaving one telephone

message with the French Ministry, the defendant has made "good faith[,] diligent efforts" to

secure discovery. *Reino De Espana*, 2005 WL 1813017, at \*9.

      However, "notwithstanding [a litigant's] good faith, [the court is] not precluded

from issuing a production order." *Id.* at *8 (citing *Compaigne Francaise*, 105 F.R.D. at 32). The court notes that the bank's second attempts to contact CBSP and the French Ministry (letters dated September 14 and 29, 2006), were made following court orders to do so (*see* orders dated September 11 and 20, 2006). (*See* Pls' Motion at 7; Def's Opp. at 5-6; *see also Reino De Espana*, 2005 WL 1813017, at *8). Therefore, "[w]hile evincing a measure of good faith, the Court is not convinced that [defendant's] efforts, [are] sufficient to tilt the balance in its favor," and against disclosure. *Reino De Espana*, 2005 WL 1813017, at *8.


D.      <u>Plaintiffs Are Not Entitled To An Order Deeming The Requests For Admissions Admitted.</u>

Pursuant to Rst. § 442(1)(b) and (2)(c), plaintiffs seek an order "deeming plaintiffs' requests for admission admitted" and "the documents authenticated and admitted." (Pls' Motion at 28-29.)[26] Section 442(1)(b) provides,

> Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions, including finding of contempt, dismissal of a claim or defense, or default judgment, or may lead to a determination that the facts to which the order was addressed are as asserted by the opposing party.

Section 442(2)(c) provides,

---

[26]  Plaintiffs also request the court to order the discovery authenticated and admitted pursuant to Fed. R. Civ. P. 36(a), asserting that Rule 36 "permits this Court to enter a 'deeming sanction' or, alternatively, to issue an order requiring Defendant to answer the discovery requests." (Pls' Motion at 29, n.32.) Although Rule 36 allows a party to "apply for an order compelling disclosure or discovery[,]" it does not provide a "deeming sanction." Fed. R. Civ. P. 36(a). Instead, Rule 36(a) provides that a matter is admitted if a party fails to timely answer or object, or if the court determines that an answer does not comply with the requirements of Rule 36. *See id.* Here, Credit Lyonnais timely objected to the plaintiffs' requests for admissions. Because the record lacks any factual basis to sanction Credit Lyonnais and because plaintiffs fail to cite any authority for the court to issue a "deeming" sanction, the court declines to do so.

> a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

As Credit Lyonnais correctly notes, these sections apply only in the event that a party has failed to comply with a court order. Accordingly, because Credit Lyonnais has not failed to comply with a court order, the court may not order the discovery requests admitted and authenticated, pursuant to Rst. §§ 442(1)(b) and (2)(c). The court, however, orders that Credit Lyonnais respond to the plaintiffs' Requests for Admissions by June 25, 2007.

Plaintiffs also request that the court order Credit Lyonnais "to produce all documents sought by Plaintiffs in their First Request for the Production of Documents." (Pls' Motion, Proposed Order, ¶ 6.) Defendant objects on the grounds that it has asserted objections other than French law, and that those objections are not the subject of the pending motion. (Def's Opp. at 29-30.) However, in performing the analysis as to whether French bank secrecy, anti-money laundering and anti-terrorism laws apply and prevent Credit Lyonnais from complying with plaintiffs' discovery requests, the court has already determined that plaintiffs' discovery requests seek relevant information and are narrowly tailored to the issues in this case (*see supra*, section C, subsections 2 and 3). In addition, postponing motion practice regarding Credit Lyonnais's relevance or other objections to plaintiffs' requests would only serve to prolong the discovery phase in this case. It is well within the court's authority to order the production of documents and maintain control of its docket. *See Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) (noting that there exists a "power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and

for litigants"); *Rapture Shipping Ltd. v. Allround Fuel Trading B.V.*, No. 06 Civ. 5296, 2006 WL 2474869, at \*3 (S.D.N.Y. Aug. 28, 2006) (dismissing case "as part of [the court's] broad power to maintain control over its docket"); *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d. 421, 427 (S.D.N.Y. 2005).

CONCLUSION

All factors enumerated in Rst. § 442(1)(c), *Aerospatiale* and *Minpeco* weigh in favor of plaintiffs. Most importantly, the mutual interests of the United States and France in thwarting terrorist financing outweighs the French interest in preserving bank customer secrecy – especially where France has not expressed an interest in precluding discovery responses pursuant to its bank secrecy or other statutes, and has demonstrated its national interest in cooperating in international efforts to detect, monitor and report customer links to terrorist organizations, and freeze funds used for terrorist financing. Notably, Credit Lyonnais has shown a specific interest in CBSP, having investigated CBSP's connections to terrorism and/or money laundering, reported CBSP's activities to TRACFIN and, presumably detecting a connection with terrorism and/or money laundering, closed CBSP's accounts. In addition, the requested discovery originated outside of the United States, is crucial to this litigation and is specifically tailored to the issues in this case. Plaintiffs do not have viable alternative means of securing the discovery, as the Hague Convention can be costly, uncertain and time-consuming, and only Credit Lyonnais or CBSP have access to the requested records. Moreover, although Credit Lyonnais has made good faith efforts to provide the requested discovery, Credit Lyonnais has not demonstrated that it is likely to face substantial hardship by complying with plaintiffs' discovery requests. Finally,

although plaintiffs are not entitled to an order deeming the Requests for Admissions admitted, as defendant has not violated a court order, the plaintiffs are entitled to Credit Lyonnais's responses to its Requests for Admissions and other discovery demands.

