UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
MOSES STRAUSS, et al.,              :
                           :
              Plaintiffs,     :
                           :        **OPINION AND ORDER**
                           :        06-cv-702 (DLI) (MDG)
          -against-        :
                           :
                           :
CRÉDIT LYONNAIS, S.A.,      :
                           :
              Defendant.    :
                           :
------------------------------------------------------- x
BERNICE WOLF, et al.,          :
                           :
              Plaintiffs,     :
                           :        07-cv-914 (DLI) (MDG)
          -against-        :
                           :
                           :
CRÉDIT LYONNAIS, S.A.,      :
                           :
              Defendant.    :
                           :
------------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

Over 200 individuals and estates of deceased persons (collectively, "Plaintiffs"), brought this consolidated action against defendant Crédit Lyonnais, S.A. ("Defendant"), seeking to recover damages from fifteen terrorist attacks in Israel and Palestine pursuant to the civil liability provision of the Antiterrorism Act of 1992 ("ATA"), 18 U.S.C. § 2333(a) ("Section 2333(a)"). Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In addition, a group of Plaintiffs who seek damages related to one of the fifteen attacks, a September 9, 2003 terrorist attack at the Café Hillel in Jerusalem, ("Café Hillel

Plaintiffs"),[1] cross-moved for summary judgment as to liability against Defendant. For the reasons set forth below, Defendant's motion is denied in part and granted in part, and the Café Hillel Plaintiffs' motion is denied in part and granted in part.

BACKGROUND[2]

## I.  The Parties

Plaintiffs' claims arise from fifteen attacks in Israel and Palestine that occurred between March 27, 2002 and September 24, 2004, which Plaintiffs allege were perpetrated by the Palestinian organization, Hamas. (Def.'s Am. Statement of Material Facts, Strauss Dkt. Entry 295 ("CL's 56.1 Stmnt."), ¶ 251; Pls.' Resp. to Def.'s Am. Statement of Material Facts, Strauss Dkt. Entry 297 ("Pls.' 56.1 Resp.") ¶ 251.)[3] Plaintiffs comprise over 200 United States citizens who were injured in the terrorist attacks, the estates of those killed in the terrorist attacks and/or are family members of people killed or injured in the terrorist attacks. (*See* 3d Am. Compl., Strauss Dkt. Entry 127 ("Strauss 3d Am. Compl."), ¶¶ 5-572; Compl., Wolf Dkt. Entry 1 ("Wolf Compl."), ¶¶ 5-313.)

Defendant is a financial institution incorporated and headquartered in France that also does business in the United States. (CL's 56.1 Stmnt. ¶ 1; Pls.' 56.1 Resp. ¶ 1.)

---

[1] The Café Hillel Plaintiffs are Natan Applebaum for the Estate of David Applebaum and the Estate of Naava Applebaum, Debra Applebaum, the Estate of Jacqueline Applebaum, Natan Applebaum, Shira Applebaum, Yitzchak Applebaum, Shayna Applebaum, Tovi Belle Applebaum, Geela Applebaum Gordon and Chaya Tziporah Cohen.

[2] Except where otherwise stated, the Background is taken from facts that are not genuinely in dispute.

[3] Citations to the "Strauss Docket" are to docket 06-cv-702. Citations to the "Wolf Docket" are to 07-cv-914. Where documents have been filed on both dockets, the court cites to the Strauss Docket only, as it is the lead case.

## II.    CBSP

The Comite de Bienfaisance et de Secours aux Palestiniens ("Committee for Palestinian Welfare and Relief") ("CBSP") is a non-profit organization registered in France and currently headquartered in Paris.  (CL's 56.1 Stmnt. ¶ 2; Pls.' Resp. ¶ 2.)  CBSP opened an account with Defendant in May 1990, and opened three additional accounts with Defendant in 1993.  (CL's 56.1 Stmnt. ¶ 3; Pls.' 56.1 Resp. ¶ 3.)  CBSP indicated in the account opening documentation it provided to Defendant that it collects funds for humanitarian aid that it transfers to various charitable organizations in the West Bank and Gaza and surrounding areas.  (CL's 56.1 Stmnt. ¶ 2; Pls.' 56.1 Resp. ¶ 2.)

During the period relevant to this case, neither France nor the European Union included CBSP on any lists of persons subject to the freezing of assets or supervision of their financial transactions.  (CL's 56.1 Stmnt. ¶ 114; Pls.' 56.1 Resp. ¶ 114.)  However, on August 21, 2003, the United States Treasury Office of Foreign Assets Control ("OFAC") listed CBSP as a "Specially-Designated Global Terrorist" ("SDGT").  (CL's 56.1 Stmnt. ¶ 116; Pls.' 56.1 Resp. ¶ 116.)  In the press release issued by the Department of Treasury's Office of Public Affairs announcing the designation, CBSP was described as a primary fundraiser for Hamas in France that has "collected large amounts of money . . ., which it then transfers to sub-organizations of Hamas."  (Decl. of Joel Israel, Wolf Dkt. Entry 182-4 ("Israel Decl.") Ex. 31 at 5.)  Hamas already had been designated as a Foreign Terrorist Organization ("FTO") in 1997 by the United States.   (CL's 56.1 Stmnt. ¶¶ 299-301; Pls.' 56.1 Resp. ¶¶ 299-301.)   The press release announcing CBSP's designation also stated that CBSP had worked "in collaboration with more than a dozen humanitarian organizations based in different towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon."  (Israel Decl. Ex. 31 at 5.)  In addition, in

1997, the Israeli government had designated CBSP as a "terrorist organization" under the Prevention of Terrorism Ordinance and an "unlawful organization" under Israel's Defense (Emergency) Regulations. (CL's 56.1 Stmnt. ¶ 125; Pls.' 56.1 Resp. ¶ 125.)

## III. The Charities

While CBSP had accounts with Defendant, it transferred money to "13 Charities"[4] Plaintiffs contend were "alter egos" of Hamas. (CL's 56.1 Stmnt. ¶¶ 284, 299-301; Pls.' 56.1 Resp. ¶¶ 284, 299-301.) The United States, however, did not designate any of the transferees of funds from CBSP's accounts as SDGTs before August 21, 2003. (CL 56.1 Stmnt. ¶ 117; Pls.' 56.1 Resp. ¶ 117.)

The boards of directors of at least some of the 13 Charities included members of Hamas. (CL's 56.1 Stmnt. ¶ 317; Pls.' 56.1 Resp. ¶ 317.) Each of the 13 Charities maintained its own bank accounts in either its own name or the names of the treasurer or the head of the entity. (CL's 56.1 Stmnt. ¶¶ 322-23; Pls.' 56.1 Resp. ¶¶ 322-23.)

## IV. Defendant's Suspicions About CBSP's Accounts

### A. Defendant's Initial Suspicions

From 1997 through 2003, activity in CBSP's accounts was monitored by Defendant's unit responsible for the prevention of fraud and money laundering, which became known as the

---

[4] The 13 Charities are: Al-Mujama al-Islami-Gaza (the Islamic Center-Gaza); Al- Jam'iya al-Islamiya-Gaza (the Islamic Society-Gaza); Al-Salah Islamic Association-Gaza (Jam'iyat al-Salah al-Islamiya-Gaza); Al-Wafa Charitable Society-Gaza (Jam'iyat al-Wafa al-Khiriya-Gaza); Islamic Charitable Society-Hebron (Al-Jam'iya al-Khiriya al-Islamiya al-Khalil); Jenin Zakat Committee (Lajnat al-Zakaa Jenin); Nablus Zakat Committee (Lajnat al-Zakaa Nablus); Al-Tadamum Charitable Society-Nablus (Jam'iyat Al-Tadamum al-Khiriya al-Islamiya Nablus); Tulkarem Zakat Committee (Lajnat al-Zakaa Tulkarem); Ramallah-al Bireh Zakat Committee (Lajnat al-Zakaa Ramallah wal-Bireh); Al-Islah Charitable Society-Ramallah & Al-Bireh (Jam'iyat al-Islah al-Khiriya al-Ajithamiya Ramallah wal-Bireh); Beit Fajar Zakat Committee (Lajnat al-Zakaa Beit Fajar); and Jerusalem Central Zakat Committee (Lajnat al-Zakaa al-Markaziya al-Quds). (CL's 56.1 Stmnt. ¶ 284; Pls.' 56.1 Resp. ¶ 284.)

Financial Security Unit ("FSU"). (CL's 56.1 Stmnt. ¶ 5; Pls.' 56.1 Resp. ¶ 5.) The FSU's Committee for the Prevention of Money Laundering and Fraud ("CPML") was the body within the FSU responsible for analyzing information it received about suspicious activity by Defendant's customers, including CBSP, and then evaluating what steps should be taken based on that information. (CL's 56.1 Stmnt. ¶ 9; Pls.' 56.1 Resp. ¶ 9.)

In 1997, Robert Audren, the individual at the FSU in charge of monitoring activities in CBSP's accounts, opened an investigative file on CBSP's accounts. (*See* Decl. of Aitan D. Goelman, Strauss Dkt. Entry 299 ("Goelman Decl."), Ex. 11 at 21-22, 46.) Audren opened the investigative file after the accounts were brought to Audren's attention by employees at the local branch where CBSP maintained its accounts. (*See id.* 22.) Audren testified that he believed the local branch brought the accounts to his attention because "Associations" "are not very common types of accounts in a branch and an account which through its title or through its name raised questions." (*Id.*) During his review, Audren requested back-up information for transfers to several of the 13 Charities. (*See id.* Ex. 11 at 60-66, Exs. 16-18.) Audren testified that he believed the transfers "corresponded or they were at least perfectly coherent with the stated purpose of this Association which was, in fact, welfare and solidarity with Palestine." (*Id.* Ex. 11 at 66.) After reviewing account statements, Audren determined that the account's operation seemed normal and that "the incoming funds were coming from private individuals, seemingly, according to the names of the donors of North African origin and that seemed coherent in people's minds with the account such that it was opened. Now, the way that the funds left the account didn't pose a problem for us." (*Id.* 28.)

## B. Defendant Reports CBSP to the French Government

In late fall of 2000, Audren became aware of what he perceived to be large and

unexplained increases in the number and amounts of deposits into CBSP's main account coming from sources he was unable to identify. (CL's 56.1 Stmnt. ¶ 20; Pls.' 56.1 Resp. ¶ 20.) Audren concluded that the increase in the number and amounts of unidentifiable inflows made the origins of the deposits more opaque. (CL's 56.1 Stmnt. ¶ 21; Pls.' 56.1 Resp. ¶ 21.) More specifically, Audren testified that, "[i]n terms of the names of the donors there is no opacity. As for the origin of the funds contributed by the donors, well, I don't know them personally." (Goelman Decl. Ex. 15 at 114-15.) According to Audren, he believed that the large increase in cash flows indicated that CBSP's main account might have been used for money laundering. (Decl. of Emily P. Eckstut, Strauss Dkt. Entry 316 ("Eckstut Decl.") Ex. 2 ¶ 4.)

On December 19, 2000, Audren drafted for the CPML's review what he referred to as a "pre-declaration," describing the suspicious activity in CBSP's main account. (CL's 56.1 Stmnt. ¶ 26; Pls.' 56.1 Resp. ¶ 26.) In the pre-declaration, Audren described CBSP's activities as "[c]ollection of funds from 'supporters'[5] and individual donors, then transfers to banks established in LEBANON or PALESTINE, to non-resident charitable and/or Islamic associations." (Eckstut Decl. Ex. 32.) Audren described his "reason for suspicion" as:

> Essentially, the increased amount. The movements, up to now, apparently compatible with a collection provided by individuals, by checks, wire transfers, cash for low amounts, increased in October, November 2000 . . ., mainly by increasing payments in cash, both in number and amounts. Similarly, the check deposits grew and the current main account balance is now often around one million francs. If the events in ISRAEL partly explain this new increase in support, the source of funds is also much more obscure. Moreover, the personality of the President appears contrasted.

---

[5] The actual French word in the pre-declaration is "sympathisants." Plaintiffs dispute Defendant's translation of this word as "supporters" and insist that the proper translation is "sympathizers." (*See* Pls.' 56.1 Resp. ¶ 32.) Audren testified that he used the word to "convey the sympathy and support sufficient that people would set up permanent transfers or even give checks." (Goelman Decl. Ex. 11 at 100-01.) The court takes no position on the correct translation, and notes that the translation of this word does not affect the outcome of the Order.

(*Id*.)  Audren testified that by "events" in Israel he was referring to the increased period of conflict in Israel and Palestine at the time, known as the "Second Intifada."  (CL's 56.1 Stmnt. ¶ 33; Pls.' 56.1 Resp. ¶ 33; Goelman Decl. Ex. 11 at 107-08; Café Hillel Pls.' Statement of Material Facts, Wolf Dkt. Entry 182-2 ("CH Pls.' 56.1 Stmnt.") ¶ 3; Def.'s Resp. to Café Hillel Pls.' Statement of Material Facts, Wolf Dkt. Entry 188-2 ("CL's 56.1 Resp.") ¶ 3.)  Audren also explained that his description of the "President" as "contrasted" was intended to refer to Defendant's personnel's perception that CBSP's president had an uncooperative and unfriendly demeanor.  (CL's 56.1 Stmnt. ¶ 34; Pls.' 56.1 Resp. ¶ 34.)