Accordingly, by <u>June 25, 2007</u>, Credit Lyonnais shall produce all documents responsive to plaintiffs' Document Requests and respond to plaintiffs' Requests for Admissions and Related Interrogatories. To the extent Credit Lyonnais withholds documents and responses on the basis of asserted attorney-client and/or attorney work-product privileges, Credit Lyonnais shall provide a privilege log identifying those documents and responses and the basis for withholding them, by <u>June 25, 2007</u>.

<u>DEFENDANT'S MOTION TO COMPEL</u>

On July 5, 2006, Credit Lyonnais served plaintiffs with its First Set of Interrogatories and Initial Request for the Production of Documents. (*See* Declaration of Lawrence B. Friedman, Esq. dated 10/18/06 ("Friedman Decl."), Exh. B.) Plaintiffs responded to both on August 14, 2006 (*see id.*, Exhs. A and C), and asserted two principal objections: that the requests seek attorney work product and that Interrogatory Number 4 is a "premature contention interrogatory." (*Id.*, Exh. A.) Pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, Credit Lyonnais seeks an order overruling plaintiffs' objections and compelling plaintiffs to provide answers to Credit Lyonnais's Interrogatories and produce documents in response to Credit Lyonnais's Document Requests.

At issue are Interrogatory numbers 1 and 3-5, and Document Request numbers 1, 4 and 7-14 served by Credit Lyonnais. The disputed interrogatories and plaintiffs' responses are as follows:

- Request No. 1: Identify the persons and entities that supplied, directly or indirectly, or otherwise participated, directly or indirectly, in obtaining on behalf of Plaintiffs the documents called for by Request Numbers 1, 4 and 7-13 in [defendant's] Initial Request for the Production of Documents, dated July 5, 2006.

- Response to No. 1: Plaintiffs object to this Interrogatory as being overbroad, burdensome, irrelevant to the claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs specifically object to the terms "directly" and "indirectly" in this interrogatory [sic] as being vague. Plaintiffs further object to this Interrogatory on the grounds that it seeks investigatory materials protected by the attorney work product doctrine. The methods and sources by which Plaintiffs' attorneys have and/or may choose to prepare their case are protected from disclosure and do not constitute factual information to which [defendant] is entitled.

• No. 3: Identify all expert witnesses on whom Plaintiff intends to rely at trial.

• Response to No. 3: Plaintiffs object to this Interrogatory as being overbroad, burdensome, and premature at this time as discovery has recently commenced and Plaintiffs are not in a position to determine which expert witnesses will be called to testify at trial. Plaintiffs further object to this request to the extent it seeks investigatory materials protected by the attorney work product doctrine. Plaintiffs will disclose expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(C).

• No. 4: Explain in detail the factual bases for Plaintiffs' allegations concerning (i) the identity of persons and/or entities that perpetrated the attacks that caused Plaintiffs' injuries, (ii) how and in what forms and by what means such persons and/or entities received material support and/or resources from [defendant]; and (iii) how and by what means such material support and/or resources proximately caused Plaintiffs' injuries.

• Response to No. 4: Plaintiffs object to Interrogatory No. 4 as unduly vague and overbroad and on the basis of General Objection A as a premature contention interrogatory.[27] Plaintiffs also object to this

---

[27] Plaintiffs' General Objection A provides,

Plaintiffs object to responding to Defendant's Interrogatories as being premature to the extent they are contention interrogatories. While such interrogatories are generally permitted, the obligation to respond should be postponed until the end of the discovery period, absent a showing by the requesting party of a particular need. *See generally In re Convergent Technologies Security Litig.*, 108 F.R.D. 328, 338 (N.D. Cal. 1985); *see also Manual for Complex Litig.*, 3rd, § 21.33 at p. 62 (2000) (Contention interrogatories may serve a useful purpose in narrowing issues for trial "especially when served after adequate opportunity for relevant discovery.") Plaintiffs have not completed any discovery with [defendant]. Therefore, Plaintiffs will not be in a position to offer full and useful answers to contention interrogatories until Defendant produces responsive documents to Plaintiffs' requests. Responding to contention interrogatories at this stage of the litigation poses an undue burden on Plaintiffs, who will be forced to answer the Interrogatories a second time after the production of discovery is complete. Defendant will not be prejudiced by the delay because it has full access to information about its own behavior.

Interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to this Interrogatory to the extent it seeks investigatory materials protected by the attorney work product doctrine.

- No. 5: Identify all persons who assisted in preparing responses to these Interrogatories and all documents considered, read, referred to, discussed or reviewed in preparing responses to these Interrogatories.

- Response to No. 5: Plaintiffs object to this Interrogatory as being vague, overbroad, burdensome, harassing, irrelevant to the claim or defense of any party, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to this Interrogatory to the extent it seeks investigatory materials protected by the attorney work product doctrine.

(*Id.*, Exh. A.)

As set forth above, plaintiffs objected to all of defendant's interrogatories on the ground that the interrogatories are overbroad and seek material protected by the attorney work product privilege.

Credit Lyonnais's Document Requests seek:

- No. 1: All documents upon which Plaintiffs rely in support of their allegations in the Complaint . . . .

- No. 4: All documents concerning the acts that caused Plaintiffs' injuries, including but not limited to articles and media reports.

- No. 7: All documents concerning [Credit Lyonnais].

- No. 8: All documents concerning CBSP.

- No. 9: All documents concerning any relationship between [Credit Lyonnais] and CBSP.

- No. 10: All documents concerning [Credit Lyonnais's] alleged relationship to the acts that caused Plaintiffs' injuries, including but not <u>limited</u> to any documents reflecting [Credit Lyonnais's] collection, provision, and/or transmission of any support, money and/or financial services, either directly or indirectly, to or from HAMAS.