Audren drafted this pre-declaration so the CPML could decide whether to report CBSP's activity to the French government agency known as TRACFIN and/or to terminate Defendant's relationship with CBSP.  (CL's 56.1 Stmnt. ¶ 27; Pls.' 56.1 Resp. ¶ 27.)  Defendant believed that it was obligated by French law to file a declaration with TRACFIN when Defendant suspected that one of its customers was laundering money so that TRACFIN could analyze the bank's report and, if appropriate, refer the matter to French prosecutors.  (CL's 56.1 Stmnt. ¶ 28; Pls.' 56.1 Resp. ¶ 28.)  The CPML discussed the pre-declaration at a meeting on January 9, 2001, where they decided to file a declaration concerning Defendant's suspicions about CBSP with TRACFIN.  (CL's 56.1 Stmnt. ¶¶ 35, 39; Pls.' 56.1 Resp. ¶¶ 35, 39.)  During the meeting, the CPML also decided to place CBSP's accounts under heightened surveillance.  (CL's 56.1 Stmnt. ¶ 40; Pls.' 56.1 Resp. ¶ 40.)

The local prosecutors in the region where CBSP maintained its accounts with Defendant investigated CBSP, but, on July 19, 2001, the local authorities issued a decision to end the investigation and not bring charges, due to an "absence of offense."  (CL's 56.1 Stmnt. ¶ 100; Pls.' 56.1 Resp. ¶ 100.)

**C.  Defendant Reports CBSP to the French Government for the Second Time**

In late 2001, Audren decided to bring the CBSP file to the attention of the CPML for a second time.  (CL's 56.1 Stmnt. ¶ 42; Pls.' 56.1 Resp. ¶ 42.)  On November 27, 2001, Audren drafted for the CPML's consideration a "pre-declaration" for a "complementary" declaration to be filed with TRACFIN regarding CBSP, providing updated information about CBSP.  (CL's 56.1 Stmnt. ¶ 44; Pls.' 56.1 Resp. ¶ 44.)  The pre-declaration stated that the movements of funds in CBSP's main account had increased since the previous filing with TRACFIN, but that Defendant was not suspicious with respect to any change in the origin of the funds, and the destination of CBSP's outgoing transfers had not changed.  It also noted that CBSP was depositing funds through an intermediary French bank, rather than directly from the original donors, which made it impossible for Defendant to identify the original sources of those funds.  (CL's 56.1 Stmnt. ¶ 46; Pls.' 56.1 Resp. ¶ 46.)

Audren also wrote, for the CPML's eyes only, "[t]hese developments, the international context, and the potential repercussions on the image of the CL lead us to ask ourselves whether or not to maintain the accounts in our Establishment.  Of course, any decision in this matter will essentially be political."  (Eckstut Decl. Ex. 17.)  Audren testified that he was referring to possible bad press if the media discovered Defendant was holding "the accounts of Muslim organizations or Muslim individuals," but also the concern that there would be negative repercussions within the Muslim community if the accounts were closed.   (Goelman Decl. Ex. 15 at 122.)  The CPML discussed the pre-declaration at a meeting on December 6, 2001, and directed that an updated declaration be filed with TRACFIN.  (CL's 56.1 Stmnt. ¶ 50; Pls.' 56.1 Resp. ¶ 50.)

Upon submission of the declaration, the French authorities re-opened their investigation

into CBSP.  (*See* CL's 56.1 Stmnt. ¶ 104; Pls.' 56.1 Resp. ¶ 104.)  On September 19, 2002, as part of the investigation, Audren provided a sworn statement concerning CBSP to the local police in the region where CBSP maintained its accounts.  (CL's 56.1 Stmnt. ¶ 101; Pls.' 56.1 Resp. ¶ 101.)  Auden explained in his statement that he became aware of CBSP at some point in 1998 "following an increase in the movements received in the accounts and the fact that transfers to banks located in Palestine or Jordan were operated for the benefit of seemingly Islamist organizations without visibility on our part."  (Eckstut Decl. Ex. 39.)  Audren later testified that he understands "Islamist" means "that it promotes a radical form of Islam. . . .  Now, without thinking that all persons who are referred to as Islamists are potential terrorists certain events have demonstrated that certain branches of this trend use violence."  (Goelman Decl. Ex. 15 at 54.)  Audren also explained in his statement to the police that Defendant perceived a considerable increase in the movement of funds in CBSP's accounts at the end of 2000 and in November 2001, and that, while Defendant decided to terminate CBSP's accounts, it was giving CBSP an extension of time to establish a relationship with another bank.  (Eckstut Decl. Ex. 39.)

On October 28, 2002, the local prosecutor issued a decision to end the investigation and not bring any charges, due to "insufficient evidence of offense."  (CL's 56.1 Stmnt. ¶ 104; Pls.' 56.1 Resp. ¶ 104.)  Investigations also were conducted into CBSP by the French National Police in Paris from January 2003 through April 2008.  (CL's 56.1 Stmnt. ¶ 105; Pls.' 56.1 Resp. ¶ 105.)  On April 11, 2008, the prosecutor directing the investigation decided not to bring any charges.  (CL's 56.1 Stmnt. ¶ 105; Pls.' 56.1 Resp. ¶ 105.)

### D.    Defendant Decides to Close the CBSP Accounts

In the December 6, 2001 CMPL meeting where the committee decided once again to report CBSP to the French authorities, the CMPL also decided to close CBSP's accounts.  (CL's

56.1 Stmnt. ¶ 51; Pls.' 56.1 Resp. ¶ 51.)  In a letter dated January 9, 2002, Defendant informed CBSP that CBSP's accounts would be closed on May 9, 2002.  (CL's 56.1 Stmnt. ¶ 86; Pls.' 56.1 Resp. ¶ 86.)  On February 19, 2002, the president of CBSP responded to Defendant by letter, requesting a postponement of the closing date to December 31, 2002 so that CBSP would have time to set up a new account and inform donors.  (Eckstut Decl. Ex. 53.)  The president of CBSP wrote "[b]ecause, if it were necessary to close our accounts with CL now, we would be obligated to give the exact reasons for this change.  We would like to spare you the bad publicity."  (*Id.*)  The CPML granted CBSP's request to keep its accounts open until the end of 2002.  (Eckstut Decl. Ex. 54.)  The last time CBSP transferred money from its account with Defendant to another organization was on February 11, 2002, but CBSP's accounts with Defendant remained officially open until after the end of 2002.  (CL 56.1 Stmnt. ¶¶ 89-90; Pls.' 56.1 Resp. ¶¶ 89-90.)

By letter dated April 1, 2003, CBSP's attorney accused Defendant of closing its accounts based upon religious discrimination.  (Eckstut Decl. Ex. 59 at 1.)  The letter stated that Audren told local police:

> that he needed to know about CBSP accounts specifically due to: "*transfers to banks located in Palestine or Jordan were operated for the benefit of seemingly Islamist organizations without visibility on our part.*"  Essentially, this is saying that you are refusing this charity as a client because you believe it has relationships with Muslim NGOs.

(*Id.* (emphasis in original).)  In the letter, CBSP's attorney asserted that Defendant's concerns had "no basis" and that it had reported its money laundering concerns to TRACFIN in "complete bad faith."  (*Id.* 2.)  The attorney also noted that "[y]ou emphasized that large amounts of money were sitting in my client's accounts, while you were the one refusing to make the transfers."  (*Id.*)

Defendant's legal department assessed and rejected the discrimination allegation, instead finding that the decision to close the account was "based on the sudden change in volume of the transactions recorded in CBSP's accounts, compared to the previous period." (Eckstut Decl. Ex. 60; CL's 56.1 Stmnt. ¶ 95; Pls.' 56.1 Resp. ¶ 95.) On May 10, 2003, Defendant sent a response to CBSP denying that its decision to close the accounts was based upon discrimination and instructing CBSP to close its accounts by May 31, 2003, or Defendant would send the money left in the accounts by cashier's check. (Eckstut Decl. Ex. 61.) Defendant also sent numerous letters to CBSP requesting that CBSP provide information for an account at another bank to which Defendant could transfer the balance of CBSP's funds, but CBSP never responded. (CL's 56.1 Stmnt. ¶ 97; Pls.' 56.1 Resp. ¶ 97.)

### E. CBSP Is Designated as a Terrorist Supporter and Its Accounts Are Closed

As described above, on August 21, 2003, the OFAC listed CBSP as a SDGT because of its purported financial support of Hamas. (CL's 56.1 Stmnt. ¶ 116; Pls.' 56.1 Resp. ¶ 116.) The following day, the Vice President and Compliance Officer for Defendant's operations in the United States emailed the OFAC bulletin officially designating CBSP as a SDGT to a number of Defendant's employees. (CH Pls.' 56.1 Stmnt. ¶ 18; CL's 56.1 Resp. ¶ 18.) Among those who received the bulletin were the head of Defendant's Anti-Fraud and Anti-Money Laundering Department and the employee who oversaw international issues in Defendant's FSU, who then further distributed the bulletin internally. (CH Pls.' 56.1 Stmnt. ¶¶ 20-22; CL's 56.1 Resp. ¶¶ 20-22.)

On August 25, 2003, after learning that CBSP's accounts at Defendant remained open, Alain Marsat, who worked in the FSU, emailed Antoine Blachier, who was a risk supervisor for the region where CBSP maintained its accounts, and others requesting an explanation for the

delay in closing the accounts. (CH Pls.' 56.1 Stmnt. ¶ 23; CL's 56.1 Resp. ¶ 23.) Blachier responded by summarizing the correspondences between Defendant and CBSP since Defendant told CBSP that it would close the accounts. (Israel Decl. Ex. 45.) Marsat replied the following day by e-mail stating "[t]his is what I do not understand, because since we announced (by registered letter with acknowledgment of receipt) the balance of the accounts at June 2, 03, why was this decision not applied? . . . [A]s one could foresee, this case is taking on international proportions." (*Id.* Ex. 50.) Marsat attached to his e-mail an Associated Press story about the designation of CBSP as a SDGT and CBSP's denial that it supported Hamas. (*Id.*) On August 26, 2003, Blachier sent an e-mail to Marsat and others requesting confirmation that, "following the embargo announced in the USA, it is still advisable to close the accounts immediately and send the funds to the association, or alternatively if we have to change the way of doing it." (*Id.* Ex. 46.)[6] Marsat responded that "[t]he OFAC embargo does not change our closure decision and the manner of doing it." (*Id.*)

On August 29, 2003, Defendant sent a letter to CBSP explaining that, because CBSP had not told Defendant what bank it wanted its money sent to, Defendant was proceeding to close the accounts, and enclosed four checks for the balance of CBSP's accounts, which totalled over €250,000. (Eckstut Decl. Ex. 62.) However, the accounts continued to receive deposits into September 2003. (CH Pls.' 56.1 Stmnt. ¶ 37; CL's 56.1 Resp. ¶ 37.) In early September 2003, Defendant sent checks to CBSP with the additional money that had been deposited. (CH Pls.' 56.1 Stmnt. ¶ 43; CL's 56.1 Resp. ¶ 43.)

---

[6] Defendant insists that this phrase is properly translated as "[h]owever, please confirm that following the embargo declared in the U.S., it is still appropriate to close the accounts immediately and send the funds to the association, or if we should change the approach." (CL's 56.1 Resp. ¶ 26.) The court takes no position on the correct translation, but notes that the court finds the differences in the two translations immaterial for purposes of the summary judgment motions.

## V.    This Action

Pursuant to Section 2333(a) of the ATA, two groups of Plaintiffs brought separate actions in this district against Defendant, captioned *Strauss, et al. v. Crédit Lyonnais, S.A.*, 06-cv-702, and *Wolf, et al. v. Crédit Lyonnais, S.A.*, 07-cv-914.   (Compl., Strauss Dkt. Entry 1 ("Strauss Compl.") ¶¶ 536-54; Wolf Compl. ¶¶ 407-25.)   Plaintiffs sought damages arising out of terrorist attacks allegedly carried out by Hamas in Israel and Palestine, and alleged that Defendant aided and abetted the murder or attempted murder of United States citizens, committed acts of international terrorism and collected and transmitted funds on behalf of a terrorist organization. (Strauss Compl. ¶¶ 536-54; Wolf Compl. ¶¶ 407-25.)   More specifically, Plaintiffs alleged that Defendant aided Hamas because it maintained bank accounts for CBSP and sent money to Hamas front organizations on behalf of CBSP, even though it knew that CBSP supported Hamas. (Strauss Compl. ¶¶ 528-35; Wolf Compl. ¶¶ 393-400.)

Defendant in the *Strauss* action moved to dismiss the action in its entirety.   The Honorable Charles B. Sifton, Senior United States District Judge, who was presiding over the action at the time,[7] granted the motion with respect to Plaintiffs' claim that Defendant aided and abetted the murder or attempted murder of United States citizens, but denied the motion with respect to Plaintiffs' claims that Defendant committed acts of international terrorism and collected and transmitted funds on behalf of foreign terrorists.   *See Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006).   The court also granted the motion to dismiss with respect to claims arising from three of the attacks as time barred.   *See id.* at *7-8.

In light of Judge Sifton's rulings in *Strauss*, the parties in *Wolf* agreed to dismissal of the aiding and abetting claim and claims arising out of the three attacks that were outside of the

---

[7] These cases were ultimately reassigned to this court on January 28, 2011.

statute of limitations without prejudice to re-file the claims consistent with any appellate rulings in *Strauss* or *Wolf*. (*See* Wolf Dkt. Entries 31, 35.) By order dated October 7, 2011, *Strauss* and *Wolf* were formally consolidated.