- No. 11:  All documents concerning [Credit Lyonnais's] alleged knowledge of the alleged relationship between CBSP and the acts that caused Plaintiffs' injuries.

- No. 12:  All documents concerning the relationship between CBSP and HAMAS.

- No. 13:  All documents obtained by or on behalf of Plaintiffs concerning the allegations in the Complaint from any governmental authority.

- No. 14:  All documents referred to or relied upon in Plaintiffs' Initial Disclosures, dated June 16, 2006.

(*Id.*, Exh. C.)

In response to the above document requests, plaintiffs agreed to produce "non-objectionable, non-privileged documents responsive to" the Requests, but also objected to the above Requests on the ground, *inter alia*, that they "seek[] documents protected by the attorney work-product doctrine."  (*Id.* at 4.)  Plaintiffs explained:

> Documents concerning the methods by which Plaintiffs' attorneys have prepared, and/or may have choose [sic] to prepare, their case are protected from disclosure and will not be produced in response to this Request.  Plaintiffs need only provide Defendant with relevant facts, not information surrounding any interviews conducted, for such information has the potential for insights into Plaintiffs' attorney work product concerning the preparation of their case.

(*Id.*)  Plaintiffs did not provide a privilege log with their responses to defendant's interrogatories and document requests, as required by Rule 26(b)(5) of the Federal Rules of Civil Procedure.

Credit Lyonnais now seeks an order compelling plaintiffs' response to its Document Requests, and Requests for Admissions and Related Interrogatories.

<u>The Work Product Doctrine</u>

The attorney work product doctrine protects from discovery "documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . ." Fed. R Civ. P. 26(b)(3). The doctrine was established in order "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by his adversaries." *United States v. Aldman*, 134 F.3d 1194, 1996 (2d Cir. 1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-511 (1947)). "Three conditions must be fulfilled in order for work product protection to apply. 'The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.'" *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05-MD-01695, 2007 WL 724555, at *4 (S.D.N.Y. Mar. 9, 2007) (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc*., No. 97 Civ. 4978, 2002 WL 31556382, at *4 (S.D.N.Y. Nov. 15, 2002)) (further citations omitted). "The party asserting work product protection 'bears the burden of establishing its applicability to the case at hand.'" *Veeco*, 2007 WL 724555, at *4 (quoting *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003)).

Work product protection, however, is not absolute. Even where the applicability of the work product doctrine has been established, factual material may be ordered "upon a 'showing that the party seeking discovery has substantial need of the materials . . . and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means' . . . ." *In re Grand Jury Subpoenas*, 318 F.3d at 383 (quoting Fed. R. Civ. P. 26(b)(3)). The rule that otherwise protected factual material may be discoverable "distinguishes

between matters revealing the thought processes of a party's representative and factual information obtained in anticipation of litigation. Substantial protection is afforded the first category. Limited protection is afforded the second." *In re Savitt/Adler Litig.*, 176 F.R.D. 44, 46 (N.D.N.Y. 1997).

Work product protection typically applies only to "documents and tangible things," and not to facts within the documents. *In re Savitt/Adlert*, 176 F.R.D. at 47-48; *ECDC Envtl., L.C. v. New York Marine and Gen. Ins. Co.*, No. 96 CIV. 6033, 1998 WL 614478, at *16 (S.D.N.Y. June 4, 1998) ("[B]ecause the work product privilege does not protect facts in that document (the privilege protects documents, not facts), the party seeking those facts may obtain them through [means other than document requests], such as through depositions and interrogatories.").

"Although the work product doctrine is most commonly applied to documents and things, unjustified disclosure of the opinions or mental processes of counsel may occur when questions are posed which seek information at depositions or in interrogatories." *United States v. District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of Am.*, No. 90 Civ. 5722, 1992 WL 208284, at *7 (S.D.N.Y. Aug. 18, 1992). In *United Brotherhood*, the court found,

> How a party, its counsel and agents choose to prepare their case, the efforts they undertake, and the people they interview is not factual information to which an adversary is entitled. Disclosure of this information would inevitably teach defendants which individuals the [plaintiff] considered more or less valuable witnesses and how it was preparing for trial.

*Id*. at *10. Thus, interrogatories which seek to discover facts regarding an attorney's mental thought process seek improper work product information. In *Commonwealth of Massachusetts*

*v. First National Supermarkets, Inc.*, 112 F.R.D. 149 (D. Mass. 1986), the court distinguished between interrogatories seeking discoverable facts and those seeking attorney work product, finding a "distinction between asking the identity of persons with knowledge, which is clearly permissible, and asking the identity of persons contacted and/or interviewed during an investigation, which is not." *First National*, 112 F.R.D. at 152. Similarly, in *Morgan v. City of New York*, No. 00 Civ. 9172, 2002 WL 1808233, at *3 (S.D.N.Y. Aug. 6, 2002), the court directed plaintiff to answer an interrogatory requesting the identity of "every person whom Plaintiff believes has knowledge of any facts concerning Plaintiff's claims in this litigation[,]" but not an interrogatory requiring plaintiff to "[i]dentify every person whom Plaintiff or her agents have contacted, interviewed or communicated with concerning Plaintiff's allegations in this case." *See also Seven Hanover Assocs., LLC v. Jones Lang LaSalle Americas, Inc.*, No. 04 Civ. 4143, 2005 WL 3358597, at *1 (S.D.N.Y. Dec. 7, 2005) ("Defendant is free to ask for the names of persons with knowledge of the facts, but it is not entitled, through plaintiffs, to the identification of who among such knowledgeable individuals may have been interviewed by plaintiffs' attorney."); *Donson Stores, Inc. v. American Bakeries Co.*, 72 Civ. 3991, 1973 WL 791, at *3 (S.D.N.Y. Apr. 2, 1973) (striking the clause "including your counsel" from the interrogatory requesting, "State whether you, including your counsel, made any investigation regarding any possible violations of any company policy . . .").