Defendant moves for summary judgment, asserting that no reasonable juror could find that: 1) Defendant acted with the requisite scienter; 2) Plaintiffs have proven proximate causation and Article III standing; or 3) Hamas was responsible for the terrorist attacks at issue. (*See* Mem. of Law of Def. in Supp. of its Mot. for Summ. J., Strauss Dkt. Entry 294 ("Def.'s Mem.").) Defendant also contends that the proposed testimony of the experts Plaintiffs put forth to establish scienter, causation and Hamas' responsibility for the attacks is inadmissible, and, therefore, cannot be relied upon by the court in deciding the motion for summary judgment. (*See id.*)

Plaintiffs opposes Defendant's motion for summary judgment, and a sub-set of Plaintiffs who seek damages arising from a terrorist attack on the Café Hillel in Jerusalem ("Café Hillel Plaintiffs"), cross-moves for summary judgment on their claims with respect to Defendant's liability. (*See* Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., Strauss Dkt. Entry 306 ("Pls.' Opp'n"); Mem. of Law of Café Hillel Pls. in Supp. of Their Mot. for Summ. J., Wolf Dkt. Entry 186 ("CH Pls.' Mem.").) Café Hillel Plaintiffs contend that they have proven all the elements required by Section 2333(a) and are entitled to judgment as a matter of law that Defendant is liable for the damages Café Hillel Plaintiffs suffered as a result of the attack on the Café Hillel. (*See* CH Pls.' Mem.) Defendant opposes Café Hillel Plaintiffs' motion for summary judgment for the same reasons it seeks summary judgment on all claims. (*See* Mem. of Law of Def. in Opp'n to the Café Hillel Pls.' Mot. for Summ. J., Wolf Dkt. Entry 184 ("Def.'s Opp'n").)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.,* 156 F. 3d 396, 400 (2d Cir. 1998). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F. 3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Grp., Inc.*, 859 F. 2d 1108, 1114 (2d Cir. 1988)).

## DISCUSSION

### I.      Statutory Background

Plaintiffs' claims arise under Section 2333(a) of the ATA, which provides a civil remedy for United States citizens who are injured by a terrorist attack. The statute provides that: "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she

sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a). Plaintiffs

contend that Defendant committed an act of international terrorism because it violated 18 U.S.C.

§ 2339B ("Section 2339B") and 18 U.S.C. § 2339C ("Section 2339C"). Violations of Sections

2339B and 2339C are considered to be acts of "international terrorism" under Section 2333(a).

*See Strauss*, 2006 WL 2862704, at *1 ("Violations of 18 U.S.C. § 2339B and § 2339C are

recognized as international terrorism under 18 U.S.C. 2333(a)"); *Boim v. Quranic Literacy Inst.

& Holy Land Found. for Relief & Dev.*, 291 F. 3d 1000, 1015 (7th Cir. 2002) ("*Boim I*") ("If the

plaintiffs could show that [Defendants] violated either section 2339A or section 2339B, that

conduct would certainly be sufficient to meet the definition of 'international terrorism' under

sections 2333 and 2331.").

Section 2339B imposes criminal penalties on anybody who:

knowingly provides material support or resources to a foreign terrorist
organization, or attempts or conspires to do so. . . . To violate this paragraph, a
person must have knowledge that the organization is a designated terrorist
organization . . ., that the organization has engaged or engages in terrorist activity
. . . , or that the organization has engaged or engages in terrorism.

18 U.S.C. § 2339B(a)(1).

Section 2339C imposes criminal penalties on anybody who:

by any means, directly or indirectly, unlawfully and willfully provides or collects
funds with the intention that such funds be used, or with the knowledge that such
funds are to be used, in full or in part, in order to carry out . . . any other act
intended to cause death or serious bodily injury to a civilian, or to any other
person not taking an active part in the hostilities in a situation of armed conflict,
when the purpose of such act, by its nature or context, is to intimidate a
population, or to compel a government or an international organization to do or to
abstain from doing any act.

18 U.S.C. § 2339C(a)(1).

## II.     Scienter

Defendant asserts that no reasonable jury could find that it acted with the scienter

required by Sections 2333(a), 2339B or 2339C because there is no evidence that it knowingly provided support to terrorists. (*See* Def.'s Mem. 1-18.) Plaintiffs contend that there is ample evidence upon which a reasonable juror can conclude that Defendant had the requisite state of mind. (*See* Pls.' Opp'n 14-30.)

Courts have held that a party must engage in knowing misconduct to be liable under Section 2333(a). *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F. 3d 685, 694 (7th Cir. 2008) (en banc) ("*Boim III*"). A party also must "knowingly" provide material support to a terrorist organization to run afoul of Section 2339B, which means that it must "have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). Section 2339C similarly requires that the party act "with the *knowledge* that such funds are to be used" to carry out terrorist attacks. 18 U.S.C. § 233C(a)(1) (emphasis added); *see also Strauss*, 2006 WL 2862704, at *17.

The parties disagree vigorously over the definition of "knowledge" and "knowingly" in these statutes for purposes of a claim under Section 2333(a). Defendant suggests that Plaintiffs must show that it "intended that the funds CBSP transferred" from its accounts with Defendant "would be used to carry out terrorist attacks." (Def.'s Mem. 3.) However, ruling on Defendant's motion to dismiss, Judge Sifton rejected reading an intent requirement into the statute. *See Strauss*, 2006 WL 2862704, at *13, *17 ("The statute requires only that the defendant knowingly provide material support or resources to a foreign terrorist organization and makes no mention of an intent to further the organization's goals." (quotation marks omitted)). This holding is the law of the case and the court finds no reason to disturb it. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F. 3d 147, 167 (2d Cir. 2003)

(previous holdings "may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice" (quotation marks omitted)). Thus, for the same reasons that Judge Sifton determined that there is no intent requirement in the ATA, this court holds that Plaintiffs need not prove that Defendant intended specifically to support terrorist acts to be held liable under Section 2333(a).

Plaintiffs assert that they need to show only that Defendant was reckless or willfully blind to the fact that it was sending money to terrorists. (*See* Pls.' Opp'n 15-16.) Defendant accepts, for purposes of its motion only, that Plaintiffs can establish scienter by showing willful blindness, but argues that recklessness is insufficient. (Def.'s Mem. 3; Reply Mem. of Law of Def. in Further Supp. of its Mot. for Summ. J., Strauss Dkt. Entry 301 ("Def.'s Reply") at 10.)

Plaintiffs urge the court to adopt the scienter standard described in *Boim III*, which they argue supports a recklessness standard that is less demanding than willful blindness. (*See* Pls.' Opp'n 15-16.) However, the standard elucidated by the Seventh Circuit in *Boim III*, while using the term "reckless," appears to be indistinguishable from willful blindness. In *Boim III*, after explaining that the punitive treble damages provision in Section 2333(a) suggests that Congress sought to punish deliberate wrongdoing, the court held:

> To give money to an organization that commits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care. When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk. That is recklessness and equivalent to recklessness is wantonness, which has been defined as the conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result.

*Boim III*, 549 F. 3d at 693 (internal citations and quotation marks omitted). Circuit Judge

Richard A. Posner, writing for the Seventh Circuit's *en banc* majority, explained that, while "recklessness" can mean different things in different contexts, under the ATA "[t]he mental element required to fix liability on a donor to Hamas is therefore present if the donor knows the character of that organization." *Id.* at 695.

In *Goldberg v. UBS AG*, the court adopted the *Boim III* recklessness standard and explained that:

> Plaintiffs need not show that the defendant in fact knew its actions would further terrorism. Rather, it is sufficient to show that it knew the entity had been designated as a terrorist organization, and deliberately disregarded that fact while continuing to provide financial services to the organization with knowledge that the services would in all likelihood assist the organization in accomplishing its violent goals.

660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009); *see also Gill v. Arab Bank*, *PLC*, 2012 WL 4960358, at *31 (E.D.N.Y. Oct. 17, 2012) ("*Gill I*") ("[I]t must be shown that the defendant's alleged actions were reckless, knowing, or intentional."); *In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("A defendant must either know that the recipient of the material support provided by him is an organization that engages in terrorist acts, or defendant must be deliberately indifferent to whether or not the organization does so, *i.e.*, defendant knows there is a substantial probability that the organization engages in terrorism, but does not care.").

Finally, in *Linde v. Arab Bank, PLC*, which Defendant urges this court to follow, the court explicitly held that Section 2339B (and thus Section 2333(a)) "is violated if the Bank provides material support in the form of financial services to a designated foreign terrorist organization and the Bank either knows of the designation or knows that the designated organization has engaged or engages in terrorist activities." 384 F. Supp. 2d 571, 585 n.8, 587 (E.D.N.Y. 2005).

The court fails to perceive much, if any, difference between recklessness as described by

the Seventh Circuit in *Boim III* and applied by the court in *Goldberg*, and the standard the court described in *Linde*. Under both formulations, it is apparent that, whether it is labelled willful blindness or recklessness, Plaintiffs must show that Defendant knew or was deliberately indifferent to the fact that CBSP was financially supporting terrorist organizations, meaning that Defendant knew there was a substantial probability that Defendant was supporting terrorists by hosting the CBSP accounts and sending money at the behest of CBSP to the 13 Charities. *See Boim III*, 549 F. 3d at 693-94.

Viewing the record in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether Defendant knew about or deliberately disregarded CBSP's purported support of Hamas or Hamas front groups, and that, by sending money to the 13 Charities, it was facilitating Hamas' ability to carry out terrorist attacks.[8] Defendant admittedly had concerns about CBSP's accounts since at least 1997, and placed the accounts under heightened scrutiny. (Goelman Decl. Ex. 11 at 21-22, 46.) There is also evidence showing that these concerns may have been related to CBSP's possible connection to terrorist groups. In 2000 and 2001, Audren was sufficiently suspicious of CBSP that he raised the matter with the CPML twice, which itself was sufficiently concerned that it referred CBSP to TRACFIN, the French governmental entity in charge of policing money laundering and, arguably, terrorism financing.[9] (CL's 56.1 Stmnt. ¶¶ 35, 50; Pls.' 56.1 Resp. ¶¶ 35, 50; Eckstut Decl. Exs. 17, 32.) In 2000, Audren admittedly was

_____

[8] The court also is mindful that determining whether a given state of mind existed is "generally a question of fact, appropriate for resolution by the trier of fact . . . . The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press v. Chem. Inv. Servs. Corp.*, 166 F. 3d 529, 538 (2d Cir. 1999) (quotation marks omitted).

[9] Defendant contends that TRACFIN was not responsible for investigating terrorist financing during the relevant period, but there is evidence on the record that French banking regulators believed that concerns about terrorist financing should be reported to TRACFIN. (*See* Eckstut Decl. Ex. 66.)

concerned about the large influx of cash coinciding with a major escalation of violence in Israel and Palestine.  (CL's 56.1 Stmnt. ¶¶ 20, 33; Pls.' 56.1 Resp. ¶¶ 20, 33; CH Pls.' 56.1 Stmnt. ¶ 3; CL's 56.1 Resp. ¶ 3; Goelman Decl. Ex. 11 at 107-08.)  In November 2001, on the heels of the September 11, 2001 terrorist attacks, Audren again noted "the international context" in which his concerns arose and urged "the potential repercussions on the image of the CL lead us to ask ourselves whether or not to maintain the accounts in our Establishment."  (Eckstut Decl. Ex. 17.)

Audren more directly linked Defendant's concerns with CBSP's accounts to possible international terrorist ties by telling French authorities in 2001 that he was concerned about the CBSP accounts because of "transfers to banks situated in Palestine or in Jordan being made in favor of probably Islamist associations with no visibility from our end."  (Goelman Decl. Ex. 87.)  Audren later explained that he understands "Islamist" to mean "that it promotes a radical form of Islam. . . .  Now without thinking that all persons who are referred to as Islamists are potential terrorists certain events have demonstrated that certain branches of this trend use violence."  (Goelman Decl. Ex. 15 at 54.)  These concerns led Defendant by December 2001 to decide to close CBSP's accounts and block transfers from CBSP's accounts from February 2002 until the accounts were actually closed in 2003.  (CL's 56.1 Stmnt. ¶¶ 51, 89-90; Pls.' 56.1 Resp. ¶¶ 51, 89-90.)

In August 2003, Defendant received confirmation that CBSP arguably was raising money for Hamas, when the OFAC announced that CBSP was a SDGT because it was a primary fundraiser in France for Hamas.  (CL's 56.1 Stmnt. ¶¶ 116, 299-301; Pls.' 56.1 Resp. ¶¶ 116, 299-301; Israel Decl. Ex. 31 at 5.)  It is undisputed that the OFAC's announcement was distributed within Defendant.  (CH Pls.' 56.1 Stmnt. ¶¶ 18, 20-22; CL's 56.1 Resp. ¶¶ 18, 20-22.)  Moreover, a reasonable fact-finder could infer that Defendant's reaction to the

announcement was not one of surprise that CBSP had been identified as a supporter of a FTO, but rather of frustration that the accounts had not yet been closed because of the possible repercussions of hosting CBSP's accounts. As one employee said in an email after complaining that CBSP's accounts remained open, "*as one could foresee*, this case is taking on international proportions." (Israel Decl. Ex. 50 (emphasis added).)[10] In light of this information, a reasonable fact-finder could come to the conclusion that Defendant knew of or was deliberately indifferent to its support of terrorism through its dealings with CBSP.