The court applies the foregoing to the disputed discovery demands.

Interrogatories Nos. 1 and 5.

In this case, Interrogatory No. 1 requests that plaintiffs "identify the persons or entities that supplied . . . or otherwise participated . . . in obtaining on behalf of Plaintiffs the

documents called for" by Credit Lyonnais's Document Requests Nos. 1, 4 and 7-13. Interrogatory No. 1 does not seek documents or tangible material or information that would intrude upon the attorney work product doctrine. Rather, Interrogatory No. 1 seeks the sources of documents requested in defendant's Document Requests Nos. 1, 4 and 7-13. The parties were obligated, in their mandatory initial disclosures, to provide copies or a description by category and location of all documents in a party's possession, custody or control as mandated by Rule 26(a)(1) of the Federal Rules of Civil Procedure. Defendant's request, that plaintiffs disclose the sources of documents that they may use to support their claims, does not seek thought processes, opinions or mental processes of plaintiffs' counsel. Plaintiffs' response to Interrogatory No. 1 must provide the defendant with information that will allow defendant the opportunity to seek documents from the same sources from which plaintiffs obtained documents, irrespective of whether plaintiffs also produce copies of documents they obtained from these sources. Accordingly, plaintiffs shall respond to Interrogatory No. 1 because disclosure of the information sought will not "teach defendants which individuals the [plaintiffs] considered more or less valuable witnesses and how [they are] preparing for trial." *United Brotherhood*, 1992 WL 208284, at *10.

Interrogatory No. 5 requests that plaintiffs "identify all persons who assisted in preparing responses to these Interrogatories and all documents considered . . . ." The cases relied upon by Credit Lyonnais in support of its motion to compel responses to Interrogatory No. 5 are inapposite. For example, in *In re Savitt/Adler*, the court did not rule that interrogatory responses are never entitled to work product protection, but rather, that the interrogatories at issue did not seek work product because they sought facts that supported plaintiffs' allegations

and those facts were not prepared by a party or a party's representative.  *See In re Savitt/Adler*, 176 F.R.D. at 48.

As in *First National*, defendant does not seek simply "identities of persons with knowledge" of the facts regarding plaintiffs' claims, a request to which the court would have ordered a response.  Rather, defendant seeks the identities of those who actually participated in plaintiffs' case preparation, including the preparation of responses to the Interrogatories.  *First National*, 112 F.R.D. at 152.   Thus, as the court determined in *Morgan*, requiring plaintiffs to reveal the identities of individuals who assisted them with their interrogatory responses could easily reveal "every person whom Plaintiff[s or their] agents have contacted, interviewed or communicated with concerning Plaintiff[s'] allegations in this case," or even which persons plaintiffs believe to have the most relevant information.  *Morgan*, 2002 WL 1808233, at *3.  Here, Credit Lyonnais's motion to compel a response to Interrogatory No. 5 is denied because it seeks information regarding individuals who assisted plaintiffs' counsel with the preparation of their interrogatory responses, which is protected work product.  *See Seven Hanover*, 2005 WL 3358597, at *1; *Morgan*, 2002 WL 1808233, at *3; *Donson Stores*, 1973 WL 791, at *3.  In response to Interrogatory No. 5, plaintiffs should, however, identify and produce the non-privileged documents upon which they relied in preparing their interrogatory responses.  If plaintiffs claim work product protection for any of the documents, they must provide a privilege log and sustain their burden of establishing that the documents were prepared by counsel or reveal their counsels' mental impressions, opinions, conclusions or legal theories.

Consequently, the court grants defendant's motion to compel plaintiffs to respond further to Credit Lyonnais's Interrogatory Nos. 1 and 5 to the extent plaintiffs must identify the

sources of documents called for in defendant's document requests and the documents upon which plaintiffs relied in preparing their responses to the interrogatories, and produce responsive, non-privileged documents. The court denies defendant's motion to compel a response to Interrogatory No. 5 to the extent it seeks the identities of individuals upon whom plaintiffs relied to assist in the preparation of their interrogatory responses.

Interrogatory No. 3.

Defendant's Interrogatory No. 3 requests that plaintiffs "[i]dentify all expert witnesses on whom Plaintiffs intend to rely at trial." (Friedman Decl., Exh. B.) Plaintiffs responded:

> Plaintiffs object to this Interrogatory as being vague, overbroad, burdensome, and premature at this time as discovery has recently commenced and Plaintiffs are not in a position to determine which expert witnesses will be called to testify at trial. Plaintiffs further object to this request to the extent it seeks investigatory materials protected by the attorney work product doctrine. Plaintiffs will disclose expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2)(C).

(*Id.*, Exh. A.)

Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure provides that expert disclosures "shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court . . . , the disclosures shall be made at least 90 days before the trial date." As discussed above, work product protection does not extend to facts within a document or to the identities of people with relevant knowledge. *See ECDC Envtl.*, 1998 WL 614478, at *16 ("[T]he privilege protects documents, not facts . . ."); *First National*, 112 F.R.D. at 152. Nor does the work product doctrine protect the identities of expert witnesses upon whom plaintiffs intend to rely at trial, the experts' opinions, the bases and reasons therefor, or

the data and information considered by the expert witnesses. Fed. R. Civ. P. 26(a)(2)(B). *See Morgan*, 2002 WL 1808233, at *3 (directing plaintiff to answer an interrogatory requesting the identity of "every person whom Plaintiff believes has knowledge of any facts concerning Plaintiff's claims in this litigation"); *Seven Hanover*, 2005 WL 3358597, at *1.