Such testimonial and documentary evidence from Defendant's employees relating to the same period as the attacks at issue distinguishes this case from *Gill v. Arab Bank*, *PLC*, 2012 WL 5395746 (E.D.N.Y. Nov. 6, 2012) ("*Gill III*"), where the Honorable Jack B. Weinstein, Senior United States District Judge, granted summary judgment in favor of the defendant financial institution in an ATA action. In *Gill*, in opposition to the defendant's motion for summary judgment, the plaintiff relied upon "a chain of inferences of remote dates with little or no citation or documentation." *Id.* at *15. For example, events that allegedly put the defendant in *Gill* on "notice" that it was supporting Hamas-affiliated charities "took place in 2005 or earlier" and, therefore, had "no substantial probative force in proving the [defendant's] intentions concerning an event that took place in 2008." *Id.* at *16. Here, there is considerable documentary and testimonial evidence showing Defendant's knowledge of CBSP's possible terrorist affiliations

---

[10] Plaintiffs also assert that an incident where Defendant froze a transfer from one of CBSP's accounts in October 2001 to an organization called the "El Wafa Charitable Society-Gaza" demonstrates Defendant's knowledge that its transfers on behalf of CBSP were supporting terrorism. (*See* Pls.' Opp'n 19.) However, the blocking provides limited, if any, support for Plaintiffs, because there is no genuine dispute that Defendant blocked this transaction because the organization had a name similar to the Wafa Humanitarian Organization, which had been designated by OFAC as a fundraiser for Al Qaeda, and that the two organizations are distinct. (*See* CL's 56.1 Stmnt. ¶¶ 58-63, 80; Pls.' 56.1 Resp. ¶¶ 58-63, 80.)

from at least 2001 through 2003, which is contemporaneous to the terrorist attacks at issue.

Defendant argues strenuously that it was suspicious only that CBSP's accounts may have been used for money laundering and did not suspect that CBSP was funnelling money to a terrorist group. (*See* Def.'s Mem. 6-10.) While the court agrees that this is a plausible interpretation of the record, the court cannot adopt this interpretation *as a matter of law*. For example, Defendant has not pointed to any evidence showing that some other criminal activity was the source of the money possibly being laundered by CBSP (for example, narcotics trafficking), while there is evidence that it was concerned about the accounts, at least in part, because money was being sent to "Islamist" organizations in Palestine during the Second Intifada. A reasonable juror also could find incredible testimony that Defendant was concerned only about the sources of CBSP's money, and not its destination. In particular, Audren testified that he thought that the source of CBSP's money was opaque, even though he could determine the names of people sending money to CBSP's accounts, because he did not know the donors "personally." (Goelman Decl. Ex. 15 at 114-15.) A reasonable juror could find this explanation unbelievable, because presumably Audren did not know personally a significant number of donors to any non-profit. Thus, by Audren's definition, taken it to its logical extreme, non-profits are *per se* suspicious and he should have reported them all to TRACFIN.

Moreover, and perhaps most importantly, there is no serious dispute that money laundering and terrorism are not mutually exclusive. It has been widely acknowledged that they can go hand in hand, as one certainly can be used to fund the other. (*See* Eckstut Decl. Ex. 66.) In other words, even if Defendant sincerely believed that CBSP's accounts were being used to launder money, that does not show it could not have thought that the accounts also were being used to support terrorism.

Defendant also asserts that it could not have known that CBSP was funding a terrorist organization because neither France nor the European Union have ever sanctioned CBSP or charged it with supporting terrorists, and French authorities cleared CBSP of any crimes after Defendant filed its two declarations with TRACFIN. (*See* Def.'s Mem. 4-5.) However, just because the French government and the European Union have decided that they have insufficient evidence to sanction CBSP under their own governing law, does not mean that CBSP was not supporting a terrorist organization for purposes of the ATA.[11] While a reasonable jury could conclude that France and the European Union essentially are correct, and that there is not sufficient evidence that CBSP was sending money to terrorists, it would be perfectly reasonable for a jury to disagree and side with the United States government's assessments.

Thus, when viewing the record in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether Defendant knowingly provided material support to a terrorist organization.[12]

## III.  Proximate Causation and Article III Standing

### A.  Proximate Causation

Defendant asserts that Plaintiffs have failed to raise a triable issue of fact of proximate

---

[11] Indeed, the court notes that, according to Plaintiffs' proposed expert, Dr. Matthew Levitt, French officials have resisted banning CBSP, not because they dispute that CBSP is affiliated with Hamas, but because Hamas also provides social welfare services. (Eckstut Decl. Ex. 102 at 34.) Levitt quotes from a 2005 letter written by then-Minister of Interior Nicholas Sarkozy to the director of the Wiesenthal Center in Paris acknowledging CBSP's connection with Hamas: "[s]ome of the Palestinian organizations the CBSP works with are affiliated with the Hamas movement, which is on the European list of terrorist organizations. The CBSP justifies these transfers, which are not a secret, by the need for this structure to rely on partners that are reliable and not corrupted." (*Id.*)

[12] Defendant also seeks to exclude the proposed expert testimony of Frances McLeod and Thierry Bergeras relating to the question of Defendant's scienter. (*See* Def.'s Mem. 15-18.) The court need not decide this issue at this time because, even without the proposed expert testimony, there is a genuine issue of material fact as to Defendant's state of mind.

causation because there is insufficient evidence that the money remitted to the 13 Charities from CBSP's accounts caused the terrorist attacks at issue. (*See* Def.'s Mem. 18-29.) Specifically, Defendant contends that Plaintiffs admittedly have no evidence that the money transferred by Defendant to CBSP and the 13 Charities was used specifically to finance the terrorist attacks at issue. (*See id.* 19.) Defendant contends that merely transferring money to the 13 Charities is not sufficient to show causation without showing the money was used to fund the attacks because the money was sent through third parties, rather than directly to Hamas. (*See id.* 25-29.) Plaintiffs counter that Defendant cannot escape liability by funding a terrorist group's non-violent activities. (*See* Pls.' Opp'n 31-32.)

Section 2333(a) provides for recovery by individuals injured "by reason of" international terrorism. 18 U.S.C. § 2333(a). Recently, the Second Circuit held that the phrase "by reason of" requires that Plaintiffs show that their damages were proximately caused by Defendant. *See Rothstein v. UBS AG*, --- F. 3d ---, 2013 WL 535770, at *12 (2d Cir. 2013) ("We are not persuaded that Congress intended to permit recovery under § 2333 on a showing of less than proximate cause . . . ."). In its holding, the court rejected the plaintiffs' contention that the "'by reason of' language chosen by Congress in creating a civil right of action under the ATA was intended to permit recovery on a showing of less than proximate cause, as the term is ordinarily used." *Id.* As the term is "ordinarily used," proximate cause requires a showing that Defendant's actions were "a substantial factor in the sequence of responsible causation," and that the injury was "reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank, N.A.*, 318 F. 3d 113, 123 (2d Cir. 2003).

Here, there is a genuine issue of material fact as to whether Defendant's conduct is a proximate cause of Plaintiffs' injuries. A reasonable jury could conclude, based upon the

evidence, that Defendant sent millions of dollars to organizations controlled by Hamas, and was providing financial services to Hamas' primary fundraiser in France. (*See* Israel Decl. Ex. 31 at 5; Eckstut Decl. Ex. 97 at 1-17.) There also is evidence that, during the same period, Hamas financed and executed the attacks that injured Plaintiffs and/or Plaintiffs' family members. *See infra* § V. On this record, a reasonable juror could conclude that the sizable amount of money sent from Defendant to Hamas front organizations was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable consequence of sending millions of dollars to groups controlled by Hamas. *Cf. Gill I*, 2012 WL 4960358, at *31 ("A defendant who is deliberately indifferent to – that is, reckless with regard to – facts that should put him on notice that his actions are substantially likely to result in harm to American nationals will be more likely have his actions be found to be the proximate cause of any subsequent harm to Americans. . . .").[13]

None of Defendant's counterarguments are convincing. Defendant asserts that the Second Circuit's decision in *Rothstein* requires this court to decide in Defendant's favor here. However, *Rothstein* is distinguishable from this case. In *Rothstein*, the plaintiff alleged that the defendant-financial institution provided United States currency to the Iranian government. 2013 WL 535770, at *3. The Iranian government has been designated a state sponsor of terrorism by the United States government and it provides material support to Hamas and Hezbollah. *Id.* at *1-2. The plaintiffs were injured and/or had family members injured or killed in Hamas or Hezbollah attacks. *Id.* at *4. To make a causation connection among the currency provided by the defendant to Iran, Iran's support of Hamas and Hezbollah, and the attacks at issue, the

---

[13] In contrast, the monetary transfers and financial services at issue in *Gill* took place years before the attack at issue. *See Gill III*, 2012 WL 5395746, at *18, *26 ("No single or total transfer highlighted by plaintiff establishes the requisite magnitude and temporal connection to the attack required to find that the Bank's actions proximately caused plaintiff's injuries.").

plaintiffs alleged that Hezbollah and Hamas "needed large sums of money to fund their operations; that those organizations, by reason of their nature and the existence of counterterrorism sanctions, could not freely use normal banking services such as checks or wire transfers; and that U.S. currency is a universally accepted form of payment." *Id.* at *10.

The Second Circuit held that these allegations, along with conclusory allegations that the dollars the defendant provided to the Iranian government "would be used *to cause and facilitate terrorist attacks* by Iranian-sponsored terrorist organizations *such as* Hamas [and] Hizbollah," were not adequate to plead proximate causation. *Id.* at *14 (emphasis in original). This connection is more attenuated than in the instant case, where the money from Defendant was purportedly going directly to Hamas front-groups, rather than to a government that performs myriad legitimate functions in addition to allegedly funding terrorist organizations. *Cf. id.* at *14 ("But the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund."). Here, Hamas carried out the attacks during the same period of time within which the money was transferred, which, again, is distinguishable from *Rothstein*, where Iran did not carry out the attacks at issue.

These differences are meaningful because Congress has specifically found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). The same thing cannot be said about a government. *See Rothstein v. UBS AG*, 772 F. Supp. 2d 511, 516 (S.D.N.Y. 2011) ("[T]he Supreme Court's finding that FTOs are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct is specific to FTOs. Such a finding does not necessarily, or even probably, apply to state sponsors of terrorism."),

*aff'd*, 2013 WL 535770 (2d Cir. 2013). Indeed, unlike here, in *Rothstein*, the Second Circuit explained that "[t]he Complaint does not allege that [the defendant] was a participant in the terrorist attacks that injured plaintiffs. It does not allege that [the defendant] provided money to Hizbollah or Hamas. It does not allege that U.S. currency [the defendant] transferred to Iran was given to Hizbollah or Hamas." *Rothstein*, 2013 WL 535770, at *14. Therefore, *Rothstein* does not require judgment as a matter of law in favor of Defendant here.

Defendant also maintains that there is no evidence that the money it provided to the 13 Charities was used to fund the attacks at issue or even used to support violence, rather than peaceful charitable activities. However, plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because "[m]oney is fungible." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010). As Judge Weinstein held in denying in part a financial institution's motion to dismiss Section 2333(a) claims, money transferred by the defendant "need not be shown to have been used to purchase the bullet that struck the plaintiff. A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets." *Gill I*, 2012 WL 4960358, at *32; *see also Boim III*, 549 F. 3d at 698 ("If Hamas budgets $2 million for terrorism and $2 million for social services and receives a donation of $100,000 for those services, there is nothing to prevent its using that money for them while at the same time taking $100,000 out of its social services 'account' and depositing it in its terrorism 'account.'").

Indeed, the social services provided by Hamas and its front groups are integral to building popular support for its organization and goals, which then facilitates its ability to carry

out violent attacks. *See Boim III*, 549 F. 3d at 698 ("Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect (they would lose the material benefits that Hamas provides them), and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren."). That is why Congress crafted the ATA to cut off *all* money to terrorist organizations, finding that they are fundamentally tainted even if they also have non-violent public welfare operations.

The court also finds unconvincing Defendant's argument that its alleged support for Hamas was indirect because the money went through CBSP and the 13 Charities. A jury could find that Defendant sent the money to organizations that were controlled by Hamas, which is no different from sending the money directly to Hamas for purposes of the ATA. *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F. 3d 192, 200 (D.C. Cir. 2001) ("Logically, indeed mathematically, if A equals B and B equals C, it follows that A equals C. If the NCRI is the PMOI, and if the PMOI is a foreign terrorist organization, then the NCRI is a foreign terrorist organization also."). To hold otherwise would "invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare)." *Boim III*, 549 F. 3d at 702.

Accordingly, a reasonable juror could decide that Defendant's actions proximately caused Plaintiffs' injuries.

## B.    Hamas Alter Egos

Defendant asserts that, to show proximate causation, Plaintiffs must establish that the 13 Charities were either alter egos of or controlled by Hamas, which the evidence does not

establish. (*See* Def.'s Mem. 20-24.) Plaintiffs contend that proposed testimony of Plaintiffs'

experts, Dr. Mathew Levitt and Arieh Spitzen, describing the connections between the 13

Charities and Hamas, is sufficient for a jury to determine that the 13 Charities are Hamas alter

egos. (*See* Pls.' Opp'n 37-39.) Assuming, *arguendo*, that, to show proximate causation,

Plaintiffs must establish that at least some of the 13 Charities are alter egos of Hamas or under

Hamas' control, Plaintiffs have met their burden for purposes of Defendant's summary judgment

motion.

In his decision granting in part and denying in part Defendant's motion to dismiss, Judge

Sifton adopted the holding in *National Council of Resistance of Iran v. Department of State*, 373

F. 3d 152 (D.C. Cir. 2004), where then-United States Circuit Judge John G. Roberts, Jr., writing

for a panel of the D.C. Circuit, addressed the question of when an entity is considered an "alias"

of a FTO for purposes of the statute granting the Secretary of State power to designate FTOs.