Notwithstanding the foregoing, however, plaintiffs will not be compelled at this time to disclose the identities of experts pursuant to Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure because the court has not set a date by which expert reports, disclosures and discovery must be provided. *See Sheehan v. Metropolitan Life Ins. Co.*, No. 01 Civ. 9182, 2003 WL 22290230, at *4 (S.D.N.Y. Oct. 6, 2003) (because "[n]o trial date ha[d] yet been set, nor ha[d] the Court directed a time frame for submission of expert disclosures," the parties were not precluded from submitting expert reports within the time allowed by Fed. R. Civ. P. 26(a)(2)(C)); *cf. Millenium Expressions, Inc. v. Chauss Marketing, Ltd.*, No. 02 Civ. 7545, 2006 WL 288353, at *2 (S.D.N.Y. Feb. 6, 2006) (denying introduction of plaintiff's expert report even though it was served within the 90 day period provided by Rule 26(a)(2)(C), because plaintiff failed to comply with the court's discovery deadline); *Brenton v. Consol. Rail Corp.*, No. 00 CV 0742E, 2006 WL 1888598, at *2 (W.D.N.Y. July 7, 2006) (finding Rule 26(a)(2)(C) inapplicable because the court had set a discovery deadline). Accordingly, in the absence of a further court order, plaintiffs shall identify the experts on whom they intend to rely at trial, at least 90 days before the trial date.

Interrogatory No. 4.

Credit Lyonnais's Interrogatory No. 4 asks plaintiffs to "explain in detail the factual basis" for their allegations regarding "(i) the identity of persons and/or entities that

perpetrated the attacks that caused Plaintiffs' injuries, (ii) how and in what forms and by what means such persons and/or entities received material support and/or resources from [defendant]; and (iii) how and by what means such material support and/or resources proximately caused Plaintiffs' injuries."  Plaintiffs assert that Interrogatory No. 4 is a "contention interrogatory," which would require plaintiffs "to identify evidence that they may use to prove two essential elements of their claim – i.e., that Credit Lyonnais provided 'material support' to known terrorist organizations and that its conduct was a 'proximate cause'" of plaintiffs' injuries.  (Pls' Opp. at 9-10.)

Contention interrogatories involve "an opinion or contention that relates to fact or the application of law to fact."  Fed. R. Civ. P. 33(c).  Such interrogatories "may ask another party to indicate what it contends, to state all the facts on which it bases its contentions, to state all the evidence on which it bases its contentions, or to explain how the law applies to the facts."  *McCarthy v. Paine Webber Group, Inc.*, 168 F.R.D. 448, 450 (D. Conn. 1996).  Contention interrogatories are distinct from those that "request identification of witnesses or documents that bear on the allegations."  *Id.*.  "[I]nterrogatories seeking the identity of witnesses and interrogatories seeking the location of documents or other tangible evidence may be sought while discovery is still in its infancy."  *Fischer & Porter Co. v. Tolson*, 143 F.R.D. 93, 96 (E.D. Pa. 1992).

Pursuant to Fed. R. Civ. P. 33(c), a court may postpone a response to contention interrogatories until discovery is closer to completion:

> An interrogatory otherwise proper is not necessarily objectionable
> merely because an answer to the interrogatory involves an opinion or
> contention that relates to fact or the application of law to fact, but the
> court may order that such an interrogatory need not be answered until

> after designated discovery has been completed or until a pre-trial
> conference or other later time.

Fed. R. Civ. P. 33(c). Rule 33(c) "protects the responding party from being hemmed into fixing [its] position without adequate information." *Roth v. Commonwealth*, No. CIV-79-36E, 1988 WL 43963, at *4 (W.D.N.Y. May 4, 1988).

Some courts in this district have found contention interrogatories premature where no "significant discovery has taken place." *County of Suffolk v. Lilco*, No. 87 CV 0646, 1988 WL 69759, at *1 (E.D.N.Y. June 13, 1988). As Judge Lindsay recently noted, "[N]othing in Rule 33 of the Federal Rules of Civil Procedure or the Local Rules for the Eastern District of New York prohibits a party from interposing contention interrogatories at an early stage of discovery, although there is considerable support for doing so." *Protex Int'l Corp. v. Vanguard Products Group, Inc.*, No. CV 05-5355, 2006 WL 3827423, at *2 (E.D.N.Y. Dec. 27, 2006). She held, "The burden imposed on Protex in responding to these requests outweighs the likelihood that useful information will be produced when Protex has not had discovery of [defendant's] documents." *Id.*; *see also Shannon v. New York Transit Auth.*, No. 00 CIV. 5079, 2001 WL 286727, at *3 (S.D.N.Y. Mar. 22, 2001) (finding that because only document discovery had occurred, the contention interrogatories were premature); *Roth*, 1988 WL 43963, at *5 (finding that half of defendants' interrogatories were "contention interrogatories and need not be answered until the substantial completion of pretrial discovery"); *McCarthy*, 168 F.R.D. at 450 (denying defendant's motion to compel answers to interrogatories because "substantial discovery . . . remains to be completed" and "defendant has not shown why any relevance of the information . . . outweighs the burden its collection would impose on plaintiffs at this time while discovery is ongoing"); *Fischer*, 143 F.R.D. at 96 (denying defendants' motion to compel

responses to contention interrogatories because "substantial discovery remains to be conducted . . .").