Specifically, the D.C. Circuit held that:

> [O]rdinary principles of agency law are fairly encompassed by the alias concept
> under AEDPA. When one entity so dominates and controls another that they
> must be considered principal and agent, it is appropriate, under AEDPA, to look
> past their separate juridical identities and to treat them as aliases. . . . Just as it is
> silly to suppose that Congress empowered the Secretary to designate a terrorist
> organization only for such periods of time as it took such organization to give
> itself a new name, and then let it happily resume the same status it would have
> enjoyed had it never been designated, so too is it implausible to think that
> Congress permitted the Secretary to designate an FTO to cut off its support in and
> from the United States, but did not authorize the Secretary to prevent that FTO
> from marshaling all the same support via juridically separate agents subject to its
> control.

*Nat'l Council of Resistance of Iran*, 373 F. 3d at 157-58 (internal citation, quotation marks and

alteration omitted). In adopting the D.C. Circuit's alter ego concept, Judge Sifton explained that

"[f]actors to be considered include whether the organizations share leadership, whether they

commingle finances, publications, offices, etc., and whether one operates as a division of the

other."  *See Strauss*, 2006 WL 2862704, at *10 (internal citations omitted).  The parties do not dispute that this standard applies for purposes of Defendant's motion for summary judgment.[14]

Considering the factors described by Judge Sifton in *Strauss* and the record developed in this case thus far, a reasonable jury could find that the 13 Charities are operating as Hamas front groups.  To cite a few examples:

- The Islamic Center Gaza was founded by co-founders of Hamas.  (Eckstut Decl. Ex. 102 ("Levitt Supp. Report") at 55-58.)

- The Islamic Society Gaza was founded by Hamas' founder; its chairman from 1985 to 2004 was a senior Hamas leader who vocally has supported Hamas' terrorist attacks; the German intelligence service has warned that the Islamic Society Gaza is "closely associated with Hamas;" it has been outlawed previously by both Israel and the Palestinian Authority because of its affiliation with Hamas; it supports Hamas' ideology through, among other things, the schools that it runs; and the Palestinian Ambassador in Saudi Arabia wrote a letter in 2000 to the Saudi government complaining about Saudi donations to radical groups, including Islamic Society Gaza, "which belongs to Hamas."  (*Id.* 10-11, 58-62.)

- The Al-Salah Society has been described by one Hamas leader as "one of three charities that form Hamas' welfare arm;" the United States designated the Al-Salah Society as a SDGT in 2007 and has accused it of financing Hamas' terrorist agenda by recruiting youth to support Hamas and financing Hamas land purchases; it has been described as one of "our organizations" by a Hamas operative; and its director for over a decade personally was designated as a SDGT, and has since served as a minister for the Hamas government in Gaza.  (*Id.* 62-64.)

- The Islamic Charitable Society-Hebron ("ICS") has been described by the German intelligence service as "the most important Hamas association on the West Bank;"  current and former leaders have been identified as Hamas operatives or have worked with Hamas, including a member of ICS's administrative board; a one-time head of ICS was also the Hamas spokesman in Hebron and became a senior strategist for Hamas; the directorate co-chairman of ICS has been imprisoned for Hamas-related activities; the head of the ICS's Orphan Branch was a member of Hamas' leadership in Hebron; schools run by the ICS purportedly instill their pupils with Hamas' values.  (*Id.* 65-69.)

---

[14] Defendant also recites the traditional factors for corporate veil piercing, and asserts that Plaintiffs must satisfy these elements.  While these factors may be similar to the factors listed by Judge Sifton, the court questions whether legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies here.

The expert reports submitted by Plaintiffs describe similar overlap among the rest of the 13 Charities and Hamas, including shared leadership and an active support of Hamas' ideology and goals. (*See id.* 72-89; *see also* Eckstut Decl. Ex. 103 ("Spitzen Report") at 36-142.) Though some of the 13 Charities share stronger connections with Hamas than others, the reports paint a plausible picture of the 13 Charities as interwoven with Hamas and crucial to its success.[15] Thus, a reasonable jury could weigh the overlap and mutual support evidence and determine whether the 13 Charities are alter egos of and/or are controlled by Hamas.

## C. Article III Standing

For similar reasons that it contends that Plaintiffs have not shown proximate causation, Defendant asserts that Plaintiffs lack Article III standing. (*See* Def.'s Mem. 18-19.) Article III, Section 2 of the United States Constitution limits federal court jurisdiction to the resolution of "cases" and "controversies." There are three elements necessary to show the "irreducible constitutional minimum of standing" under Article III:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*McCormick v. Sch. Dist. of Mamaroneck*, 370 F. 3d 275, 284 (2d Cir. 2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations, footnote, and internal quotation marks omitted)). To show a sufficient causal connection for purposes of Article III standing, Plaintiffs must show that their injuries are "fairly . . . trace[able] to the challenged action of the

---

[15] Defendant tries to poke holes in the expert reports by pointing to alter ego factors where the evidence is weak or non-existent, including evidence (or lack thereof) relating to overlapping bank accounts and the presence of non-Hamas members on the 13 Charities' boards of directors. (*See* Def.'s Mem. 20-24.) This is for a jury to weigh against the evidence described above supporting Plaintiffs' contention that the 13 Charities are affiliated with Hamas.

defendant." *Lujan*, 504 U.S. at 560 (alterations in original). "[T]he test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause." *Rothstein*, 2013 WL 535770, at *9.

In this case, for the same reasons that there are triable proximate causation issues, *a fortiori*, there is sufficient evidence that Plaintiffs' injuries are fairly traceable to Defendant's conduct. Plaintiffs have set forth evidence in the record that Defendant sent, at the behest of CBSP, over $2 million to Hamas front organizations, the 13 Charities, between 1997 and 2003. (*See* Eckstut Decl. Ex. 97 at 1-17; *supra* § III.A.) Moreover, Defendant performed financial services to CBSP, an organization labelled as a primary fundraiser for Hamas in France (*see* Israel Decl. Ex. 31 at 5), over the same period, and remitted to CBSP hundreds of thousands of dollars upon closing its accounts in 2003. (*See* Eckstut Decl. Ex. 62.) Finally, as discussed *infra* § V, there is evidence that Hamas executed terrorist attacks injuring Plaintiffs during the same period as these transfers.

Accordingly, Plaintiffs have Article III standing.

### D. Expert Testimony

Defendant asserts that, even if Levitt's and Spitzen's proposed testimony were sufficient to show proximate cause and Article III standing, the proposed testimony is inadmissible. Specifically, Defendant attacks the proposed expert testimony on five grounds: 1) the testimony is irrelevant; 2) the testimony is repackaged hearsay; 3) Levitt's proposed testimony is not supported sufficiently by his sources and he did not consider any alternative conclusions that could be drawn from those sources; 4) Spitzen employs no accepted, peer reviewed or verifiable methodology; and 5) Levitt and Spitzen offer improper legal conclusions. (*See* Def.'s Mem. 24, 30-34.)

Federal Rule of Evidence 104(a) provides that the admissibility of expert testimony is a preliminary question of law for the court to determine. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). In *Daubert*, the Supreme Court explained that the trial judge must perform a "gatekeeping" function to ensure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. It is, therefore, proper for district courts to screen out inadmissible expert testimony on summary judgment:

> Because the purpose of summary judgment is to weed out cases in which "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court.

*Raskin v. Wyatt Co.*, 125 F. 3d 55, 66 (2d Cir. 1997) (internal citations omitted). This is true even if the exclusion of expert testimony would be outcome determinative. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997) (rejecting "[the] argument that because the granting of summary judgment in [a] case [may be] 'outcome determinative,' [the exclusion of expert testimony] should [be] subjected to a more searching standard of review.").

As discussed below, Defendant's request that the court exercise its gatekeeping function and discard Levitt's and Spitzen's proposed expert testimony for purposes of Defendant's summary judgment motion is denied.[16]

    1.   Relevance

Defendant contends that Levitt's and Spitzen's proposed testimony is inadmissible because neither addresses the relevant factors for determining alter ego or control status. (Def.'s

---

[16] This decision that the expert testimony is admissible for purposes of summary judgment is without prejudice, and Defendant is free to renew its challenge to the admissibility the witnesses' testimony via voir dire at trial.

Mem. 30.) In fulfilling the court's gatekeeping role with respect to expert testimony, "the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F. 3d 256, 265 (2d Cir. 2002) (quotation marks and alteration omitted).

Here, the proposed expert testimony tends to make the existence of Hamas' control over the 13 Charities more probable, because, upon consideration of the proposed testimony about the connections among the 13 Charities and Hamas, a reasonable jury could determine that they are alter egos of Hamas. The proposed expert testimony may not align perfectly with the relevant control factors, but the proposed experts describe in detail, among other things, the origins of the 13 Charities and their personnel overlap with Hamas, all of which is evidence a jury can rely on to find they are Hamas front groups. As Judge Weinstein held in admitting testimony by Levitt, Spitzen and other terrorism experts in *Gill*, "[w]ith so many vectors at play – most of which will not be familiar to jurors – a wide gateway to large amounts of evidence must be provided. Jurors will not have the broad background knowledge and hypotheses they bring to bear in run-of-the-mill cases within their ken." *Gill v. Arab Bank, PLC*, 2012 WL 5177592, at *1 (E.D.N.Y. Oct. 19, 2012) ("*Gill II*"). Accordingly, Spitzen's and Levitt's testimony is relevant.

### 2. Hearsay

Defendant asserts that Levitt's and Spitzen's proposed testimony is repackaged hearsay from secondary sources, and, thus, is an impermissible end-run around the Federal Rules of Evidence. (*See* Def.'s Mem. 30.) Pursuant to the Federal Rules of Evidence:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field

would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703. Although an expert may rely upon inadmissible hearsay, the expert "must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [party] to circumvent the rules prohibiting hearsay." *United States v. Mejia*, 545 F. 3d 179, 197 (2d Cir. 2008) (quotation marks and internal citations omitted).

However, courts in this circuit have admitted testimony from experts based upon hearsay analyzing the "origin, leadership, and operational structure" of terrorist organizations, analogizing such testimony "to the type of expert testimony regularly permitted by the United States Court of Appeals for the Second Circuit in cases involving organized crime families." *United States v. Paracha*, 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006) (citing *United States v. Amuso*, 21 F. 3d 1251, 1263-64 (2d Cir. 1994); *United States v. Locascio*, 6 F. 3d 924, 936 (2d Cir. 1993); *United States v. Daly*, 842 F. 2d 1380, 1388 (2d Cir. 1988)), *aff'd*, 313 F. App'x 347 (2d Cir. 2008). Indeed, courts, including this one, have allowed Levitt to testify about similar terrorist organizational matters over objections that his testimony only repeated inadmissible hearsay. *See United States v. Damrah*, 412 F. 3d 618, 625 (6th Cir. 2005) (Affirming district court's holding that Levitt's reliance upon hearsay was permissible because, "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon."); *United States v. Hammoud*, 381 F. 3d 316, 336-38 (4th Cir. 2004) (en banc) (Affirming admission of Levitt's testimony describing Hezbollah's structure and leadership.), *rev'd on other grounds*, 543 U.S. 1097 (2005); *United States v. Defreitas*, 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011) (Admitting Levitt's testimony about "background information

on Hezbollah and that group's longstanding presence in South America and its efforts to secure financing, recruit operatives and conduct terrorist attacks." (quotation marks omitted)). Additionally, as stated above, in *Gill*, Judge Weinstein also held that similar testimony about Hamas' organizational structure from both Levitt and Spitzen were admissible, notwithstanding objections that their reports relied upon inadmissible evidence. *Gill II*, 2012 WL 5177592, at *6.

Here, while both Levitt and Spitzen rely in large part upon sources such as news reports and academic materials that are hearsay, and portions of their reports appear to be repetition of other secondary sources, their proposed testimony generally is admissible. Their reports do not only regurgitate the hearsay, but bring to bear their terrorism expertise, and the types of sources they use are reasonably relied upon by experts in the field. For example, rather than just cut and paste or summarize what others have said about Hamas, Levitt uses the information to opine that social welfare organizations affiliated with Hamas are crucial to its ability to carry out terrorist attacks. (*See* Levitt Supp. Report 2.) He uses his expertise to describe the leadership structures of Hamas and the 13 Charities, and thus how the 13 Charities are connected to Hamas. (*Id.* 2-3.) Moreover, as other courts have noted in the past, it is reasonable that an expert in terrorism would have to rely on hearsay as opposed to relying solely on fieldwork, as terrorist organizations necessarily are secretive and dangerous, and there may be political reasons against meeting with reputed terrorists. (*See* Goelman Decl. Ex. 125 at 111 (Levitt's testimony that, while he has met with Hamas members who are in jail, he does not meet with those who are not in jail because he does not want to create the impression, as a former government official, that he was opening up a back channel between the United States government and Hamas).)

Spitzen also analyzes sources, including both primary and secondary sources, and makes conclusions about the structure of Hamas and its affiliations with the 13 Charities based upon his

professional expertise. Spitzen goes beyond rehashing secondary sources, and analyzes factors he believes are important in determining whether each of the 13 Charities is controlled by Hamas. (*See, e.g.*, Spitzen Report 48-59 (discussing the Islamic Society-Gaza (one of the 13 Charities) and concluding that it is "controlled by Hamas.")