Credit Lyonnais argues that because this District has not adopted the Southern District of New York's Local Rule 33.3, contention interrogatories are more readily permitted in the Eastern District, early in the proceedings. Local S.D.N.Y. Civil Rule 33.3 specifically prohibits interrogatories other than those seeking the identity of witnesses, the computation of damages, or the location of documents until 30 days prior to the end of discovery, unless "they are a more practical method of obtaining the information sought than a request for production or a deposition," or they are "ordered by the court." S.D.N.Y. Local Civil Rule 33.3.

Absent a similar rule in the Eastern District of New York, the court, in its discretion, may order responses to contention interrogatories, even in the early stages of discovery, where responses would assist in clarifying plaintiffs' allegations and identifying witnesses without imposing undue burdens on the responding party. In *Convergent Business Systems, Inc. v. Diamond Reporting, Inc.*, No. CV-88-2329, 1989 WL 92038, at *1 (E.D.N.Y. Aug. 3, 1989), the court found "nothing improper *per se*" about interrogatories which "track the allegations of defendants' antitrust claims and seek all documents in support of the various allegations." The court further noted:

> Defendants' . . . assertion that contention interrogatories are
> inappropriate where the complaint is detailed is . . . unavailing.
> Information in a complaint is not a substitute for answers to
> interrogatories which unlike the allegations of a complaint can be used
> as affirmative evidence at trial and for impeachment and cross-
> examination purposes.

*Id.* Although the court did not specifically address the status of discovery, discovery was well underway when plaintiffs moved to compel: defendants had produced "a mass of documents"

and the parties had conducted several depositions.  *See id.*  Moreover, defendants failed to "prove how and why providing the answers would be oppressive."  *Id.* at *2.

In this case, subpart (i) of Credit Lyonnais's Interrogatory No. 4 is not a contention interrogatory because it simply requests discoverable factual information: the identity "of persons and/or entities that perpetrated the attacks that caused Plaintiffs' injuries . . . ."  (*Id.*)  *See McCarthy*, 168 F.R.D. at 450 (distinguishing contention interrogatories from those that request the identities of people with knowledge).  Subparts (ii) and (iii) of Credit Lyonnais's Interrogatory No. 4 arguably are contention interrogatories to the extent that they request plaintiffs to state their contentions as to the application of law to fact.  *See* Fed. R. Civ. P. 33(c).  Subpart (ii) asks "how and in what forms and by what means such persons and/or entities [identified in subpart (i)] received material support and/or resources from [defendant]," and subpart (iii) asks "how and by what means such material support and/or resources proximately caused Plaintiffs' injuries."  (Freidman Decl., Exh. A.)  *See McCarthy*, 168 F.R.D. at 450 (finding that the "proposed interrogatories . . . seek to elicit the contentions and allegations of plaintiffs"); *Roth*, 1988 WL 43963, at *4-5 (noting that contention interrogatories are "those that ask the adverse party to state all the *facts* or all the *evidence* upon which he *bases* some specific contention . . . .") (emphasis in original).

Because this district has not adopted Southern District Local Civil Rule 33.3, the court declines to impose a blanket rule that contention interrogatories are inappropriate until the parties have completed, or are close to completing, discovery.  *See Convergent Bus. Systems*, 1989 WL 92038, at *1.  Requiring plaintiffs in this case to answer subparts (ii) and (iii) at this early stage in discovery would not be futile or burdensome because the interrogatories track the

allegations in the complaint, upon which plaintiffs presumably have sufficient facts to plead.  In

any event, plaintiffs are under an ongoing obligation to supplement their discovery responses.

*See* Fed. R. Civ. P. 26(e).  Although Credit Lyonnais has not yet produced any documents to

plaintiffs and only one deposition has occurred, the plaintiffs are ordered to disclose the facts and

documents that support the allegations in their complaint, as requested in Interrogatory 4, by

June 25, 2007.

Credit Lyonnais's Document Requests.

In order for a document to qualify as work product, it must have been "prepared

in anticipation of litigation, [and] . . . by or for a party, or his representative." *Veeco*, 2007 WL

724555, at *4.  The "mere incantation" of work product protection is insufficient to establish that

protection is warranted.  *Omega Eng'g, Inc. v. Omega, S.A.*, 98 Civ. 2462, 2001 WL 173765, at

*3 (D. Conn. Feb. 6, 2001).  Instead, "[t]he burden is on the party resisting discovery to explain

its objections and to provide support therefore."  *Shannon*, 2001 WL 286727, at *1.  The burden

cannot be "discharged by mere conclusory or ipse dixit assertions."  *von Bulow v. von Bulow*,

811 F.2d 136, 146 (2d Cir. 1987).

The party asserting a protection or privilege must not only sufficiently assert the

basis therefor, but must also timely produce a privilege log.  Fed. R. Civ. P. 26(b)(5) provides,

> When a party withholds information otherwise discoverable under
> these rules by claiming that it is privileged or subject to protection as
> trial preparation material, the party shall make the claim expressly and
> shall describe the nature of the documents, communications, or things
> not produced or disclosed in a manner that, without revealing
> information itself privileged or protected, will enable other parties to
> assess the applicability of the privilege or protection.

Similarly, Local Rule 26.2 directs that parties asserting a privilege shall disclose the type of document, general subject matter of the document, date, and any other information "sufficient to identify the document for a subpoena duces tecum, including . . . the author of the document, the addressees of the document . . . and the relationship of the author, addressees, and recipients to each other."  Local Civil Rule 26.2.