This testimony by Levitt and Spitzen is precisely the type of analysis of a criminal group's organization and leadership of criminal groups that courts have admitted in the past. Thus, their reliance on hearsay does not preclude their testimony, as it is "less an issue of admissibility for the court than an issue of credibility for the jury." *Locascio*, 6 F. 3d at 938.

### 3. Levitt's Sources and Alternative Explanations

Defendant also opposes the admission of Levitt's proposed testimony because his sources are insufficient to support his conclusions and he did not consider alternative explanations for the information upon which he relied. (Def.'s Mem. 31-32.) Defendant contends that Levitt could not rely upon secondary sources rather than fieldwork, because other experts have performed fieldwork and come to different conclusions from Levitt, which Levitt fails to consider. (*Id.*) Defendant further asserts that Levitt mischaracterizes his sources and they actually do not support his conclusions. (*Id.*)

In considering whether expert testimony is admissible, "[a] district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Amorgianos*, 303 F. 3d at 265 (quotation marks omitted). "In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 265-66 (quotation marks omitted). In other words, expert testimony should be excluded if it is "speculative or

conjectural," or if is based on assumptions that are "'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F. 3d 18, 21 (2d. Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F. 2d 202, 208 (2d Cir. 1984)).

The purported flaws in Levitt's report described by Defendant are insufficient to render his report inadmissible. As support for its contention that other experts have done more extensive field work, Defendant provides a laundry list of books and articles that Defendant argues are based on primary sources and contradict Levitt's conclusions. (*See* Def.'s Mem. 31; Def.'s 56.1 Stmnt. ¶ 385.) However, the court is not convinced that the materials Defendant cites to conclusively contradict Levitt's report such that his failure to discuss these articles could render his report fundamentally flawed, and there appears to be a genuine dispute over how much of the materials are based upon "field work." (*See* Pls.' 56.1 Resp. ¶ 385.) Notably, Defendant may cross-examine the expert concerning the evidence or lack of evidence upon which his opinion is based.

Similarly, Defendant's assertions that Levitt mischaracterizes certain of his sources and that other conclusions lack support, do not appear to undermine his basic conclusion that Hamas exerts certain degrees of control over the 13 Charities. Rather, Defendant takes issue generally with statements that do not have an immediate citation, but are supported elsewhere in the report (*see* Pls.' 56.1 Resp. ¶ 390), or are relatively minor misquotes. (*See id.* ¶ 401.) Additionally, in support of its contention that Levitt did not properly vet his sources, Defendant only points to two sources, and there is a genuine dispute as to how thoroughly Levitt vetted those two sources. (Def.'s Mem. 32; Def.'s 56.1 Stmnt. ¶¶ 420-30; Pls.' 56.1 Resp. ¶¶ 420-30.) At most, these issues raise questions about Levitt's credibility that can be tested on cross-examination during

trial and are up to the jury to resolve. *Amorgianos*, 303 F. 3d at 267 ("[O]ur adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony. As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (quoting *Daubert*, 509 U.S. at 596)).

4. Spitzen's Methodology

Defendant next contends that Spitzen's proposed expert testimony should be rejected because he does not employ an accepted, peer reviewed methodology. (Def.'s Mem. 32-33.) More specifically, Defendant asserts that Spitzen invented his own 18-factor test to determine whether the 13 Charities are alter egos or controlled by Hamas, and he does not apply his test consistently. (*Id.* 32-34.) It is well settled that "[u]nder *Daubert* and Rule 702, expert testimony should be excluded if the witness is not actually applying expert methodology." *United States v. Dukagjini*, 326 F. 3d 45, 54 (2d Cir. 2003). District courts may consider factors such as:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F. 3d at 266 (internal citations and quotation marks omitted). However, these factors are not a "definitive checklist or test," as the court's inquiry is a "flexible one," that "must be tied to the facts of a particular case." *Id*.

While there may be legitimate questions as to whether Spitzen's 18-point test demonstrates definitively that the 13 Charities are alter egos under the standard previously discussed (*see supra* § III.B), his methodology is supported sufficiently to be admissible.

Spitzen testified that the factors he used in his test are based upon those used by law enforcement authorities and other experts in determining whether an entity is controlled by Hamas, and that his methodology was approved by the Israel Security Agency ("ISA"), a government security agency where Spitzen worked. (Goelman Decl. Ex. 128 at 430-31, 440-41.) The court finds this testimony sufficient to establish admissibility for purposes of summary judgment. Indeed, Defendant fails to point to any factors that are unreliable or are different from those used by other experts in the field. As Judge Weinstein held in admitting Spitzen's testimony in *Gill*, "Mr. Spitzen's eighteen-factor analysis encompasses categories of information generally considered by experts who analyze entities believed to act for terrorist entities. His methodology passes muster under *Daubert* and Rule 702." *Gill II*, 2012 WL 5177592, at *6.

Contrary to Defendant's conclusion that Spitzen purposely ignored certain factors in analyzing several of the 13 Charities, Spitzen's omission of these factors appears to be the unsurprising result of the unavailability of certain information. Finally, the court does not consider Spitzen's somewhat subjective weighing of the evidence supporting his factors as a fatal methodological flaw. Spitzen's expertise is in a social science field where there are not the type of hard data and neat conclusions that would be expected with a hard science. Thus, Spitzen's proposed testimony is admissible.

5.    Legal Conclusion

Defendant also asserts that Levitt's and Spitzen's proposed testimony is inadmissible because they make legal conclusions that the 13 Charities are alter egos of Hamas. (*See* Def.'s Mem. 24.) The court must determine whether expert testimony will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F. 3d 280, 289 (2d Cir. 1999). "In

evaluating the admissibility of expert testimony, [the Second Circuit] requires the exclusion of testimony which states a legal conclusion." *United States v. Duncan*, 42 F. 3d 97, 101 (2d Cir. 1994).

The court finds that Levitt's and Spitzen's reports do not state legal conclusions. Levitt's report provides information and analysis on the structure of Hamas and its connections with the 13 Charities, but it does not provide any conclusions that these connections satisfy the legal alter ego standard or otherwise describe the legal requirements of establishing that the 13 Charities are alter egos of Hamas.

Spitzen's 18-factor test purporting to show whether an organization is "controlled by Hamas, only supports Hamas or coincidentally employs one or more members of Hamas," (Spitzen Report 4-5), also does not define the legal definition of alter ego, as the test does not track courts' definition of alter ego or separately try to legally define the term alter ego. *See Duncan*, 42 F. 3d at 101-02 (expert testimony not impermissible legal conclusion where expert did not "use any legally specialized terms" that tracked the relevant statute). Therefore, this case is different from the case Defendant cites, *Pereira v. Cogan*, 281 B.R. 194 (S.D.N.Y. 2002). In *Pereira*, unlike here, the expert report at issue actually sought "to define the term 'alter ego,'" which would have usurped the court's function. *Id.* at 199-200. Instead, Spitzen presents an 18-factor test that he based on his experience in law enforcement, which leaves for to the jury to decide whether satisfying some or all of the factors makes the 13 Charities alter egos of Hamas under the legal definition provided by this court. Thus, at this stage, the court finds that Spitzen's expert testimony could assist the jury in deciding whether Plaintiffs have demonstrated that the 13 Charities are alter egos of Hamas, without intruding on the exclusive fact finding province of the jury or the legal determinations of the court. *See Gill II*, 2012 WL 5177592, at

*6 (Spitzen's "report and testimony will aid the jury in understanding issues related to the Bank's conduct and state of mind.").

Accordingly, Levitt's and Spitzen's testimony do not state legal conclusions and are admissible.

## IV. Section 2339B Claim

Defendant seeks to dismiss Plaintiffs' Section 2339B claim on the ground that Plaintiffs must show Defendant gave support directly to a FTO, reiterating that the 13 Charities are not Hamas alter egos. (Def.'s Mem. 34.) As discussed above, this assertion is without merit because Plaintiffs have shown that there is a material issue of fact as to whether the 13 Charities are Hamas alter egos.[17]

## V. Hamas' Responsibility for the Attacks

Defendant asserts that, based on the admissible evidence, no reasonable trier of fact could find that Hamas is responsible for the fifteen attacks at issue in this case. (Def.'s Mem. 35-50.) Defendant strenuously argues that the testimony of Plaintiffs' proposed experts supporting Plaintiffs' contention that Hamas is responsible for the fifteen attacks (Ronni Shaked and Evan Kohlmann) is inadmissible because the experts: 1) are unqualified; 2) aggregate inadmissible hearsay; 3) opine on topics that are not proper subjects of expert testimony; and/or 4) do not utilize a sufficient methodology under *Daubert*. (*Id.* 35-48.) Defendant further maintains that

---

[17] The court also notes that Plaintiffs do not and could not assert a claim directly under Section 2339B, but rather bring claims under Section 2333(a). Section 2339B imposes criminal penalties and does not provide for an independent private cause of action. *See* 18 U.S.C. § 2339B. Plaintiffs can prove that they have a claim under Section 2333(a) by showing that Defendant violated Section 2339B, so long as knowledge and causation are shown, because such "conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331." *Boim I*, 291 F. 3d at 1015. However, the claim is still brought pursuant to Section 2333(a) and not Section 2339B. (*See* Strauss 3d Am. Compl. ¶¶ 676-81; Wolf Compl. ¶¶ 415-20.)

the evidence upon which Shaked and Kohlmann rely is inadmissible and, thus, if the court strikes their proposed testimony, Plaintiffs will have no evidence showing that Hamas is responsible for the attacks. (*Id.* 48-50.) For the reasons set forth below, the court finds that certain portions of the proposed testimony of Shaked and Kohlmann are inadmissible. However, Plaintiffs have presented sufficient independently admissible evidence to create a genuine issue of material fact as to whether Hamas perpetrated fourteen of the fifteen attacks.

### A. Shaked

Plaintiffs submit a report from Ronni Shaked, who has worked as an analyst and commentator for *Yedioth Ahronoth*, a major Israeli newspaper, covering terrorism and security-related subjects. (Eckstut Decl. Ex. 130 ("Shaked Supp. Report") at 1.) In addition, between 1969 and 1982, Shaked worked for the ISA, the security agency responsible for the "war against terror" in Israel and Palestine, where he held the positions of Commander of the Jerusalem Sector and Commander of the Ramallah Sector. (*Id.*) In his report, Shaked generally describes how Hamas typically publicizes its terrorist attacks and the resulting Israeli investigations. (*Id.* 3-16.) For each of the fifteen attacks, Shaked analyzed various materials, including news reports, claims of responsibility by Hamas through its reputed websites, video "wills" of suicide bombers, documents issued by the ISA, convictions from Israeli courts and, for some of the attacks, his interviews with Hamas operatives. (*See id.* 28-140; Eckstut Decl. Ex. 132 ("Shaked Supp. Report for Mar. 7, 2003 Attack") at 1-10.) Based upon these materials, Shaked gives his opinion, with varying degrees of certainty, that Hamas is responsible for each of the fifteen terrorist attacks. (*See* Shaked Supp. Report 28-140; Shaked Supp. Report for Mar. 7, 2003 Attack 9.)

Defendant asserts that Shaked is unqualified and that his opinions are not based upon a

reliable methodology as required by *Daubert*. (*See* Def.'s Mem. 38-42.) This contention lacks merit. Shaked has established that he has specialized "knowledge, skill, experience, training, or education," about Hamas. Fed. R. Evid. 702. Among other things, he served for over a decade in the ISA, has worked as a consultant for the FBI, authored a published book about Hamas and covered Palestinian affairs and terrorism for Israel's largest newspaper for over twenty years. (Shaked Supp. Report at 1-2.)

Moreover, Shaked's analysis appears to comport with the "same level of intellectual rigor that characterizes" a terrorism expert. *Paracha*, 2006 WL 12768, at *19. He states that his findings are based upon multiple sources of information, including interviews and reviews of secondary materials, and he has cross-checked his findings against other sources of information (*see* Shaked Supp. Report at 3-4), which is similar to what other courts have held is a typical methodology accepted among and used by terrorism experts. *See Gill II*, 2012 WL 5177592, at *4-5; *Paracha*, 2006 WL 12768, at *20.

Defendant avers that Shaked's opinion as to whether Hamas committed each of the attacks is an inappropriate topic for expert testimony and is an improper summary of inadmissible testimony. (Def.'s Mem. 36-38.) Plaintiffs respond that Shaked's testimony is similar to testimony that has been admitted in other terrorism cases, and is particularly appropriate here where Hamas operates, in part, covertly on a different continent. (Pls.' Opp'n 42-44.)