Failing to include sufficiently descriptive information may result in a finding that the privilege has not been established.  *See OneBeacon Ins. Co. v. Forman Intern., Ltd.*, No. 04 Civ. 2271, 2006 WL 3771010, at *6  (S.D.N.Y. Dec. 15, 2006) ("Courts in this Circuit have refused to uphold a claim of privilege where privilege log entries fail to provide adequate information to support the claim."); *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996); *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 166 (2d Cir. 1992) ("[T]he failure to comply with [Rule 26] may result in a finding that the privilege has been waived."); *Grossman v. Schwarz*, 125 F.R.D. 376, 386-87 (S.D.N.Y. 1989) ("[F]ailure to comply with the explicit requirements of [Rule 26] will be considered presumptive evidence that the claim of privilege is without factual or legal foundation.");  *NextG Networks of NY, Inc. v. City of New York*, No. 03 Civ. 9672, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005); *Bowne of New York City, Inc. v. Ambrase Corp.*, 150 F.R.D. 465, 474-75 (S.D.N.Y. 1993).

Moreover, failure to timely provide a privilege log may operate as a waiver.  *See Smith v. Franklin Hosp. Medical Center No.*, 04-CV-3555, 2005 WL 2219294, at *2 (E.D.N.Y. Sept. 25, 2005) (quoting *FG Hemisphere Associates, L.L.C. v. Republique Du Congo*, No. 01 Civ. 8700, 2005 WL 545218, at *6 (S.D.N.Y. Mar. 8, 2005) ("As other judges in this District and I have repeatedly held, the unjustified failure to list privileged documents on the required log

-73-

of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege.") (citations omitted)); *Lugosch v. Congel*, No. Civ. 1:00-CV-0784, 2006 WL 931687, at *15 (N.D.N.Y. Mar. 7, 2006) ("Failure to timely provide the privilege log or objection constitutes a waiver of any of the asserted privileges."); *Kitevski v. City of New York*, No. 04 Civ. 7402, 2006 WL 680527, at *4 (S.D.N.Y. Mar. 16, 2006) ("The City has failed to provide a privilege log, and has failed to present any justification for that failure. It has, therefore, waived any privilege with respect to the . . . records by failing to properly identify the documents, and assert the privilege."); *Smith v. Conway Org., Inc.*, 154 F.R.D. 73, 76 (S.D.N.Y. 1994).

In this case, plaintiffs have generally asserted work product protection. Not only have plaintiffs failed to provide a privilege log, plaintiffs also have failed to demonstrate either that the documents Credit Lyonnais seeks were prepared "in anticipation of litigation," or that they were prepared by a party's representative. Fed. R. Civ. P. 26(b)(3); *see also Weber v. Paduano*, No. 02 Civ. 3392, 2003 WL 161340, at *6 (S.D.N.Y. Jan. 22, 2003) (finding that "defendants have not proffered sufficient evidence to demonstrate that the documents in the privilege logs are work product"); *In re Savitt/Adler*, 176 F.R.D. at 48 (finding that plaintiffs failed to demonstrate that the documents sought privileged information and were prepared in anticipation of litigation).

Further, plaintiffs have failed to explain how any of the documents qualify for work product protection – for example, that certain documents consist of attorney memoranda or notes reflecting legal theories and opinions in anticipation of litigation. *See Aldman*, 134 F.3d at 1202 (holding that documents must be prepared "because of the prospect of litigation" in order to qualify as work product). The absence of such a showing precludes the court from affording

work product protection to the documents.  *See Securities & Exch. Comm'n. v. Thrasher*, No. 92 Civ. 6987, 1995 WL 46681, at *3 (S.D.N.Y. Feb. 7, 1995) (refusing to grant work product protection to notes taken by the SEC because the Commission failed to "offer testimony with regard to the interview notes, much less establish the precise purpose of the notes, whether a decision had been made to litigate at the time they were created . . . and whether the notes were treated with the requisite confidentiality").

Moreover, defendant asserts, and plaintiffs do not dispute, that most of the requested documents were prepared by third parties and not plaintiffs or their representatives. Credit Lyonnais states, "[P]laintiffs' counsel has referred to certain 'investigative reports' prepared by the Israeli government and its agencies, and subsequently obtained by plaintiffs, as a source for certain of their allegations against [Credit Lyonnais].  Plaintiffs have not produced any of these materials to date in this litigation."  (Def's Motion at 9.)  It is well-settled that parties "cannot avoid disclosure based upon the simple fact that counsel obtained certain documents from third parties.  The information in question does not fall within the protection of the work-product doctrine."  *In re Automotive Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *7 (E.D. Pa. May 26, 2006); *see also Compaigne Francaise*, 105 F.R.D. at 41 ("Documents prepared by third parties contemporaneous with the events to which the documents relate cannot fairly be deemed to have been prepared in anticipation of litigation."); *In re Grand Jury Subpoenas Dated March 19 and August 2, 2002*, No. M-11-189, 2002 WL 31040322, at *4 (S.D.N.Y. Sept. 12, 2002) (denying work product protection to bank records because "[t]hey are the pre-existing records of third parties, created and maintained by those third parties without any reference to litigation whatsoever"), *aff'd*, 318 F.3d 379 (2d Cir. 2003);

*Aldman*, 134 F.3d at 1202 (holding that work product does not protect "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation").

<u>Credit Lyonnais's Substantial Need for the Requested Documents.</u>

Assuming that plaintiffs could have established that certain documents were protected by the work product doctrine, "[e]ven where the applicability of the work product doctrine had been established, factual material may be ordered produced 'upon a showing of substantial need and inability to obtain the equivalent without undue hardship.'" *In re Omeprazole Patent Litig.*, No. M-21-81, MDL 1291, 2005 WL 818821, at *9 (S.D.N.Y. Feb. 18, 2005) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 400 (1981)). "A substantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000). Undue hardship

> does not mean that the movants must prove that obtaining the information elsewhere is absolutely impossible or that they must prove the required element beyond a reasonable doubt. All that is needed is a showing that it is likely to be significantly more difficult, time-consuming or expensive to obtain the information from another source than from the factual work product of the objecting party.