Under the Second Circuit's decision in *United States v. Mejia*, much of Shaked's testimony is inadmissible because it does not require expert knowledge. In *Mejia*, the Second Circuit held that testimony by a government expert that the "unspecified deaths of eighteen to twenty-three persons have been homicides committed by members of" a certain gang was

outside the scope of appropriate expert testimony pursuant to Federal Rule of Evidence 702, because it repeated evidence that was understandable to a layperson. 545 F. 3d at 195-96. However, the court held that the expert could testify about how evidence admitted through a lay witness connected the murders to the gang. *Id.* at 195. For example, the expert could provide an "explanation of how the graffiti near a body indicated that the murderer was a member of [the gang]," or "testimony that the gang used a particular method to kill enemies and that as a result of his review of the autopsy reports (which would have been in evidence before the jury), he had concluded that [the gang] committed those murders." *Id.*[18]

Here, significant portions of Shaked's proposed testimony appear to summarize factual, non-technical materials. For example, Shaked repeats at length postings on websites and describes video "wills" he has watched of purported Hamas suicide bombers before some of the attacks at issue, which Plaintiffs use to establish as fact Hamas' responsibility for the attacks. These materials apparently largely consist of Hamas boasting about and promoting their involvement in various attacks. For example, in support of his conclusion that Hamas was responsible for the March 27, 2002 suicide bombing in the Park Hotel in Netanya, Shaked summarizes an announcement that appeared on the internet using Hamas letterhead. Shaked quotes the substance of the announcement that basically describes the attack, praises the suicide bomber and states that Hamas' military wing, the Izz al-Din al-Qassam Brigades, is responsible for the attack. (*See* Shaked Supp. Report 29.) If the announcement were otherwise admissible, Shaked could use his expertise to explain, for example, that the logo on the letterhead is Hamas',

---

[18] Contrary to Plaintiffs' suggestion otherwise, (*see* Pls.' Opp'n 42), the holding in *Mejia* was based on both Federal Rule of Evidence 702 as well as the Confrontation Clause, and, therefore, its holding applies in civil cases. *See CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) (relying upon *Mejia* in civil case).

how Hamas typically makes announcements over the internet or that the Izz al-Din al-Qassam Brigades is Hamas' military branch. Such testimony might provide helpful context for the jury, akin to using expertise on gang violence to explain that graffiti near a dead body indicates that a member of a gang is the murderer. However, under *Mejia*, attribution testimony cannot be used as an excuse to introduce and summarize straightforward factual evidence that has not been admitted, such as a webpage that says "Hamas carried out a suicide bombing." Thus, while Shaked can put factual evidence in context to help Plaintiffs establish that Hamas is responsible for an attack, he cannot be used to establish basic facts in the first place. *See Mejia*, 545 F. 3d at 196 ("Expert testimony might have been helpful in establishing the relationship between these facts and [the gang], but it was not helpful in establishing the facts themselves.").

The court declines Plaintiffs' invitation to follow the Seventh Circuit's holding in *Boim III* that an expert's opinion based upon unauthenticated documents, such as Hamas-affiliated websites, an unsigned set of notes prepared by a United States foreign service officer who attended the trial of the Hamas operative convicted in the attack, and an Arabic-language document that purportedly was the written conviction and sentence of the alleged perpetrator of the attack, established, as a matter of law, Hamas' responsibility for an attack. 549 F. 3d at 703-05. This holding, which determined merely that the district court did not abuse its discretion in admitting the expert's testimony, cannot be squared with *Mejia*, as *Boim III* would allow a party to prove responsibility for an attack without first building a proper evidentiary foundation.[19] As

_____

[19] The court also is unconvinced by Plaintiffs' arguments based on other cases from outside this circuit that "courts routinely permit expert attribution in terrorism cases." (Pls.' Opp'n 44 (emphasis omitted).) As Defendant correctly asserts, in *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998), *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009), *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) and *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1 (D.D.C. 2008), the defendant, Iran, defaulted and there was no discussion of the admissibility of attribution testimony.

United States Circuit Judge Ilana D. Rovner, joined by United States Circuit Judges Diane P. Wood and Ann C. Williams, explained in concurring in part and dissenting in part from the majority *en banc* panel in *Boim III*, such an expert report purporting to attach responsibility for an attack "is meaningless without reference to the websites and documents that he so heavily relied upon in forming his opinion, and yet allowing [the expert] to recount what those sources say without establishing their authenticity and trustworthiness would contradict the basic requirement that expert opinion have 'a reliable foundation.'" *Id.* at 715 (Rovner, J., concurring in part and dissenting in part) (quoting *Daubert*, 509 U.S. at 597).

Thus, Plaintiffs cannot use Shaked's opinions to establish a genuine issue of material fact as to Hamas' responsibility for the fifteen attacks without first building a proper foundation.

### B.  Kohlmann

As with Shaked, Defendant contends that Kohlmann's testimony is inadmissible because he is unqualified, his methodology is unreliable, and his report merely aggregates inadmissible and unauthenticated materials.  (*See* Def.'s Mem. 42-48.)  Plaintiffs respond that Kohlmann has studied terrorism extensively and his methods have been approved by other courts.  (Pls.' Opp'n 46-47.)

As with Shaked, the court finds that Kohlmann is qualified as a terrorism expert and that his methodology is sufficiently reliable.  Among other things, he is the author of a textbook on terrorism that is used in graduate level courses at Harvard University's Kennedy School of Government and Princeton University, and oversees one of the largest digital collections of terrorist multimedia and propaganda in the world.  (*See* Eckstut Decl. Ex. 159 ("Kohlmann Report") at 3.)  Notably, Kohlmann has testified as an expert in sixteen cases in federal courts and before the Guantanamo Bay military commissions.  (*Id.* 3-4.)  Moreover, his research and

archival methodology appear to be consistent with those in the terrorist field, as other courts have recognized. *See Paracha*, 2006 WL 12768, at *20 ("Although Kohlmann's methodology is not readily subject to testing and permits of no ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of information from websites and other sources."); *United States v. Kassir*, 2009 WL 910767, at *6-7 (S.D.N.Y. Apr. 2, 2009) (rejecting argument that Kohlmann's methodology is unreliable); *see also Gill II*, 2012 WL 5177592, at *5 ("[Expert's] analysis of Internet-based material is rooted in the methodology employed by other experts in his field.").

However, part of Kohlmann's proposed testimony is inadmissible. The first portion of his report gives background on Hamas, focusing on a description of its use of propaganda and its websites. (*See* Kohlmann Report at 9-28.) This part of the report is background information that is admissible and an appropriate subject for an expert opinion, (*see supra* § III.D), and is similar to testimony that Kohlmann has been allowed to give in the past. *See Paracha*, 2006 WL 12768, at *21-22; *Kassir*, 2009 WL 910767, at *7 (Holding that Kohlmann's "testimony on the origins, history, structure, leadership and various operational methods of al Qaeda and other terrorist groups is sufficiently reliable."). The rest of the report, however, is nothing more than a recitation of secondary evidence, not all of which is admissible (*see infra* § V.C), that Hamas perpetrated the fifteen attacks. (*See* Kohlmann Report at 28-44.) In this section of his report, he makes no attempt to bring his expertise to bear and comes to no conclusion as to the import or accuracy of his summaries other than concluding that Hamas has claimed responsibility for the attacks. (*See id.*) This tactic of simply "repeating hearsay evidence without applying any expertise whatsoever" has been rejected by the Second Circuit, and therefore must be rejected here. *Mejia*, 545 F. 3d at 197.

Therefore, Kohlmann may testify as an expert about Hamas' background and use of propaganda, but his summaries of the fifteen attacks and repetition of evidence that Hamas was responsible for those attacks, without using any expertise, is not admissible and cannot be relied upon by this court in deciding the summary judgment motions.

### C.    Other Evidence

Plaintiffs contend that they have set forth sufficient evidence besides Shaked's and Kohlmann's reports that are non-hearsay or exceptions to the hearsay rule and can be authenticated.  (*See* Pls.' Opp'n 48-50.)   In particular, Plaintiffs rely upon video "wills" of suicide bombers, Israeli court documents, Hamas' claims of responsibility on its websites, Hamas' written claims taking credit for attacks faxed directly to Shaked and Israeli government records.  (*Id.* 48-49.)  Defendant contends that the evidence Plaintiffs have set forth has not been authenticated and is inadmissible hearsay.  (*See* Def.'s Mem. 47-50.)

The court holds that, while not all of the evidence Plaintiffs point to is admissible, there is sufficient admissible evidence for a reasonable jury to determine that Hamas committed all of the fifteen attacks except for one attack, the September 24, 2004 mortar fire attack in Neve Dekalim ("September 24 Attack").  Except for the September 24 Attack, Shaked and Kohlmann relied at least in part upon judgments in Israeli courts assigning responsibility to Hamas or its operatives, official Israeli government investigative reports concluding that Hamas or its operatives were responsible for the attack and/or Shaked's own eye-witness accounts.  (*See generally* Shaked Supp. Report 28-140; Shaked Supp. Report for Mar. 7, 2003 Attack 1-9; Kohlmann Report 28-44.)  These materials are admissible and can be authenticated.

A judgment of conviction is admissible in a civil case as an exception to the hearsay rule, if it was entered after trial or guilty plea, the conviction was for a crime punishable by death or

imprisonment for more than one year and the evidence is admitted to prove any fact essential to the judgment. Fed. R. Evid. 803(22). The parties do not dispute that the convictions are for crimes punishable by death or more than one year imprisonment, the evidence is admitted to prove an essential fact and this exception can be "applied to admit evidence of foreign criminal judgments." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.24[2], at 803-146 (Joseph M. McLaughlin ed., 2d ed. 2012). Moreover, as foreign public documents, they can be self-authenticated, and Defendant has not challenged the authenticity of the judgments at issue here. *See* Fed. R. Evid. 902(3); *Raphaely Int'l, Inc. v. Waterman S.S. Corp.*, 972 F. 2d 498, 502 (2d Cir. 1992). Defendant's expert concedes that, in all of the fifteen attacks except four (the March 7, 2003 attack in Kiryat Arba ("March 7 Attack"), the April 30, 2003 attack at Mike's Place in Tel Aviv ("April 30 Attack"), the October 22, 2003 attack in Hebron ("October 22 Attack") and the September 24 Attack) are linked to Hamas by Israeli criminal judgments. (*See* Eckstut Decl. Ex. 154 ("Azoulay Report") 7-13.) For these eleven attacks, therefore, Plaintiffs have sufficient admissible evidence to create a genuine issue of material fact as to Hamas' responsibility for the attacks.[20]

Defendant argues that the Israeli judgments are inadmissible in this case because Defendant was not a party to the Israeli proceedings. (*See* Def.'s Mem. 47.) Defendant is incorrect, as the plain language of Rule 803(22) of the Federal Rules of Evidence does not impose such a limit. *See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2001 WL 99506, at *3 (S.D.N.Y. Feb. 6, 2001) (rejecting argument "that a criminal judgment may not be admissible against a party who was not the subject of that judgment"). Rule 803(22)(d)

---

[20] For the January 29, 2004 attack in Jerusalem, where there is a judgment linking Hamas to the attack, Defendant argues that Hamas was not responsible because there is evidence that another group carried out the attack. (*See* Def.'s Mem. 41-42.) At most, the contradictory evidence raises a triable issue of fact.

specifically prevents using a previous conviction in a criminal case for purposes other than impeachment, unless the judgment was against the defendant.  Fed. R. Evid. 803(22)(d).  This carve out would be unnecessary if judgments always were inadmissible against a non-party. Defendant also argues that the Israeli judgments would be inadmissible hearsay in Israeli courts. (*See* Def.'s Mem. 47-48.)  However, Defendant neither points to any authority (and the court is unaware of any) nor provides any reasoned explanation as to why this court should look to Israeli evidentiary rules and not the Federal Rules of Evidence in making its admissibility rulings.

Defendant further maintains that verdicts from Israeli military courts that provide evidence of Hamas' responsibility for some of the fifteen attacks, are inadmissible because these courts do not comport with American notions of due process.  In support of its argument, Defendant directs the court to *Lloyd v. American Export Lines, Inc.*, where the Third Circuit held that "[t]he test of acceptance, then, of foreign judgments for which domestic recognition is sought, is whether the foreign proceedings accord with civilized jurisprudence, and are stated in a clear and formal record."  580 F. 2d 1179, 1189 (3d Cir. 1978).  Assuming, *arguendo*, that this standard applies in the Second Circuit, and that by "civilized jurisprudence" the Third Circuit was referring to some minimum due process, the military court verdicts still are admissible.  The record reflects that many of the basic rights that accused persons have in American courts also are applicable to defendants in the Israeli military courts.  For example, Israeli military trials typically are open to the public; defendants are entitled to representation by an attorney; the same rules of evidence as in Israeli civilian courts apply; defendants are entitled to challenge confessions on the grounds of coercion; witnesses are subject to cross-examination; defendants enjoy the privilege against self-incrimination; and, if defendants enter a guilty plea, the judge must explain the consequences of the plea to the defendant before accepting the plea.  (*See*

Eckstut Decl. Ex. 155 (Gross Report) 20-23.) While there may be some criticisms of the process afforded defendants in Israeli military courts and their ability to come to a reliable verdict, (*see* CL's 56.1 Stmnt. ¶¶ 605-33), this affects the weight of the evidence, not admissibility, particularly where it appears on this record that the accused were afforded more than a modicum of due process.

For three of the four attacks for which there are no Israeli court judgments assigning blame to Hamas, there is alternative admissible evidence a reasonable jury can consider to determine Hamas' responsibility. For the October 22 Attack, Shaked states that he witnessed firsthand the aftermath of the attack and saw evidence that Hamas was responsible. (*See* Shaked Supp. Report 127.) This eyewitness account is admissible to show that Hamas perpetrated the attack.