*Thrasher*, 1995 WL 46681, at *9.

In *Thrasher*, the court found that defendants, alleged to have committed insider trading, adequately overcame the SEC's work product objections. *See id.* The SEC asserted work product protection for notes taken during interviews with the only people who witnessed and participated in the insider trading at issue. Since the time of those interviews, one witness

had died and the others invoked their Fifth Amendment right not to testify. *See id.* at *8.

Therefore, defendants could not discover the same information through other less-invasive means, such as depositions or interrogatories. *See id.* Accordingly, the court found that the defendants "met their burden" of overcoming the work product privilege because they had a substantial need for the interview notes and could not obtain the information elsewhere. *Id.* at *9; *see also In re Savitt/Adler*, 176 F.R.D. at 48 (finding that because "critical information [regarding the bases of plaintiffs' complaint] is in the sole possession of an adversary, [defendant] satisfied its burden of establishing both substantial hardship and undue burden"); *cf. United Brotherhood*, 1992 WL 208284, at *10 (finding that defendants failed to demonstrate substantial need because they "have knowledge of the universe of people who have information relevant to the issues in this case. Indeed, [those people] are either mentioned in the Supplemental Complaint or have been identified . . . .").

Here, Credit Lyonnais has substantial need for the documents which are not work product because they were prepared by, or obtained from, third parties. For the most part, Credit Lyonnais cannot obtain the equivalent from another source without undue hardship. Importantly, Credit Lyonnais does not have access to government officials or sources who have assisted and provided plaintiffs with information regarding terrorist networks and actions and CBSP's connection to them. *See In re Savitt/Adler*, 176 F.R.D. at 48. As plaintiffs themselves note, several of those sources do not wish "their identities to be made public, or even to be disclosed confidentially to a party alleged to have a relationship with Specially Designated Global Terrorists." (Pls' Opp. at 19.) However, it is likely that the plaintiffs rely on these same sources of information to allege that Credit Lyonnais has a connection to the attacks that caused

plaintiffs' injuries. Consequently, plaintiffs may not use their information and documents both as a sword and, to the extent they seek protection from disclosure, as a shield. Therefore, "unfairness" exists regarding access to relevant, material information. *In re Grand Jury Proceedings*, 350 F.3d 299, 304 (2d. 2003) ("Forfeiture of [work product protection] is premised on the *unfairness* to the adversary of *having to defend* against the privilege holder's claim without access to pertinent privileged materials that might refute the claim.") (emphasis in original). Documents purportedly obtained by plaintiffs from unknown Israeli or other sources concerning the relationship between CBSP and those alleged to have carried out the terrorist attacks, including HAMAS and the Union of Good, are not work product but are "essential" to Credit Lyonnais's defense and "crucial" to a determination of liability. *First Nat'l Congress*, 194 F.R.D. at 110.

Furthermore, as in *In re Savitt/Adler*, although Credit Lyonnais has access to its own financial documents, it is entitled to learn what Credit Lyonnais documents plaintiffs have obtained. Contrary to plaintiffs' suggestion that this case is analogous to a products liability case (*see* Pls' Opp. at 23-24), in which the manufacturer presumably has access to its product's distributors and sellers, here, Credit Lyonnais is entitled to have access to the information and documents upon which plaintiffs rely to establish their claims, including but not limited to, the chain of parties who allegedly received and used CBSP's funds to cause plaintiffs' injuries.

Plaintiffs have failed to establish that the attorney work product doctrine protects the disputed documents. Credit Lyonnais has demonstrated substantial need for plaintiffs' document responses and its own inability to obtain the same information without undue hardship

and, thus, has overcome any work product concerns that may have protected the documents.

Accordingly, plaintiffs are ordered to produce responsive documents by June 25, 2007.[28]

<u>CONCLUSION</u>

Plaintiffs must respond to Credit Lyonnais's Interrogatory No. 1, which does not seek attorney work product. Plaintiffs must respond to Interrogatory No. 5 by identifying the documents upon which they relied in responding to the interrogatories and provide a privilege log as to those documents plaintiffs claim are protected by the work product doctrine, and sustain their burden of establishing that the documents were prepared by counsel or reveal their counsels' mental impressions, opinions, conclusions or legal theories. Plaintiffs' response to Interrogatory No. 5 need not identify the individuals who assisted in the preparation of plaintiffs' responses to defendant's interrogatories. Interrogatory No. 3 does not seek attorney work product, but plaintiffs may defer responding to Interrogatory No. 3 until 90 days before trial, in accordance with Fed. R. Civ. P. 26(a)(2)(C), unless otherwise directed by the court. Plaintiffs shall respond to Interrogatory No. 4, to the extent they are able, and shall supplement their responses, pursuant to Fed. R. Civ. P. 26(e). Finally, by June 25, 2007, plaintiffs shall produce all documents responsive to Credit Lyonnais's Document Requests Nos. 1, 4 and 7-14 because they failed to demonstrate that the requested documents are protected attorney work product. Furthermore, even if the work product doctrine did apply to documents obtained from non-

---

[28] Because the court has ordered plaintiffs to produce Credit Lyonnais's requested documents, the court does not reach defendant's argument that plaintiffs have waived work product protection as to those documents by placing them "at issue." (Def.'s Motion at 12-14.)

parties, Credit Lyonnais has overcome its application by demonstrating a substantial need for the information requested.

**SO ORDERED.**

Dated: May 25, 2007
   Brooklyn, New York

            _____/s/_____
            KIYO A. MATSUMOTO
            United States Magistrate Judge