Hamas' responsibility for the March 7 and April 30 Attacks are supported by conclusions of public Israeli government reports that are admissible as hearsay exceptions. *See* Fed. R. Evid. 803(8) (public records containing "factual findings from a legally authorized investigation" are admissible); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 159 (D. Conn. 2009) (admitting conclusions of official foreign investigation as hearsay exception). Hamas is blamed for the March 7 Attack in an Israeli government indictment, and the ISA's yearly public report on terrorist attacks concluded that Hamas was responsible for carrying out the April 30 Attack. (*See* Shaked Supp. Report 82-83; Shaked Supp. Report for Mar. 7, 2003 at 7-8.) These documents can be self-authenticated as foreign public documents. *See* Fed. R. Evid. 902(3).[21] In addition, Defendant gives no reason why these reports are

---

[21] Plaintiffs also purport to authenticate various government documents by a proposed expert, Shaul Naim. (*See* Eckstut Decl. Ex. 175 (Naim Report).) Defendant objects to Naim's ability to authenticate these materials. (*See* Def.'s Mem. 48-49.) The court need not determine whether

unreliable. *See Bridgeway Corp. v. Citibank*, 201 F. 3d 134, 143-44 (2d Cir. 2000) (Affirming admissibility of factual findings in government report where nothing in the record "indicates any motive for misrepresenting the facts" in the report.)[22]  Accordingly, there is sufficient admissible evidence indicating that Hamas is responsible for the March 7 and April 30 Attacks. *See Estate of Parsons v. Palestinian Auth.*, 651 F. 3d 118, 121-26 (D.C. Cir. 2011) (Holding that there is a triable issue of responsibility for attack based upon statement to Palestinian interrogators by person who planted bomb, an FBI report and a memo in Palestinian Authorities' investigative files assigning blame for attack).

However, Plaintiffs have not provided sufficient admissible evidence of Hamas' responsibility for the September 24 Attack.  The evidence Plaintiffs rely on, through Shaked's report, consists of:  1) newspaper reports from the *Associated Press* and an Israeli newspaper, *Ha'aretz*; 2) claims of responsibility posted on a Hamas-affiliated website; and 3) a videotape that Shaked purportedly viewed showing three masked men wearing bandanas that indicate they are affiliated with Hamas.  (*See* Shaked Supp. Report 122-23.)  The newspaper reports are inadmissible hearsay and cannot be relied upon. *See Delrosario v. City of New York*, 2010 WL 882990, at *7 (S.D.N.Y. Mar. 4, 2010) ("Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted."); *Ladner v. City of New*

---

Naim can authenticate Plaintiffs' evidence, because evidence sufficient to raise a genuine issue of material fact of Hamas' responsibility can be authenticated without Naim's testimony, as discussed more fully in this section.

[22] The court notes that Judge Weinstein held that an ISA report linking a militant cell that purportedly carried out the terrorist attack to Hamas was inadmissible because the report's conclusion was unreliable. *See Gill III*, 2012 WL 5395746, at *25.  However, in *Gill*, the relevant conclusion was supported only by a confession repeating second-hand information of uncertain provenance, and there was "no evidence independent of the confession that served as a basis of the ISA reports' indication" that the terrorist cell at issue was Hamas' agent. *Id.*  In this instance, there is much more support for the ISA's conclusion that Hamas perpetrated the April 30 Attack.  (*See* Shaked Supp. Report 79-84.)

*York*, 20 F. Supp. 2d 509, 519 (E.D.N.Y. 1998) (newspaper article "inadmissible hearsay and unusable to defeat summary judgment"), *aff'd*, 181 F. 3d 83 (2d Cir. 1999) (unpublished table decision).

The claims of responsibility by Hamas taken from their website, even assuming they could be authenticated, are hearsay. Plaintiffs assert that the statements are admissible as a hearsay exception because they are declarations against interest by unavailable witnesses pursuant to Rule 804(b)(3) of the Federal Rules of Evidence. (*See* Pls.' Opp'n 49.) While admitting to a violent attack on innocents typically is detrimental to a declarant's interests, the interests and motives of terrorists are far from typical. "Under the perverse assumptions of terrorists, an armed attack on civilians reflects glory. Taking 'credit' for such an attack is deemed a benefit, not a detriment, and is not reliable under the circumstances." *Gill III*, 2012 WL 5395746, at *23. As Plaintiffs' experts explain in detail, Hamas actively seeks publicity for its claims of responsibility for attacks against Israelis as part of its propaganda. (*See* Shaked Supp. Report 5-6; Kohlmann Report 8.) Thus, in this instance, Hamas' claims of responsibility were not against its interest as an organization such that Hamas only would have made them if it believed them to be true.

Finally, Shaked's claim that he viewed a videotape of masked men wearing Hamas bandanas firing mortars is insufficient to defeat summary judgment on the September 24 Attack, even assuming Plaintiffs could produce this video. The court finds that a video of men with Hamas bandanas firing mortars in the general area where the September 24 Attack occurred, without more, is insufficient to create a jury issue as to Hamas' responsibility for the attack. Plaintiffs have not explained how they could authenticate such a video filmed by an unidentified third party, allegedly affiliated with Hamas. Among other infirmities, Plaintiffs do not point to

any admissible evidence establishing when the video was filmed or who is in the video. Notably, even Shaked concludes only that Hamas "apparently" perpetrated the September 24 Attack and explains that the evidence he relies upon for his tentative conclusion "is not subject to the same level of comparative analysis as were the other attacks which were examined." (Shaked Supp. Report 16.)

Accordingly, summary judgment is granted in favor of the Defendant for the September 24 Attack, but there is sufficient admissible evidence for a jury to conclude that Hamas was responsible for the other fourteen attacks.

## VI. Café Hillel Plaintiffs' Motion for Summary Judgment

### A. Scienter

The Café Hillel Plaintiffs assert they have proven, as a matter of law, that Defendant knew it was supporting terrorism by at least August 2003, when the United States government designated CBSP as a SDGT, and before the terrorist attack on the Café Hillel. (*See* CH Pls.' Mem. 12-27.) Defendant responds that OFAC's designation of CBSP as a SDGT did not apply to Defendant's conduct as a French bank in its relations with its French customer in France, and that OFAC's designation under its regulatory power cannot be used as a shortcut to show scienter under the ATA. (*See* Def.'s Opp'n 4-21.) The court agrees with Defendant.

CBSP was designated as a SDGT pursuant to Executive Order 13224, 66 Fed. Reg. 49,079 (Sept. 23, 2001). (*See* Israel Decl. Ex. 31 at 5); *see also* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any foreign person or person . . . designated pursuant to Executive Order 13224 of September 23, 2001.") Pursuant to federal regulations, "property and interests in property" of organizations designated as a SDGT "that are in the United States, that hereafter come within the United States, or that hereafter come within the

possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in." 31 C.F.R. § 594.201(a).

Defendant and Café Hillel Plaintiffs argue at length about the extraterritorial application of United States OFAC regulations, but this discussion largely misses its mark. Even assuming, for the sake of argument only, that Defendant's French operations[23] somehow come within the definition of "U.S. persons"[24] and, therefore, Defendant was required to block transactions with CBSP for purposes of federal regulations, there is nothing in either the ATA or the regulations promulgated pursuant to Executive Order 13224 suggesting that providing services for a SDGT is a violation *per se* of the ATA. Instead, the ATA explicitly prevents only doing business with a FTO, *see* 18 U.S.C. § 2339B(a), which is a separate designation under different regulations. Notably, CBSP was never designated as a FTO by the United States government. The OFAC regulations provide their own civil penalties for parties that do business with SDGTs, *see* 31 C.F.R. § 594.701, and the ATA is a separate statute that imposes civil and criminal penalties for providing material support to FTOs specifically, *see* 18 U.S.C. § 2339B, and terrorist acts more generally. *See* 18 U.S.C. § 2339C. Thus, while conceivably there may be occasions where an entity violates 31 C.F.R. § 594.201(a) and the ATA, there is nothing in either that suggests that a violation of one automatically constitutes a violation of the other. Accordingly, the OFAC designation of CBSP as a SDGT does not establish scienter automatically as a matter of law under Section 2333(a).

---

[23] While Defendant does operate some branches within the United States, none of the parties have presented any evidence that contributions to CBSP, through its accounts with Defendant, were made by persons within the United States.

[24] The relevant regulations define "U.S. person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States." 31 C.F.R. § 594.315.

Moreover, while, as discussed above, the United States government's announcement that it had "credible evidence" that CBSP was a primary fundraiser for Hamas in France provides evidence that Defendant knew or deliberately disregarded that it was supporting terrorism through CBSP's accounts, a reasonable juror need not necessarily come to that conclusion. For example, the French government investigated CBSP twice after Defendant referred it to the government and did not bring charges, and CBSP still is a lawfully registered charity in France. (CL's 56.1 Stmnt. ¶¶ 100, 104-05, 114; Pls.' 56.1 Resp. ¶¶ 100, 104-05, 114.) Defendant reasonably may have relied upon the French government's exoneration of CBSP and honestly believed there was no evidence that CBSP was raising money for Hamas. Therefore, Café Hillel Plaintiffs have not established scienter conclusively after August 2003. Accordingly, summary judgment is denied for the Café Hillel Plaintiffs.

### B.    Proximate Cause and Article III Standing

Café Hillel Plaintiffs assert that they have established as a matter of law that Defendant proximately caused their damages and that they have Article III standing. (*See* CH Pls.' Mem. 27-41.) They contend the evidence demonstrates that Defendant sent money to Hamas front groups at the behest of CBSP, and that this is sufficient to show standing and proximate causation. (*Id.*) Defendant responds with the same arguments it made in its memorandum of law in support of its summary judgment motion. (*See* Def.'s Opp'n 25-37.)

While, for the same reasons discussed above (*see supra* § III), Plaintiffs have shown at this stage of the proceedings that Defendant's conduct is fairly traceable to Café Hillel Plaintiffs' damages and a reasonable jury could find that Defendant was a substantial factor in causing the damages, a reasonable juror also could find the opposite. Among other things, based on evidence that Hamas receives much more money from other sources, that other intervening

actors may have caused any given terrorist attack, and lack of evidence that the 13 Charities had any direct role in the Café Hillel attack (*see* Def.'s 56.1 Stmnt. ¶ 598; Pls.' 56.1 Resp. ¶ 598), a reasonable juror could conclude the connection between Defendant and the attack is too attenuated as a factual matter to hold Defendant liable.

Moreover, while the record shows that there is significant overlap among the 13 Charities and Hamas, the evidence is not conclusive that they were mere Hamas alter egos. There is evidence that they did have some independent identity, because, for example, they maintained their own bank accounts and had their own boards of directors. (*See* Def.'s 56.1 Stmnt. ¶¶ 313, 316-18, 322-23; Pls.' 56.1 Resp. ¶¶ 313, 316-18, 322-23.) A juror thus could conclude that Defendant was not sending money to terrorists when it sent money to the 13 Charities. For this additional reason, summary judgment is inappropriate.

### C.     Hamas' Responsibility

Café Hillel Plaintiffs assert that the record establishes, as a matter of law, that Hamas was responsible for the Café Hillel attack. (*See* CH Pls.' Mem. 37-41.) Besides Shaked's and Kohlmann's reports, Plaintiffs point to evidence that a Hamas operative was convicted for his role in the attack and Hamas claimed responsibility for the attack on its websites. (*See id.*) Defendant responds that Hamas' claims of responsibility and the convictions are inadmissible hearsay and not authenticated. (*See* Def.'s Opp'n 38-42.)

As discussed above (*see supra* § V), Shaked's and Kohlmann's proposed attribution testimony is inadmissible to the extent that it simply repeats inadmissible evidence. However, Café Hillel Plaintiffs have admissible conviction evidence showing that Hamas was responsible for the attack. Specifically, Café Hillel Plaintiffs submit certified sentencing and appellate records of Amru Abd Al-Aziz, who was convicted for his role in the Café Hillel attack. (*See*

Israel Decl. Exs. 66-67.)  In the sentencing record, the civilian Jerusalem District Court describes how Al-Aziz was convicted of assisting the suicide bomber who perpetrated the Café Hillel attack and how the attack was carried out at Hamas' direction.  (Israel Decl. Ex. 66, ¶¶ 2-4.)  The record also reflects that the court sentenced Al-Aziz to seven life imprisonment terms, one for each of the seven people who died in the attack, and thirty years' imprisonment for assisting an enemy in war and for the attempted murder of the 64 people who were injured in the attack.  (*Id.* ¶ 10.)  The appellate decision by the Israeli High Court of Justice affirming the conviction describes in more detail the attack on the Café Hillel and the testimony of Al-Aziz's co-conspirators.  (Israel Decl. Ex. 67, ¶¶ 1-4.)  The court also describes the Hamas cell that planned and perpetrated the attack.  (*See id.* ¶ 11.)

Defendant does not present any evidence contradicting the findings of the Israeli courts that blame Hamas for the attack and there is nothing in either the sentence or the appeal calling into question Hamas' responsibility.  Defendant attacks the admissibility and authenticity of the documents, but the certified sentencing record and the appellate decision are admissible as foreign judgments and are authenticated.  *See* Fed. R. Evid. 803(22), 902(3); *see also* § V.C.  On this record, because of the uncontroverted evidence that Hamas carried out the Café Hillel attack, Café Hillel Plaintiffs have established as a matter of law that Hamas carried out the Café Hillel attack, and summary judgment is granted in Café Hillel Plaintiffs' favor with respect to the Hamas responsibility element of their claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is denied in part and granted in part.  Accordingly, the claims brought by Shlomo Tratner, individually and on behalf of the Estate of Tiferet Tratner, in connection with the September 24 Attack only are

dismissed.  The claims based on the remaining fourteen attacks shall proceed.  In addition, Café

Hillel Plaintiffs' motion for summary judgment is denied in part and granted only to the extent

that they have proven Hamas' responsibility for the Café Hillel attack.  The other elements of the

claim must be proven before a jury.

SO ORDERED.

Dated:  Brooklyn, New York
        February 28, 2013

_____/s/_____
          DORA L. IRIZARRY
        United States District Judge