UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
MOSES STRAUSS, et al.,                          :
                                                :
                        Plaintiffs,             :
                                                :          **OPINION AND ORDER**
                                                :          06-cv-702 (DLI) (MDG)
            -against-                           :
                                                :
                                                :
CRÉDIT LYONNAIS, S.A.,                          :
                                                :
                        Defendant.              :
                                                :
--------------------------------------------------------- x
BERNICE WOLF, et al.,                           :
                                                :
                        Plaintiffs,             :
                                                :          07-cv-914 (DLI) (MDG)
                                                :
            -against-                           :
                                                :
                                                :
CRÉDIT LYONNAIS, S.A.,                          :
                                                :
                        Defendant.              :
                                                :
--------------------------------------------------------- x

**DORA L. IRIZARRY, U.S. District Judge:**

This is a consolidated action pursuant to the civil liability provision of the Antiterrorism

Act of 1992 ("ATA"), 18 U.S.C. § 2333(a) ("§ 2333(a)").  Plaintiffs, over 200 individuals and

estates of people who are deceased (collectively, "Plaintiffs"), seek to recover damages from

Defendant Crédit Lyonnais, S.A. ("Defendant") in connection with 19 attacks in Israel and

Palestine allegedly perpetrated by Hamas.  (*See generally* Fourth Am. Compl., ("*Strauss* FAC"),

*Strauss* Dkt. Entry No. 358; Compl. ("*Wolf* Compl."), *Wolf* Dkt. Entry No. 1).[1]  Specifically,

Plaintiffs allege that Defendant is civilly liable pursuant to the ATA's treble damages provision

---

[1] Citations to the "*Strauss* Dkt." are to docket 06-cv-702.  Citations to the "*Wolf* Dkt." are to 07-cv-914.  Where the same document has been filed on both dockets, the Court cites to the *Strauss* Docket only, as it is the lead case.

for: (1) aiding and abetting the murder, attempted murder, and serious physical injury of American nationals outside the United States in violation of 18 U.S.C. § 2332; (2) knowingly providing material support or resources to a Foreign Terrorist Organization ("FTO") in violation of 18 U.S.C. § 2339B; and (3) willfully and unlawfully collecting and transmitting funds with the knowledge that such funds would be used for terrorist purposes in violation of 18 U.S.C. § 2339C. (*Strauss* FAC ¶¶ 672-90; *Wolf* Compl. ¶¶ 407-25.) Defendant moves for dismissal of this action for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment pursuant to Rule 56. (*See* Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Mem."), *Strauss* Dkt. Entry No. 369.) Plaintiffs oppose. (*See* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss ("Pls.' Opp'n"), *Strauss* Dkt. Entry No. 371.) For the reasons set forth below, Defendant's motion is denied in its entirety.

## BACKGROUND[2]

### I. The Parties

Plaintiffs' claims arise from 19 terrorist attacks that occurred in Israel and Palestine between approximately 2001 and 2004, which allegedly were perpetrated by Hamas.[3] *See Strauss v. Crédit Lyonnais, S.A.* ("*Strauss II*"), 925 F. Supp. 2d 414, 418 (E.D.N.Y. 2013).

---

[2] The Court assumes familiarity with the facts underlying this action, which are summarized more fully in the Court's February 28, 2013 Opinion and Order on the parties' cross-motions for summary judgment. *See Strauss v. Crédit Lyonnais, S.A.* ("*Strauss II*"), 925 F. Supp. 2d 414 (E.D.N.Y. 2013). The facts recounted herein are drawn from the statement of facts set forth in that Opinion and Order, affidavits submitted in connection with the motions for summary judgment that were the subject of that Order, the pleadings, and certain materials submitted by the parties in connection with the instant motion. *See Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F. Supp. 433, 436 (S.D.N.Y. 1996) ("Matters outside the pleadings, however, may also be considered in resolving a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) without converting it into one for summary judgment.") (citing *Visual Sciences, Inc. v. Integrated Comms., Inc.*, 660 F.2d 56, 58 (2d Cir. 1981)).

[3] Hamas is an acronym for "Harakat al-Muqawama al-Islamiyya," also known as the "Islamic Resistance Movement." (*Strauss* FAC. ¶ 1 n.1.)

Plaintiffs comprise over 200 United States nationals who were injured in those attacks, the estates of persons killed in those attacks, and/or family members of persons killed or injured in those attacks. *Id.*

Defendant is a financial institution incorporated and headquartered in France. *Id.* At the time of the events giving rise to this action, Defendant conducted business in New York through the Crédit Lyonnais Americas New York Branch (Defendant's "New York Branch").[4] (*See* Decl. of Joseph Virgilio ("Virgilio Decl.") ¶ 2, Ex. 3 to the Decl. of Emily P. Eckstut in Supp. of Def's. Mot. for Summary Judgment, *Strauss* Dkt. Entry No. 316-1.) According to Defendant, the New York Branch served as the "intermediary bank for U.S. Dollar denominated transfers that were requested by customers of Crédit Lyonnais in France." (*Id.*) Plaintiffs allege that Defendant also maintains an office in Miami, Florida, and is registered with State banking authorities there. (*Strauss* FAC ¶ 579; *Wolf* Compl. ¶ 316.)

Among other customers, Defendant maintained bank accounts in France for the Comite de Bienfaisance et de Secours aux Palestiniens ("Committee for Palestinian Welfare and Relief") ("CBSP"), a non-profit organization registered in France and self-described as providing humanitarian aid to various charitable organizations in the West Bank, Gaza, and surrounding areas. *See Strauss II*, 925 F. Supp. 2d at 418-19. During the time CBSP had accounts with Defendant, it transferred money to certain charitable organizations (each a "Charity," and collectively the "Charities") that Plaintiffs contend actually were front organizations for Hamas. *See Id.* at 419. Plaintiffs allege that Defendant aided Hamas by maintaining CBSP's accounts and sending money to the Charities on CBSP's behalf, despite knowing that CBSP supported

---

[4] Plaintiffs contend that the New York Branch was a "legally inseparable" corporate branch maintained by Defendant, rather than a subsidiary with an independent corporate existence. (*See* Pl.s' Opp'n at 12 n.26.) Nevertheless, the Court uses the term "New York Branch" as a matter of convenience only.

Hamas. *See Id.* at 424-25. While the vast majority of transfers Defendant made to the Charities on behalf of CBSP never went through the United States, the parties agree that Defendant executed five such transfers through its New York Branch (the "New York Transfers"), each in response to a specific request by CBSP to send funds in U.S. Dollars. (*See* Ex. A to the Oct. 16, 2015 Friedman Ltr., *Strauss* Dkt. Entry No. 393.) The relevant electronic transfer records reflect that each New York Transfer was initiated by Defendant in Paris and routed through its New York Branch, then was directed for the benefit of the respective Charity to a correspondent account maintained by that Charity's bank either at a New York branch of Arab Bank, PLC, or in one instance, Citibank N.A. (*See* Exs. A-D to the Feb. 7, 2014 Osen Ltr., *Strauss* Dkt. Entry No. 362; Ex. B to the Oct. 16, 2015 Osen Ltr., *Strauss* Dkt. Entry No. 392; Ex. A to the Oct. 16, 2015 Friedman Ltr.)

## II.     Procedural History

After initially commencing an action against Defendant in the United States District Court for the District of New Jersey, Plaintiffs refiled the *Strauss* case in this Court in February 2006. The initial complaint, and every amended complaint thereafter, alleged that Defendant is subject both to general personal jurisdiction ("general jurisdiction") and specific personal jurisdiction ("specific jurisdiction") in the United States. (*See Strauss* FAC ¶ 4; *see also Wolf* Compl. ¶ 4.) Following its voluntary acceptance of service of process in February 2006, (*Strauss* Dkt. Entry No. 3), Defendant moved for dismissal of the *Strauss* action pursuant to Rule 12(b)(6), declining to contest personal jurisdiction at that time. (*See* Mot. to Dismiss, *Strauss* Dkt. Entry No. 10.) The late Honorable Charles P. Sifton, then presiding, denied the motion to dismiss with respect to Plaintiffs' claims that Defendant provided material support to an FTO and knowingly transmitted funds that financed terrorism, but dismissed Plaintiffs' aiding and

abetting claim, with leave to amend.  *Strauss v. Crédit Lyonnais, S.A.* ("*Strauss I*"), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006).  Defendant similarly accepted service in the *Wolf* action and thereafter filed a motion to dismiss, which the parties resolved by stipulation without any objection by Defendant as to personal jurisdiction.  (*See Wolf* Dkt. Entry Nos. 6, 13, and 31.)

Extensive merits discovery between the parties ensued.  On October 7, 2011, the Court formally consolidated the *Strauss* and *Wolf* actions.  Thereafter, Defendant moved for summary judgment dismissing the consolidated action, but again declined to raise a defense of lack of personal jurisdiction.  (*See Strauss* Dkt. Entry No. 293.)  By Opinion and Order dated February 28, 2013, the Court granted summary judgment in favor of Defendant with respect to one attack for which certain Plaintiffs sought recovery, but denied Defendant's motion with respect to Plaintiffs' claims concerning more than a dozen other attacks.  *See Strauss II*, 925 F. Supp. 2d at 452-53.

On February 6, 2014, Defendant notified the Court that, in light of the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), it intended to assert a personal jurisdiction defense for the first time in these proceedings.  (*See* Feb. 6, 2014 Friedman Ltr., *Strauss* Dkt. Entry No. 361.)  Decided in January 2014, *Daimler* addressed the extent to which a forum State may exercise general jurisdiction over a foreign corporation.  Revisiting its past personal jurisdiction jurisprudence, the Supreme Court clarified that a corporation is subject to general jurisdiction in a forum State only where its contacts are "so continuous and systematic," judged against the corporation's nationwide and worldwide activities, that it is "essentially at home" in that State.  *Daimler*, 134 S. Ct. at 761 & n.20 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)) (internal quotation marks omitted).  Aside from the "exceptional case," the Supreme Court explained, a corporation is at home and

subject to general jurisdiction *only* in a State that represents its formal place of incorporation or principal place of business. *See Id.* & nn.19-20. The Supreme Court emphasized that the "exceptional case" exists only in rare and compelling circumstances like those in *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), where a foreign corporation maintained a surrogate headquarters in Ohio during a period of wartime occupation in its native Philippines. *See Id.* at 755-56 & nn.8, 19.

Citing the "new rule" on general jurisdiction purportedly announced in *Daimler*, (*see* Feb. 6, 2014 Friedman Ltr.), Defendant filed the instant motion to dismiss this action pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. In the alternative, Defendant contends that it is entitled to summary judgment dismissing Plaintiffs' claims because, at most, it is subject to personal jurisdiction in New York only with respect to the five New York Transfers it executed through its New York Branch. (*See* Def.'s Mem. at 15-25.) Renewing arguments from its prior summary judgment motion, Defendant contends that no reasonable juror could find that it possessed the requisite *scienter* to establish liability under the ATA when making those five transfers, nor could a reasonable juror find that its activities as of the date of those transfers proximately caused Plaintiffs' injuries.

Plaintiffs oppose the instant motion, arguing as a threshold matter that Defendant waived a personal jurisdiction defense by failing to raise one in its prior motions to dismiss the *Strauss* and *Wolf a*ctions, then actively litigating this case for several years. (*See* Pl.s' Opp'n at 4-11.) Plaintiffs further argue that *Daimler* is distinguishable from this case, and therefore, the Court may exercise general jurisdiction over Defendant even if it finds that Defendant did not waive its personal jurisdiction defense. (*See Id.* at 12 n.27.) Finally, Plaintiffs contend that the Court may exercise specific jurisdiction over Defendant based on its contacts with New York and the

broader United States, including most significantly the New York Transfers. (*See Id.* at 12-25.)

On October 8, 2015, oral argument was held on Defendant's motion. (*See* Tr. of Oct. 8, 2015 Oral Argument ("Tr.")). Following argument, at the Court's request, the parties provided additional information concerning the extent of the transfers Defendant made to the Charities on behalf of CBSP, and the portion or percentage of those transfers that went through New York or the broader United States. (*See Strauss* Dkt. Entry Nos. 391-97.) This decision followed.

## DISCUSSION

### I.    Waiver

Taken together, Rules 12(g)(2) and 12(h)(1) of the Federal Rules of Civil Procedure provide that a party that moves to dismiss an action, but omits an available personal jurisdiction defense, forfeits that defense. Even a party that complies with those rules may forfeit the right to contest personal jurisdiction if it unduly delays in asserting that right, or acts inconsistently with it. *See, e.g.*, *Insur. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-04 (1982); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61-62 (2d Cir. 1999). However, an exception exists where a defendant seeks to assert a personal jurisdiction defense that previously was not available, as it is well recognized that "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made." *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981).

Here, Plaintiffs argue that Defendant waived its personal jurisdiction defense by omitting that defense from its prior motions to dismiss the *Strauss* and *Wolf* actions, then actively litigating this case over the course of several years. (*See* Pl.s' Opp'n at 4-11.) However, Plaintiffs' argument is foreclosed by *Gucci America, Inc. v. Weixing Li* ("*Gucci II*"), 768 F.3d 122 (2d Cir. 2014). In *Gucci II*, non-party Bank of China appealed from an order of the district

court compelling it to comply with an asset freeze injunction and certain disclosures. For purposes of that order, the district court assumed that Bank of China was subject to general jurisdiction in New York because it maintained branch locations there. *See Gucci Am. Inc., v. Weixing Li* ("*Gucci I*"), 2011 WL 6156936, at *4 n.6 (S.D.N.Y. Aug. 23, 2011), *vacated* 768 F.3d 122. While the appeal was pending, the Supreme Court decided *Daimler*, prompting Bank of China to assert an objection that it was not subject to general jurisdiction in New York. That objection ordinarily would have been waived because it was not raised in the district court. However, the Second Circuit declined to find waiver, explaining that Bank of China's personal jurisdiction objection was not available until *Daimler* cast doubt upon, if not outright abrogated, controlling precedent in this Circuit holding that a foreign bank with a branch in New York was subject to general jurisdiction here. *See Id.* at 135-36 (citing *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 93-95 (2d Cir. 2000)) (emphasis in original).

The same conclusion is compelled in this case. Under controlling precedent in this Circuit prior to *Daimler*, Defendant was subject to general jurisdiction in New York because it had a New York Branch through which it routinely conducted business. *Gucci II* expressly acknowledged that, in the wake of *Daimler*, contact of such a nature with a forum State, absent more, is insufficient to sustain general jurisdiction over a foreign corporation. *See Gucci II*, 768 F.3d at 134-35. Accordingly, just as the *Daimler* ruling permitted Bank of China to raise its personal jurisdiction objection in *Gucci II*, it similarly permits Defendant to assert its personal jurisdiction defense at this juncture. It follows that Defendant did not waive that defense, having asserted it promptly after *Daimler* first made it available.

Other courts in this Circuit, relying on the Second Circuit's application of *Daimler* in *Gucci II*, have held similarly. *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*,

2015 WL 4634541, at *30-31 (S.D.N.Y. Aug. 4, 2015); *7 West 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *5-7 (S.D.N.Y. Mar. 3l, 2015). Plaintiffs do not provide any valid reason why this Court should depart from those decisions, or ignore the clear guidance of *Gucci II*. At best, Plaintiffs argue that the question of waiver in this case is governed by Rule 12(h)(1) of the Federal Rules of Civil Procedure, which applies only to the parties to an action and, thus, was inapplicable to Bank of China as a non-party in *Gucci*. (*See* Sept. 23, 2014 Glatter Ltr., *Strauss* Dkt. Entry No. 378.) That argument is without merit. As relevant here, waiver under Rule 12(h)(1) expressly is limited to the "circumstances described in Rule 12(g)(2)." Subject to limited exception, Rule 12(g)(2) prohibits a party from raising a defense by way of a second motion to dismiss if that defense "was *available* to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2) (emphasis added). In this respect, Rule 12(h)(1) comports with the well settled principle that a party cannot be deemed to have waived defenses not known to be available to it. *See Holzsager*, 646 F.2d at 796. Given the Court's prior determination that a personal jurisdiction defense was not available to Defendant prior to *Daimler*, consideration of Rule 12(h)(1) does not alter the Court's conclusion that Defendant did not waive that defense.

Plaintiffs' remaining arguments are similarly unavailing. Plaintiffs contend that, if the Supreme Court narrowed the law on general jurisdiction, it did so three years before *Daimler* in *Goodyear*, 131 S. Ct. 2846, in which case Defendant waived its personal jurisdiction defense by waiting too long to assert it. (*See* Pl.s' Opp'n at 10-11.) Plaintiffs' argument finds limited support outside this Circuit. *See, e.g.*, *Am. Fidelity Assur. Co. v. Bank of N.Y. Mellon*, 2014 WL 4471606 (W.D. Okla. Sept. 10, 2014), *aff'd* 2016 WL 231474 (10th Cir. 2016); *Gilmore v. Palestinian Interim Self-Government Auth.*, 8 F.Supp. 3d 9 (D.D.C. June 23, 2014). However,

the Court is not aware of any authority in this Circuit holding that *Goodyear*, rather than *Daimler*, narrowed the law on general jurisdiction. To the contrary, the issue was briefed in *Gucci II* and the Second Circuit ultimately held that *Daimler* effected the relevant change in the law.[5] *See Gucci II*, 768 F.3d at 135-36; *see also 7 West 57th St.*, 2015 WL 1514539, at *6-7 (rejecting argument that *Goodyear* altered the law on general jurisdiction, as "*Gucci America* unequivocally holds . . . that *Daimler* effected a change in the law.")

The Second Circuit recently reaffirmed that holding in *Brown v. Lockheed Martin Corp.*, 2016 WL 641392, at *6-7 (2d Cir. Feb. 18, 2016). There, the Second Circuit explained that "*Goodyear* seemed to have left open the possibility that contacts of substance, deliberately undertaken and of some duration, could place a corporation 'at home' in many locations." *Id.* at *7. However, *Daimler* all but eliminated that possibility, "considerably alter[ing] the analytic landscape for general jurisdiction" by more narrowly holding that, aside from the truly exceptional case, a corporation is at home and subject to general jurisdiction *only* in its place of incorporation or principal place of business. *Id.; see also Daimler*, 134 S. Ct. at 760 ("*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business") (emphasis in original). As Defendant relies on that newly articulated principle of law for its personal jurisdiction defense, it reasonably could not have raised that defense prior to *Daimler*.

Plaintiffs also erroneously contend that Defendant actually contested personal jurisdiction in this case as early as 2006, or at least could have, despite now asserting that its personal jurisdiction defense only became available after *Daimler*. (Pl.s' Opp'n at 9.) Plaintiffs base their argument on representations by Defendant that it does not conduct business in the United States,

---

[5] *See, e.g.,* Letter Brief of Bank of China et al., *Gucci Am., Inc. v. Bank of China*, 2014 WL 1873367, at *3 (2d Cir. Apr. 8, 2014).

which Defendant made in: (1) a November 2006 submission to the magistrate judge; and (2) Defendant's December 2006 answer to the first amended complaint. (*See* Ex. A to the Oct. 16, 2015 Osen Ltr., *Strauss* Dkt. Entry No. 391.) Upon review, the Court finds that neither filing reasonably can be construed as asserting an objection as to personal jurisdiction.

In particular, in its 2006 submission to the magistrate judge, Defendant emphasized its lack of business activity in the United States only in the context of arguing that it would be unduly burdensome to disclose business records maintained in France. (*See* Def.'s Opp'n to Pl.s' Discovery Motion, *Strauss* Dkt. Entry No. 61, at 22-23.) Although the magistrate judge's order on the discovery motions at issue noted, in a footnote, that Defendant had waived a personal jurisdiction defense by not raising one in its answer, *see Strauss v. Crédit Lyonnais, S.A.*, 242 F.R.D. 199, 203 n.5 (E.D.N.Y. 2007), the Court declines to treat that ruling as the law of the case in light of the intervening change in the law effected by *Daimler*. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("We may depart from the law of the case for cogent or compelling reasons including an intervening change in law . . .") (internal quotation marks and citation omitted).

Plaintiffs' argument that Defendant could have asserted a personal jurisdiction defense earlier in this case fares no better. The crux of Plaintiffs' argument is that, if Defendant really conducted no business whatsoever in the United States, as it represented in 2006, then Defendant had a valid basis to contest personal jurisdiction even under pre-*Daimler* precedent. Nevertheless, as discussed, any argument by Defendant prior to *Daimler* that it was not subject to personal jurisdiction in New York would have been futile because Defendant had a branch in New York during the timeframe relevant to the Court's jurisdictional inquiry. *See Gucci II*, 768 F.3d at 135-36; *see also Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 128 (2d Cir. 2008)

("In general jurisdiction cases, we examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to an including the date the suit was filed.") The Court declines to find that Defendant, in failing to raise a futile argument, waived its personal jurisdiction defense.

Finally, Plaintiffs argue in passing that, even if an objection as to general jurisdiction was unavailable to Defendant prior to *Daimler*, Defendant still could have challenged the existence of specific jurisdiction earlier in this case. However, any challenge to that effect would have been purely academic because, regardless of the outcome, Defendant still would have been subject to general jurisdiction in New York under existing law at the time. To the extent Defendant failed to contest specific jurisdiction at an earlier time, the Court is satisfied it was for that reason. Accordingly, the Court concludes that Defendant did not waive its personal jurisdiction defense.

## II. Personal Jurisdiction

### A. Legal Standard

Once personal jurisdiction has been challenged, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). On a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a *prima facie* showing that jurisdiction exists to satisfy that burden. *See Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). Where, as here, discovery regarding a defendant's forum contacts has been conducted but no evidentiary hearing has been held, the "plaintiff['s] *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the

defendant."[6]  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)) (alterations in original).  The Court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor."  *Porina*, 521 F.3d at 126.  However, the Court is not to "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (internal quotation marks and citation omitted), or "accept as true a legal conclusion couched as a factual allegation."  *Jazini v. Nissan Motor Co*., Ltd., 148 F.3d 181, 185 (2d Cir. 1998) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

        To make a *prima facie* showing that personal jurisdiction exists, a plaintiff must demonstrate: "(1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction over the defendant; and (3) that [the court's] exercise of jurisdiction over the defendant is in accordance with constitutional due process principles."  *Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381, 385 (E.D.N.Y. 2015) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 673 F.3d 50, 59-60 (2d Cir. 2012)).  Here, because Defendant does not dispute that it properly was served with process, the Court's analysis primarily is a two-part inquiry to determine whether there is a statutory basis for jurisdiction, and if so, whether due process is satisfied.

        In conducting this analysis, the Court distinguishes between general and specific jurisdiction.  General or "all-purpose" jurisdiction is "based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject

---

[6]  No jurisdictional discovery has been ordered in this matter.  However, in the course of merits discovery, Plaintiffs sought and obtained extensive disclosure concerning the relevant jurisdictional facts.  As such, at oral argument in connection with the instant motion, the parties agreed that further discovery directed to the jurisdictional facts would be unnecessary.  (*See* Tr. at 40:18-21; 41:22-42:8.)

matter of the suit is unrelated to those contacts." *Metro. Life*, 84 F.3d at 568 (quoting

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 & nn.8-9 (1984)). In

contrast, specific or "case-linked" jurisdiction depends "on the relationship among the defendant,

the forum, and the litigation," *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014), and is said to exist

where "a State exercises personal jurisdiction over a defendant in a suit arising out of or related

to the defendant's contacts with the forum." *Metro. Life*, 84 F.3d at 567-68 (quoting

*Helicopteros*, 466 U.S. at 414-16 & nn.8-9).

**B.    General Jurisdiction**

A court may exercise general jurisdiction over a foreign corporation to hear any and all

claims against it when the corporation's affiliations with the forum State are so continuous and

systematic as to render it essentially at home there. *Goodyear*, 131 S. Ct. at 2851 (citing *Int'l

Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). Here, it is undisputed that New York is

neither Defendant's principal place of business nor its place of incorporation. (*See Strauss* FAC

¶¶ 577-78; *Wolf* Compl. ¶¶ 314-15). Therefore, Defendant is not at home in New York under

either of the two paradigm bases for general jurisdiction discussed in *Daimler*. *See Daimler*, 134

S. Ct. at 760. It follows that exercising general jurisdiction over Defendant would not comport

with the principles of due process articulated in *Daimler* unless this is an exceptional case, akin

to *Perkins*, 342 U.S. 437, where Defendant's contacts with New York are so substantial and of

such a nature as to render it essentially at home there. *See Daimler*, 134 S. Ct. at 761 n.19.

The Court has little difficulty concluding that the facts here do not present an exceptional

case. Defendant's alleged contacts with New York are nowhere near as substantial as those in

*Perkins*, where the defendant corporation maintained a surrogate headquarters in Ohio, the forum

State. *Id*. By contrast, Defendant in this case merely had a New York Branch, which it used just

for that discrete element of its worldwide operations that required clearing U.S. Dollar transfers. *See Brown*, 2016 WL 641392, at *8 (for purposes of a general jurisdiction analysis, a corporation's in-forum conduct must be assessed "in the context of the company's overall activity" throughout the United States and the world) (citing *Daimler*, 134 S. Ct. at 762 n.20) (emphasis omitted). In fact, such contacts with New York are even more attenuated than those maintained by Bank of China in *Gucci II*, which the Second Circuit deemed insufficient to permit the exercise of general jurisdiction. *See Gucci II*, 768 F.3d at 135.

Moreover, Defendant's New York contacts fall far short of the contacts maintained with Connecticut by Lockheed Martin ("Lockheed"), the corporate defendant that was the subject of the Second Circuit's recent decision in *Brown*. For example, Lockheed continuously maintained a physical presence in Connecticut for over 30 years, ran operations out of as many as four leased locations in the State, employed up to 70 workers there, and derived about $160 million in revenue from its Connecticut-based work during the relevant timeframe.[7] *Brown*, 2016 WL 641392, at *6-7. Nevertheless, the Second Circuit held that those facts still did not rise to an exceptional case that would support general jurisdiction over Lockheed in a forum where it neither was headquartered nor incorporated. *Id.* at *7-9. In reaching its decision, the Second Circuit emphasized that a corporation's "mere contacts" with such a forum, "no matter how systematic and continuous, are extraordinarily unlikely to add up to an exceptional case." *Id.* at *8 (internal quotation marks omitted).

---

[7] Lockheed also was formally registered to do business in Connecticut. Notably, the Second Circuit declined to interpret the Connecticut business registration statute as requiring foreign corporations to consent to general jurisdiction as a condition of registration. *Brown*, 2016 WL 641392, at *9-18. The Second Circuit further observed that, even if the statute required such consent, it is questionable whether such consent validly could confer general jurisdiction over a foreign corporation after *Daimler*. *Id.* at *18. Here, although Defendant's New York Branch was registered in New York under § 200 of the Banking Law, the Court declines to find that Defendant consented to general jurisdiction in New York by virtue of such registration. *See 7 West 57th St.*, 2015 WL 1514539, at *11 ("The plain language of this provision limits any consent to personal jurisdiction by registered banks to *specific* personal jurisdiction.") (emphasis in original).

Given the fact that neither *Gucci II* nor *Brown* amounted to an exceptional case, the instant case clearly is not exceptional either. Accordingly, in light of *Daimler*, there is no basis for the Court to exercise general jurisdiction over Defendant in New York. Plaintiffs nevertheless attempt to distinguish *Daimler* on the ground that it involved a foreign corporation with a subsidiary in the forum State, whereas in this case the New York Branch purportedly was a legally inseparable branch office of Defendant. (*See* Pl.s' Opp'n at 12 n.27.) However, that distinction hardly renders *Daimler* inapposite. As a central principle, *Daimler* held that it would be "unacceptably grasping" to permit general jurisdiction over a corporation in every State where it engages in continuous and systematic business. *Daimler*, 134 S. Ct. at 761. There is no basis to suggest that such reasoning, though articulated in the context of a case involving subsidiaries, would not also apply in cases involving a foreign bank with a branch in New York. *See Gliklad v. Bank Hapoalim B.M.*, No. 155195/2014, 2014 N.Y. Slip Op. 32117(U), at *3 (Sup. Ct. N.Y. Cnty. Aug. 4, 2014). In fact, the Second Circuit drew no such distinction when applying *Daimler* to the facts in *Brown*, which involved Lockheed's maintenance of offices and a facility in Connecticut. *See Brown*, 2016 WL 641392, at *6-7. Accordingly, *Daimler* is controlling here and clearly precludes the Court from exercising general jurisdiction over Defendant in this matter.

### C.     Specific Jurisdiction Under Rule 4(k)(1)(A)

Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure permits a federal court to "exercise personal jurisdiction to the extent of the applicable [State] statutes." *Peterson v. Islamic Republic of Iran*, 2013 WL 1155576, at *11 (S.D.N.Y. Mar. 13, 2013), *aff'd* 758 F.3d 185 (2d Cir. 2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Under this rule, a federal court may look to the long-arm statute of the State in which it sits to establish a statutory basis for the exercise of

personal jurisdiction over a defendant. Here, Plaintiffs invoke several provisions of New York's long-arm statute, alleging that Defendant is subject to specific jurisdiction under New York Civil Practice Law and Rules ("C.P.L.R.") §§ 302(a)(1), (a)(2), and (a)(3). (*See* Pls.' Opp'n at 22-25.) Because the Court concludes that C.P.L.R. § 302(a)(1) ("§ 302(a)(1)") permits the exercise of jurisdiction over Defendant, it does not consider whether jurisdiction also exists under §§ 302(a)(2) and (3).

### 1. CPLR § 302(a)(1)

Pursuant to § 302(a)(1), a court may exercise personal jurisdiction over a non-domiciliary that "transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). This provision confers jurisdiction over a defendant if two requirements are met. First, the defendant must have transacted business in New York. Known as the "purposeful availment" prong of § 302(a)(1), this requirement calls for a showing that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within New York . . . thereby invoking the benefits and protections of its laws." *Id.* at 61 (internal quotation marks and citations omitted). The second requirement, known as the "nexus" prong of § 302(a)(1), holds that there must be an "articulable nexus" or "substantial relationship" between the plaintiff's claim and the defendant's transaction in New York. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (quoting *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998)).

In *Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 20 N.Y.3d 327 (2012), the New York Court of Appeals ("Court of Appeals") answered questions certified from the Second Circuit concerning the reach of § 302(a)(1) in the context of an action, like the instant one, alleging that a foreign bank violated the ATA by knowingly transferring funds that supported an FTO. Notably, the defendant bank in question "did not operate branches or offices, or maintain

employees, in the United States." *Id.* at 332. Nevertheless, the Court of Appeals held that the bank transacted business in New York by executing dozens of wire transfers through a correspondent bank account in New York on behalf of an entity that allegedly served as the financial arm of an FTO. As the Court of Appeals explained: "[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a course of dealing—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339 (internal quotations marks and citation omitted).

The Court of Appeals further explained that the nexus prong of § 302(a)(1) does not demand a causal connection between the defendant's New York transaction the plaintiff's claim, but instead requires only a "relatedness . . . such that the latter is not completely unmoored from the former." *Id.* at 339. This "relatively permissive" nexus is satisfied where "at least one element [of the plaintiff's claim] arises from the [defendant's] New York contacts." *Id.* at 339, 341. The Court of Appeals held that this requisite nexus was established in *Licci II* because the defendant bank, in utilizing a correspondent account in New York allegedly to send money to a terrorist organization, purportedly violated the very statutes under which the plaintiffs sued. *Id.* at 340. Furthermore, the bank did not direct those funds through New York "once or twice by mistake," but deliberately and repeatedly used a New York account allegedly to support the same terrorist organization accused of perpetrating the attacks in which the plaintiffs were injured. *Id.* at 340-41.

Turning to the instant action, Defendant's relevant New York conduct is even more substantial and sustained than that of the foreign bank in the *Licci* cases (collectively, "*Licci*"). Whereas the bank in *Licci* maintained only a correspondent account as its sole point of contact in

New York, Defendant had a New York Branch that was staffed with employees and licensed to operate under New York banking laws. Defendant routinely conducted business in New York through that branch, utilizing it as the exclusive clearing channel for U.S. Dollar transfers requested by its customers. (*See* Virgilio Decl. ¶ 2; *see also* Tr. 20:22-21:6). In doing so, Defendant necessarily availed itself of the benefits and protections accorded to such transactions when carried out using New York's dependable banking system, under the auspices of New York banking and commercial laws. *See Licci II*, 20 N.Y.3d at 339-40. These facts satisfy the purposeful availment prong of § 302(a)(1).

With respect to the nexus prong of § 302(a)(1), the relevant facts further demonstrate a close relatedness between Plaintiffs' claims in this action and Defendant's New York conduct. Most significantly, in executing the New York Transfers, Defendant allegedly used New York's banking system to effect the very financial support of Hamas that is the basis for Plaintiffs' claims. While those five transfers represent only a subset of the total transfers Defendant made to the Charities on behalf of CBSP, they integrally constitute part of Defendant's alleged support of Hamas and its terrorist activities, including the 19 attacks in which Plaintiffs were injured. As such, the New York Transfers unquestionably are among the financial services underlying Plaintiffs' claims. (*See Strauss* FAC ¶¶ 676-90; *Wolf* Compl. ¶¶ 407-25.)

That nexus would be too attenuated if, contrary to the facts alleged here, Defendant routed transfers through New York just "once or twice by mistake," or executed the New York Transfers at a time far removed from the attacks that caused Plaintiffs' injuries. *Licci II*, 20 N.Y.3d at 340. However, five separate times, Defendant deliberately routed a transfer through its New York Branch in response to a specific request by CBSP to transmit funds in U.S. Dollars to a given Charity. Furthermore, the first New York Transfer occurred in 1997, while the

remaining four transfers all were performed in June and July of 2001. (*See* Ex. A to the Oct. 16, 2015 Friedman Ltr.)  As such, those transfers not only overlapped with the attacks in 2001 through 2004 that caused Plaintiffs' injuries, but also occurred at a time when Defendant allegedly knew that funds it transferred on behalf of CBSP were being used to support a terrorist organization. (*See, e.g.*, *Strauss* Compl. ¶ 678; *Wolf* Compl. ¶ 419); *see also Strauss II*, 925 F. Supp. 2d at 429-430 (noting that "Defendant admittedly had concerns about CBSP's accounts since at least 1997," and further finding that "there is considerable documentary and testimonial evidence showing Defendant's knowledge of CBSP's possible terrorist affiliations from at least 2001 through 2003, which is contemporaneous to the attacks at issue.")

Defendant nevertheless argues that the nexus required by § 302(a)(1) is foreclosed because Plaintiffs have not proven with respect to any New York Transfer that the beneficiary Charity actually received and took possession of the underlying funds. (*See* Def.'s Mem. at 10-11.)  However, it is not Plaintiffs' burden to adduce any such proof at this stage.  Rather, Plaintiffs need only plead facts that, if credited, would establish jurisdiction over Defendant. *See Metro. Life*, 84 F.3d at 567.  Plaintiffs have done so, having relied not only on an averment of facts but also on actual transfer records showing that each New York Transfer was directed to a beneficiary Charity, was routed by Defendant through its New York Branch, and reached a correspondent account in New York maintained by the respective Charity's bank. (*See* Ex. B. to the Oct. 16, 2015 Osen Ltr.)

Defendant further argues that, even if each New York Transfer reached its intended beneficiary, those transfers do not support jurisdiction because they are *de minimis* in comparison to the many other transfers Defendant made to the Charities at CBSP's behest.  The parties generally agree that, in addition to the five New York Transfers, Defendant executed at

least 280 other transfers to the Charities on behalf of CBSP that never went through New York or the United States. (*See* Oct. 20, 2015 Osen Ltr., *Strauss* Dkt. Entry No. 395.) Furthermore, whereas the New York Transfers represented just $205,000 in transferred funds, the other relevant transfers routed elsewhere in the world totaled approximately $3 million. (*See* Oct. 16, 2015 Osen Ltr.) Accordingly, whether measured by number or monetary value, the vast majority of the transfers underlying Plaintiffs' claims were routed from CBSP's accounts in Paris to various bank accounts abroad, without any contact with New York or the United States.

While relevant to the Court's jurisdictional analysis, these facts do not foreclose jurisdiction under § 302(a)(1). As a "single act statute," even "one transaction in New York is sufficient to invoke jurisdiction [under § 302(a)(1)] . . . so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Deutsche Bank Secs., Inc.*, *v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006) (internal quotation marks and citation omitted); *see also Chloé*, 616 F.3d at 170; *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). In number, the New York Transfers accounted for approximately 1.8% of the total transfers Defendant made to the Charities on behalf of CBSP. (*See* Oct. 21, 2015 Friedman Ltr., *Strauss* Dkt. Entry No. 396). Defendant notes that a similar percentage of New York activity was deemed *de minimis* in *DH Services, LLC v. Positive Impact, Inc.*, 2014 WL 496875, at *9-10 (S.D.N.Y. Feb. 5, 2014), where the court found that it could not exercise jurisdiction over an out-of-state organization that received approximately 1% of its annual funding from New York sources.[8]

However, the court further explained that the grants and donations composing that 1% of

---

[8] The Court notes that Defendant makes an apples-to-oranges comparison. In *DH Services*, 1% represented the proportional *value* of funds received from New York sources, whereas in this case 1.8% represents the proportional *number* of transfers executed through New York. Expressed in terms of value, and based on the figures generally agreed upon by the parties, the New York Transfers may have represented as much as 6.8% of the total funds Defendant transferred to the Charities on behalf of CBSP.

funding had no demonstrated connection to the trademark claims that were the subject of the action. *Id.* at *9. The court sharply contrasted *Chloé*, 616 F.3d at 166, where the Second Circuit held that a defendant who shipped a single counterfeit handbag into New York was subject to jurisdiction under § 302(a)(1) because that "*was* the conduct underlying the lawsuit." *DH Services*, 2014 WL 496875, at *9 (emphasis in original). Here, although the New York Transfers represent a minority of the total transfers Defendant made to the Charities on behalf of CBSP, they are an integral facet of the conduct that is the basis for all of Plaintiffs' claims. Thus, similar to the facts in *Chloé*, the New York Transfers *are* the conduct underlying this lawsuit. As such, they establish the articulable nexus required by § 302(a)(1).

Furthermore, the nexus between Plaintiffs' claims and Defendant's New York conduct is premised on more than just the New York Transfers. As an element of their claims, "Plaintiffs must show that Defendant knew or was deliberately indifferent to the fact that CBSP was financially supporting terrorist organizations." *Strauss II*, 925 F. Supp. 2d at 428. According to Plaintiffs, what Defendant knew about CBSP's potential involvement in financing terrorism was informed, at least in part, by Defendant's communications and other interactions with the New York Branch. In particular, consistent with its general practice, Defendant's New York Branch filtered all transfer requests made by CBSP through a system designed to detect terrorism financing based on notices from the United States Treasury Office of Foreign Asset Control ("OFAC"). (*See* Virgilio Decl. ¶ 3.) In October 2001, the New York Branch blocked a transfer from CBSP's main account in Paris to the "El Wafa Charitable Society-Gaza" (the "El Wafa Transfer"), as that organization's name was similar to the name of an organization designated by OFAC as an Al Qaeda fundraiser. (*See Id.* ¶¶ 2-4.) Ultimately, those two organizations were determined to be distinct. As such, the New York Branch's blocking of the El Wafa Transfer, by

itself, provides limited insight into what Defendant potentially knew about CBSP's involvement in financing terrorism. *See Strauss II*, 925 F. Supp. 2d at 430 n.10.

Nevertheless, Plaintiffs allege that the blocking of the El Wafa Transfer precipitated communications between Defendant and its New York Branch regarding CBSP's banking activities. (*See* Ex. A to the Oct. 22, 2015 Osen Ltr., *Strauss* Dkt. Entry No. 397) (attaching list of communications). Those communications, in turn, allegedly renewed suspicions at Defendant's home office in Paris regarding CBSP, and led to discussions among bank officials there regarding stricter scrutiny of CBSP's accounts. (*See* Pl.s' Opp'n at 13 & n.29.) Defendant nonetheless contends that those communications, potentially implicating what Defendant knew about CBSP's ties to terrorism, are not relevant to the Court's jurisdictional analysis under § 302(a)(1) because they do not give rise to Plaintiffs' claims. (*See* Def.'s Reply Mem. in Supp. of Mot. to Dismiss ("Def.'s Reply") at 3, *Strauss* Dkt. Entry No. 372.)

However, Defendant too narrowly construes the nexus requirement of § 302(a)(1). The defendant in *Chloé* similarly misconstrued that requirement, arguing that counterfeit bags it shipped into New York bearing marks not registered to the plaintiff were irrelevant to a jurisdictional analysis, as the plaintiff's trademark claims necessarily did not arise from those particular shipments. The Second Circuit rejected that argument on appeal, explaining that those shipments were relevant to an analysis under § 302(a)(1) because they evidenced a "larger business plan purposefully directed at New York." *Chloé*, 616 F.3d at 166-67. With the benefit of that broader context, the shipment of a single bag into New York bearing the plaintiff's marks was not the "one-off transaction" it otherwise appeared to be. *Id.* Here, the blocking of the El Wafa Transfer and the ensuing communications between the New York Branch and bank officials at Defendant's home office in Paris similarly evidence a broader operation

fundamentally intertwined with New York. Standing alone, that relationship perhaps would not be enough to establish the nexus required by § 302(a)(1). However, those interactions give deeper context to the New York Transfers, demonstrating that Plaintiffs' claims are tied to New York by more than just those five transactions.

In any event, jurisdiction under § 302(a)(1) is not determined by the quantity of a defendant's contacts with New York, but by the quality of those contacts when viewed in the totality of the circumstances. *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007); *Farkas v. Farkas*, 36 A.D.3d 852, 853 (2d Dep't 2007). Here, Defendant had a New York Branch through which it continuously and systematically conducted business in New York, utilizing that branch to execute U.S. Dollar transfers requested by its customers. Whatever efficiency and cost savings Defendant gained as a result allowed Defendant to retain relationships with customers that had a need to deal in U.S. currency, a contingent that from time to time included CBSP. Most importantly, Defendant executed the five New York Transfers through the New York Branch, repeatedly and deliberately using New York's banking system to effect the alleged financial support of Hamas that is the basis for Plaintiffs' claims. Given the quality of those contacts and their close connection to New York, the Court concludes that § 302(a)(1) permits the exercise of jurisdiction over Defendant.

### 2. Scope Of Jurisdiction Under § 302(a)(1)

A plaintiff must establish personal jurisdiction with respect to each claim asserted. *See Sunward Elecs.*, *Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). Invoking this principle, Defendant argues that each Plaintiff in this action asserts a claim under the ATA separately and individually, and that jurisdiction must be established uniquely for each one of these claims. (*See* Def.'s Reply at 5.) Plaintiffs argue otherwise, essentially contending that they assert a

"claim" under the ATA, and that a single New York contact that would support the exercise of specific jurisdiction is sufficient to confer jurisdiction over that entire claim. (*See, e.g.*, Tr. 55:1-10.)

Because Plaintiffs allege injuries in connection with 19 different attacks, each associated with a distinct class of Plaintiffs, the Court disagrees that all of their claims can be aggregated into a single, unitary claim under the ATA for purposes of establishing specific jurisdiction. Even so, the Court concludes that Defendant is subject to jurisdiction under § 302(a)(1) with respect to claims made in connection with all 19 attacks. To explain why, it is useful to consider the result if Plaintiffs had pursued their claims in 19 separate actions, each premised upon a single attack. As previously noted, the first New York Transfer was in 1997 and the remaining four transfers all occurred in June and July of 2001, while the 19 attacks at issue in this action all took place between March 2001 and September 2004. (*See* Ex. A to the Oct. 16, 2015 Friedman Ltr.) Given the timing of those transfers and the substantial amount underlying them, Plaintiffs in all 19 actions legitimately could rely upon the New York Transfers as among the financial services and material support allegedly provided by Defendant in violation of the ATA.

That conceivably would not be the case if, for instance, one of the attacks for which Plaintiffs sought recovery occurred in 1992, five years before the first New York Transfer. Under such circumstances, the nexus between claims arising from the 1992 attack and a series of transfers that did not even begin to occur until five years later theoretically would be too attenuated to support jurisdiction under § 302(a)(1). *See, e.g.*, *Standard Chartered Bank* v. *Ahmad Hamad Al Gosaibi & Bros. Co.*, No. 653506/2011, 2013 N.Y. Slip. Op. 32312(U), at *3-5 (Sup. Ct. N.Y. Cnty. Sept. 24, 2013) (nexus required under § 302(a)(1) not satisfied where 2009 default could not have arisen from business the defendant transacted in New York in 2010

and thereafter). However, those are not the facts here. Even assuming that Plaintiffs had pursued their claims in 19 separate actions, the New York Transfers would embody purportedly unlawful conduct relevant to establishing Defendant's liability in each action.[9] As such, the claims in each action could be said to arise, at least in part, from the New York Transfers, in which case § 302(a)(1) would confer jurisdiction over Defendant in each action. *See Licci II*, 20 N.Y.3d at 341.

Nevertheless, Defendant contends that the scope of jurisdiction the Court may exercise in this action, where Plaintiffs assert their claims collectively, is narrower and does not permit adjudication of all of Plaintiffs' claims. Defendant's position rests on the assumption that, if the Court were to adjudicate all of those claims, it necessarily would be exercising specific jurisdiction not only with respect to the New York Transfers, but also with respect to numerous other transfers that never touched New York or the United States. (*See* Def.'s Mem. at 8-10) ("This Court cannot treat [Defendant's] discrete wire transfers that touched New York as providing a basis for asserting personal jurisdiction over [Defendant] in New York with respect to transfers that never touched the United States.") According to Defendant, exercising jurisdiction over the latter category of transfers is impermissible in a "specific jurisdiction universe" because those transfers, which were not routed through the New York Branch, have no connection to Defendant's New York conduct.

Defendant's argument is fundamentally flawed, however, as it erroneously assumes that

---

[9] Defendant notes that one of the attacks at issue occurred on March 28, 2001, at which point the only New York Transfer that had been executed was a 1997 transfer in the amount of $5,000. (*See* Def.'s Mem. at 23.) According to Defendant, the four remaining New York transfers necessarily could not have proximately caused that attack because they were performed after it occurred, in June and July of 2001. That argument presents a question of causation not appropriately resolved here, but the Court notes that the Honorable Brian M. Cogan, of this Court, recently rejected the very same argument in denying the defendant's post-trial motions in *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 329 (E.D.N.Y. 2015). As Judge Cogan explained: "Defendant's emphasis on the fact that these payments were made after the attacks occurred misses the point; the jury was entitled to find that the prospect that the families of dead Hamas terrorists would be financially rewarded was a substantial factor in increasing Hamas' ability to carry out attacks such as these." *Id.*

the Court's adjudicatory power over Defendant is defined according to which individual *transfers* satisfy the jurisdictional requirements of § 302(a)(1), rather than which *claims* satisfy those requirements. In fact, the two are distinct. Plaintiffs' claims are that Defendant violated the ATA, causing injury, by providing material support to an FTO and knowingly financing terrorism. *See* 18 U.S.C. §§ 2339B and 2339C. Those claims do not necessarily correspond one-to-one with particular transfers, but instead rest upon the millions of dollars Defendant allegedly transferred to Hamas front organizations in close temporal proximity to the 19 attacks in which Plaintiffs were injured. Because the New York Transfers were part of that allegedly unlawful conduct, the Court may exercise jurisdiction with respect to claims made in connection with all 19 attacks.

This is true notwithstanding the fact that those claims also may arise from other transfers Defendant did not route through New York, including ones performed after the last of the New York Transfers was executed in July 2001.[10] There is no requirement under § 302(a)(1) that a plaintiff's claim must arise *exclusively* from New York conduct. To the contrary, as long as there is a relatedness between a plaintiff's claim and the defendant's New York transaction, § 302(a)(1) confers jurisdiction even if some, or all, of the acts constituting the breach sued upon occurred outside New York. *See Hoffritz for Cutlery, Inc. v. Amajac Ltd.*, 763 F.2d 55, 59 (2d Cir. 1985) (applying § 302(a)(1) and rejecting the district court's "finding of no jurisdiction over defendants merely on the basis that the acts alleged in the complaint did not take place in New

---

[10] For this reason, the Court rejects Defendant's argument that Plaintiffs should be required to prove their claims based on the state of affairs, and what Defendant knew, as of the date of the last New York Transfer. (*See* Def.'s Mem. at 10-11.) That argument is premised on the fallacy that the Court only may exercise jurisdiction over the individual New York Transfers, which uniquely give rise to specific claims that are not premised on any other transfers. That is not the case, however, as all of Plaintiffs' claims arise more broadly from the many transfers Defendant made to the Charities during the relevant timeframe, of which the New York Transfers were a part. Moreover, the Court unequivocally rejects Defendant's unsupported contention that personal jurisdiction limits the evidence Plaintiffs may use to prove their claims, confining it just to what existed at the time of the last New York Transfer.

York."); *Hedlund v. Products from Sweden, Inc.*, 698 F. Supp. 1087, 1091-93 (S.D.N.Y.1988) (finding defendant subject to jurisdiction in New York under § 302(a)(1) with respect to a claim of tortious interference that arose from conduct in Sweden). Thus, even if Defendant's conduct outside New York substantially gave rise to Plaintiffs' claims, and outweighs Defendant's relevant New York conduct, Plaintiffs' claims still are within the permissible scope of jurisdiction under § 302(a)(1) because they are all "sufficiently related to the business transacted [in New York] that it would not be unfair . . . to subject [Defendant] to suit in New York." *Hoffritz*, 763 F.2d at 59.

The Court is not persuaded that a different result is compelled by *Fontanetta v. American Board of Internal Medicine*, 421 F.2d 355 (2d Cir. 1970), a case Defendant heavily relies upon even though it was decided 45 years ago without the benefit of clear precedent from the New York courts regarding how § 302(a)(1) should be applied. *See Hoffritz*, 763 F.2d at 61. *Fontanetta* involved a physician who sought certification as an internist from the American Board of Internal Medicine, which required passing both an oral and written exam. *See Fontanetta*, 421 F.2d at 356. The physician passed the written exam in New York in 1963, but twice failed the oral exam—once in Philadelphia, Pennsylvania in 1965, and once in St. Louis, Missouri in 1967. *Id.* After he failed the oral exam for a second time, the physician brought suit in New York to compel the Board to disclose the reasons why he had failed the two oral exams, and to issue the requested certification. *Id.* Applying § 302(a)(1), the Second Circuit held that the physician's claim, which concerned only the oral exam, was not sufficiently related to the written exam to sustain jurisdiction in New York. *Id.* at 357-58. As the Second Circuit later explained in *Hoffritz*: "We held [in *Fontanetta*] that the substantive differences between the two kinds of examination, together with the separation both in time and geographic location of the

oral examination from the written examination, rendered unrealistic a view of the two as one unit." *Hoffritz*, 763 F.2d at 61.

Here, while the transfers at issue vary in time and location to a degree, substantively they constitute a single course of conduct by Defendant that purportedly entailed violations of the same statute in the same manner with respect to all of Plaintiffs' claims. Moreover, whereas in *Fontanetta* the plaintiff's claim did not relate to the written examination, the Court already has determined the all of Plaintiffs' claims in this action relate to the New York Transfers. *See Id.* at 61-62 (similarly distinguishing *Fontanetta* and holding that jurisdiction existed under § 302(a)(1) with respect to a claim "sufficiently connected to defendants' transaction of business in New York.") As such, the Court's finding that it may exercise jurisdiction with respect to all of Plaintiffs' claims is not inconsistent with *Fontanetta*.

Defendant's reliance on *State v. Samaritan Asset Management Services, Inc.*, 22 Misc.3d 669 (Sup. Ct. N.Y. Cnty. 2008), similarly is unavailing. There, the New York Attorney General brought a securities fraud action against the defendants under the State's Martin Act, N.Y. Gen. Bus. Law § 352 *et. seq*. The court dismissed the action in part, holding that it could exercise personal jurisdiction with respect to trades the defendants executed through New York brokers, but not with respect to trades executed through a trust company located in Phoenix, Arizona. *Id.* at 676-77. However, that holding substantially was a consequence of the territorial limitations of the Martin Act, which applies exclusively to acts "within and from" New York. *See Id.* at 674, 676-77. No such limitation binds the Court here. To the contrary, the ATA expressly is directed at terrorist activities that "occur primarily outside the territorial jurisdiction of the United States." 18 U.S.C. § 2331(1). Indeed, the very purpose of the ATA was to "provide a new civil cause of action in Federal law for international terrorism that provides extraterritorial jurisdiction over

terrorist acts abroad against United States nationals." *In re September 11 Litig.*, 751 F.3d 86, 93 (2d Cir. 2014) (quoting H.R. 2222, 102d Cong. (1992)) (internal quotation marks omitted). While these are concepts of territorial jurisdiction, not personal jurisdiction, they distinguish *Samaritan* and render it inapposite here.

### D.    Jurisdiction Under Rule 4(k)(1)(C)

Plaintiffs argue that Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure provides an additional statutory basis for the Court to exercise personal jurisdiction over Defendant. The Court agrees. Under Rule 4(k)(1)(C), personal jurisdiction may be established through proper service of process upon a defendant pursuant to a federal statute that contains its own service provision. *See* Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute."); *see also* 4B Wright & Miller et al., Federal Practice & Procedure § 1125 (4th ed.) As relevant here, the ATA expressly authorizes nationwide service of process, thereby establishing personal jurisdiction over a defendant properly served under the statute.[11]

Here, Defendant does not dispute that it properly was served with process at its agency in Miami, Florida in connection with the original filing of this action in the District of New Jersey. (*See* Ex. A to the Declaration of Aaron Schlanger, dated May 1, 2014 ("Schlanger Decl."), *Strauss* Dkt. Entry No. 370.) Furthermore, when the *Strauss* action was refiled in this Court, Defendant expressly agreed to accept service of the Summons and Complaint by

---

[11] *See* 18 U.S.C. § 2334 (providing for nationwide service of process "where[ever] the defendant resides, is found, or has an agent"); *Licci I*, 673 F.3d at 59 n.8 (2d Cir. 2012) (acknowledging the ATA's nationwide service of process provision as a possible basis for personal jurisdiction); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *3 (M.D. Fla. Mar. 31, 2011); *Sokolow v. Palestine Liberation Org.*, 2011 WL 1345086, at *2 (S.D.N.Y. Mar. 30, 2011); *Wultz v. Islamic Republic of Iran* ("*Wultz I*"), 755 F. Supp. 2d 1, 31-32 (D.D.C. 2010); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 806-07 (S.D.N.Y. 2005); *see also IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (federal statute authorizing nationwide service of process may be used to establish personal jurisdiction).

stipulation of the parties dated February 17, 2006.[12]  (*See* Ex. B to the Schlanger Decl.)

Defendant voluntarily accepted service in the *Wolf* action as well.  (*See* Stipulation and Order

dated April 5, 2007, *Wolf* Dkt. Entry No. 6.)  As such, Rule 4(k)(1)(C) provides an additional

basis for this Court to exercise personal jurisdiction over Defendant, to the extent permitted by

due process.[13]  *See In re Terrorist Attacks*, 349 F. Supp. 2d at 806 (exercise of personal

jurisdiction pursuant to Rule 4(k)(1)(C) still requires demonstration that defendant has sufficient

"minimum contacts" to satisfy traditional due process inquiry); *see also Wultz I*, 755 F. Supp. 2d

at 32 ("Nationwide service of process does not dispense with the requirement that an exercise of

personal jurisdiction comport with the Due Process Clause.")

E.      **Constitutional Due Process**

Having concluded that there is a statutory basis to exercise personal jurisdiction over

Defendant, the Court must consider whether exercising such jurisdiction would comport with the

due process protections provided by the United States Constitution.  As articulated by the

Supreme Court in *International Shoe*, the touchstone due process principle requires that the

defendant "have certain minimum contacts [with the forum state] such that maintenance of the

suit does not offend traditional notions of fair play and substantial justice."  *Licci ex rel. Licci v.*

*Lebanese Canadian Bank, SAL* ("*Licci III*"), 732 F.3d 161, 169 (2d Cir. 2013) (quoting *Int'l*

*Shoe*, 326 U.S. at 316) (alterations in original).  Assuming the threshold showing of "minimum

contacts" is satisfied, the Court also must consider whether its exercise of jurisdiction would be

---

[12]  At the time Defendant accepted service, the provision presently embodied by Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure was in effect as Rule 4(k)(1)(D), which subsequently was renumbered pursuant to the 2007 Amendment to the Federal Rules.

[13]  In *Wultz v. Republic of Iran* ("*Wultz II*"), 762 F. Supp. 2d 18, 25-29 (D.D.C. 2011), the district court held that the ATA's nationwide service of process provision cannot be invoked to establish personal jurisdiction unless the first clause of that provision, concerning proper venue under the statute, also is satisfied.  Here, Defendant has waived any argument that venue is improper by failing to raise that issue.  In any event, given that the ATA provides for venue in any district where any plaintiff resides or where the defendant is served, the Court would find that venue is proper in this district even if Defendant had asserted a challenge.  *See* 18 U.S.C. § 2334(a).

reasonable under the circumstances. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985); *see also Licci III*, 732 F.3d at 173-74.

Notably, after the Court of Appeals determined in *Licci II* that the defendant bank was subject to jurisdiction in New York under § 302(a)(1), the Second Circuit in *Licci III* considered whether exercising such jurisdiction would comport with due process. In concluding that due process was satisfied, the Second Circuit observed that it would be "rare" and "unusual" for a court to determine that the exercise of personal jurisdiction over a defendant was permitted by § 302(a)(1), but prohibited under principles of due process. *Licci III*, 732 F.3d at 170. In fact, the Second Circuit noted that it was aware of no such decisions within this Circuit. *Id.* Therefore, given the Court's prior determination that § 302(a)(1) permits the exercise of jurisdiction over Defendant, it would be unusual, and even unprecedented, for the Court to find that due process is not satisfied here.

### 1. Minimum Contacts

Where, as here, a court's specific jurisdiction is invoked, "minimum contacts" sufficient to satisfy due process exist if "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci III*, 732 F.3d at 170 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)) Courts typically conduct this inquiry under two separate prongs: (1) the "purposeful availment" prong, "whereby the court determines whether the entity deliberately directed its conduct at the forum"; and (2) the "relatedness" prong, "whereby the court determines whether the controversy at issue arose out of or related to the entity's in-forum conduct." *Gucci Am., Inc. v. Weixing Li* ("*Gucci III*"), 2015 WL 5707135, at *7 (S.D.N.Y. Sept. 29, 2015) (citing *Chew v. Dietrich*, 143 F.3d 24, 27-29 (2d Cir. 1998)).

Because this action arises under the ATA, a nationwide service of process statute, the appropriate "minimum contacts" inquiry is whether Defendant has sufficient contacts with the United States as a whole.[14]  Nevertheless, aside from an office Defendant purportedly maintains in Miami, Florida, essentially all of the contacts relevant to the Court's due process inquiry involve Defendant's conduct in New York.  Moreover, having already determined that Defendant's New York conduct satisfies the purposeful availment prong of § 302(a)(1), the Court has little difficulty concluding that it similarly demonstrates purposeful availment sufficient to establish "minimum contacts" with the United States.  *See Licci III*, 732 F.3d at 170.  There is nothing remotely "random, isolated, or fortuitous" about that conduct that would call into question whether it was purposefully directed at the United States.  *Id.* at 171 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).  Defendant had a New York Branch and systematically utilized that branch as its exclusive clearing channel for U.S. Dollar transfers requested by its customers.  Defendant's officers in Paris also regularly communicated with the New York Branch, including with regard to CBSP on several occasions.  (*See* Ex. A to the Oct. 22, 2015 Osen Ltr.) (attaching list of communications).

Most notably, Defendant deliberately used New York's banking system to execute the five New York Transfers.  Given that similar recurring transfers routed through a New York correspondent account were sufficient to establish purposeful availment in *Licci III*, the New York Transfers demonstrate such availment *a fortiori* because they were executed through Defendant's own branch in New York.  As such, there is no question that Defendant

---

[14]  *See LIBOR*, 2015 WL 4634541, at *18; *Wultz II*, 762 F. Supp. 2d at 25; *In re Terrorist Attacks*, 349 F. Supp. 2d at 806 (Where jurisdiction is asserted under the ATA's service provision, the "relevant inquiry under such circumstances is whether the defendant has minimum contacts with the United States as a whole [to satisfy Fifth Amendment due process requirements], rather than . . . with the particular state in which the federal court sits.") (quoting *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 87 (D.R.I. 2001)) (alterations in original).  *But see Gucci II*, 768 F.3d at 142 n.21 (noting that the Second Circuit has not yet decided whether the "national contacts" approach is proper for determining personal jurisdiction in cases arising under federal statutes that authorize nationwide service.)

purposefully availed itself of the "privilege of conducting business in [New York]," thereby subjecting itself to suit in the United States with respect to any and all claims substantially related to such conduct. *Licci III*, 732 F.3d at 171 (quoting *Bank Brussels Lambert*, 305 F.3d at 127); *see also Gucci III*, 2015 WL 5707135, at *8.

Turning to the question of relatedness, the Second Circuit held in *Licci III* that the defendant bank's use of an in-forum correspondent account to execute the very wire transfers that were the basis for the plaintiffs' claims satisfied "minimum contacts." As the Second Circuit explained:

> [W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy. In this case, the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged. We conclude that in connection with this particular jurisdictional controversy—a lawsuit seeking redress for the allegedly unlawful provision of banking services of which the wire transfers are a part—allegations of [the defendant's] repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Shahid, in order to further Hizballah's terrorist goals, are sufficient [to sustain jurisdiction].

*Licci III*, 732 F.3d at 171. The same conclusion is compelled here, where the New York Transfers are among the allegedly unlawful financial services Defendant provided to CBSP for which Plaintiffs seek redress in this action.

Defendant attempts to distinguish *Licci III* on the ground that all of the wire transfers at issue in that case were routed through New York, whereas in this case only a fraction of the transfers at issue contacted New York. However, in *Licci III*, the Second Circuit did not hold, or even suggest, that due process was satisfied because the transfers at issue were routed *exclusively* through New York. That fact was not even made explicit in the Second Circuit's opinion. Rather, per the Second Circuit's express holding, "minimum contacts" were established by the

defendant bank's *repeated* and *deliberate* use of a New York correspondent account to effect the financial services underlying the plaintiffs' claims. *See Id.* at 171-73; *Wultz I*, 755 F. Supp. 2d at 34 (suggesting that a single wire transfer knowingly performed in the U.S. for the benefit of a terrorist organization could support a finding of specific jurisdiction in the ATA context); *see also Burger King*, 471 U.S. at 475 n.18 ("So long as it creates a substantial connection with the forum, even a single act can support jurisdiction.") (internal quotation marks and citation omitted). The facts alleged here demonstrate the same repeated and deliberate conduct by Defendant.

The Court acknowledges that *Licci III* involved dozens of wire transfers through New York totaling millions of dollars, whereas in this case there were only five New York Transfers totaling $205,000. Nevertheless, if not for the New York Transfers, $205,000 would not have been provided to the Charities and thereupon purportedly delivered into the hands of Hamas during the same timeframe that Hamas allegedly carried out the attacks in which Plaintiffs were injured. *Contra 7 West 57th St.*, 2015 WL 1514539, at *10 ("minimum contacts" not satisfied in LIBOR fixing case because defendant bank's conduct in New York had no alleged connection with plaintiff's injury and did not even occur during the relevant timeframe). Furthermore, Plaintiffs allege facts to support a finding that Defendant executed the New York Transfers at a time when it knew, or at least suspected, that it was supporting a terrorist organization by sending money from CBSP to the Charities. *See Strauss*, 925 F. Supp. 2d at 429-30; *cf. Wultz I*, 755 F. Supp. 2d at 34 ("Where a bank has knowledge that it is funding terrorists . . . contacts created by such funding can support such a finding [of specific jurisdiction].") (citing *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 488-90 (S.D.N.Y. 2010)). Under *Licci III*, these factual assertions are sufficient to satisfy the "minimum contacts" component of the

due process inquiry.

For the reasons discussed by the Court when analyzing the scope of jurisdiction under § 302(a)(1), *supra*, the Court further concludes that Defendant's New York conduct established "minimum contacts" as to which all of Plaintiffs' claims substantially relate. As such, the Court finds that it may exercise jurisdiction over Defendant with respect to all of those claims without offending due process. *See Walden*, 134 S. Ct. at 1121 ("minimum contacts" satisfied if "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State."). Furthermore, as acknowledged by the Second Circuit, there is authority for the "general proposition that use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct." *Licci III*, 732 F.3d at 172 n.7. Here, Defendant is a sophisticated financial institution that had a New York Branch and routinely conducted business in the United States through that branch. As such, it reasonably can be presumed that Defendant was "fully aware of U.S. law concerning financial institutions, including provisions of the ATA criminalizing material support to terrorist organizations." *Wultz I*, 755 F. Supp. 2d at 34. Assuming the truth of Plaintiffs' allegations, Defendant reasonably could have foreseen that repeatedly availing itself of New York to execute the New York Transfers would subject it to jurisdiction in the United States with respect to the overall course of conduct of which those transfers were a part.

Nevertheless, Defendant asserts the same fallacy as it did with respect to § 302(a)(1), arguing that due process prohibits the Court from exercising "jurisdiction" over transfers that never went through New York or the United States. Defendant contends that this principle is exemplified in a decision recently reached by the Honorable Naomi R. Buchwald, United States

District Judge for the Southern District of New York, in a multidistrict litigation concerning alleged manipulation of the London Interbank Offer Rate ("LIBOR"). (*See* Oct. 16, 2015 Friedman Ltr.; *see also* Tr. 44:12-25.) In basic terms, LIBOR is a set of interest-rate benchmarks calculated on the basis of quotes from a panel of leading banks, each of which reports on a daily basis the rate at which it could borrow funds under certain stated conditions. *See LIBOR*, 2015 WL 4634541, at *2-3. The plaintiffs in the multidistrict litigation allege, *inter alia*, that the panel banks knowingly and persistently submitted falsely high or low quotes to manipulate LIBOR in a manner designed to fraudulently improve their respective positions in the market. As a threshold ruling, Judge Buchwald indicated that specific jurisdiction would not exist in New York with respect to any claim alleging fraud based upon a false LIBOR quote that neither was determined nor submitted in New York, nor otherwise requested by a trader located in New York. *See Id.* at *32.

Whatever basis in the facts and law that ruling had in *LIBOR*, no such basis can be found here. In that case, each purportedly false LIBOR submission at issue was alleged to have caused a distinct and identifiable harm that directly gave rise to a specific plaintiff's claim. The transfers at issue here are not comparable. Without rehashing the Court's entire analysis concerning the scope of jurisdiction under § 302(a)(1), *supra*, Plaintiffs' claims are that Defendant provided material support to an FTO and knowingly financed terrorism. Those claims rest upon the many transfers Defendant made to the Charities on behalf of CBSP in close temporal proximity to the 19 attacks in which Plaintiffs were injured. Due process does not require that the Court secure a basis for jurisdiction over all of those transfers in order to adjudicate Plaintiffs' claims. Rather, as discussed, Plaintiffs must show that there is a substantial relationship between claims made in connection with all 19 attacks and Defendant's relevant

New York conduct. *See Walden*, 134 S. Ct. at 1121. Based on its prior determination that Plaintiffs adequately have done so, *prima facie*, the Court may exercise jurisdiction with respect to all of their claims without offending due process.

## 2. Reasonableness

At the second stage of the due process analysis, the party challenging jurisdiction bears a heavy burden to make "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert*, 305 F.3d at 129 (quoting *Metro. Life Ins. Co.*, 84 F.3d at 568). Where a defendant has purposefully directed its suit-related conduct at the forum State, as is the case here, "dismissals resulting from the application of the reasonableness test should be few and far between." *Metro. Life*, 84 F.3d at 575 (citing *Burger King*, 471 U.S. at 477). Among the factors typically considered by a court assessing the reasonableness of exercising jurisdiction are: (1) "the burden that the exercise of jurisdiction will impose on the [entity]"; (2) "the interests of the forum state in adjudicating the case"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of the controversy"; and (5) "the shared interest of the states in furthering substantive social policies." *Gucci III*, 2015 WL 5707135, at *9 (citing *Bank Brussels Lambert*, 305 F.3d at 129) (alterations in original). In addition, "[w]hen the entity that may be subject to personal jurisdiction is a foreign one, courts consider the *international* judicial system's interest in efficiency and the shared interests of the *nations* in advancing substantive policies." *Id.* (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.* 480 U.S. 102, 115 (1987)) (emphasis in original).

Here, in challenging jurisdiction, Defendant does not directly address the individual reasonableness factors. Having considered those factors anyway, the Court concludes that they

support the exercise of jurisdiction over Defendant. To begin with, Defendant has been litigating this action in this Court for the better part of ten years. Extensive discovery already has taken place, with the parties capably surmounting any obstacles presented by the fact that many of the pertinent witnesses and documents are located abroad. As such, Defendant cannot seriously contend that continuing to litigate this case in New York presents an unreasonable burden. *See Licci III*, 732 F.3d at 174 (observing that any such burden is eased by "the conveniences of modern communication and transportation"). Indeed, up until *Daimler* was decided, Defendant presumably had every expectation of litigating this matter to a resolution in New York.

Furthermore, the claims in this action are predicated on the overall course of conduct by which Defendant allegedly provided financial support to a terrorist organization. To the extent Defendant's use of New York's banking system was integral to that conduct, the Court also may take into account "the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism." *Id*. Finally, although not a controlling factor, it is appropriate to consider the federal policy underlying Congress' enactment of the ATA. *Cf.* 4 Wright & Miller, Federal Practice and Procedure § 1068.1 (4th ed.) ("[W]hen Congress has undertaken to enact a nationwide service statute applicable to a certain class of disputes, that statute should be afforded substantial weight as a legislative articulation of federal social policy.") As demonstrated by the legislative history and express language of the ATA, a clear statutory objective is "to give American nationals broad remedies in a procedurally privileged U.S. forum." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 422 (E.D.N.Y. 2009). That policy by no means overrides the due process to which Defendant is entitled. However, having already determined that Defendant established "minimum contacts" with the United States as a whole, the Court is further persuaded by that

policy and the other reasonableness factors that exercising jurisdiction over Defendant is consistent with due process. Accordingly, Defendant's motion to dismiss for lack of personal jurisdiction is denied.[15]

## III. Pendent Personal Jurisdiction

Plaintiffs invoke the doctrine of pendent personal jurisdiction as an alternative basis for finding that Defendant is subject to jurisdiction with respect to all of Plaintiffs' claims. (*See* Pl.s' Opp'n at 19 n.9.) In general, that doctrine permits a court to exercise personal jurisdiction with respect to a claim for which it otherwise lacks jurisdiction, if that claim arises from the same common nucleus of fact as another claim for which the court properly has jurisdiction over the defendant. *See* 4 Wright & Miller, Federal Practice and Procedure § 1069.7 (4th ed.) However, within the Second Circuit, the doctrine of pendent personal jurisdiction primarily has been embraced to permit the adjudication of pendent state law claims that derive from the same common nucleus of fact as a federal claim for which the court has jurisdiction over the defendant. *See, e.g., IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1059 (2d Cir. 1993); *see also Hargarve v. Oki Nursery, Inc.*, 646 F.2d 716, 719-21 (2d Cir. 1980) (court that properly had jurisdiction over defendant on state law claim permitted to exercise pendent jurisdiction as to related state law claims). Notably, those are not the circumstances here, where all of Plaintiffs' claims are brought under a single federal statute. In any event, having already determined that it may exercise jurisdiction with respect to all of Plaintiffs' claims under traditional personal jurisdiction principles, the Court need not decide whether it also would be

---

[15] In *Gucci II*, the Second Circuit directed the district court to consider, upon remand, whether the exercise of jurisdiction over Bank of China would comport with principles of international comity. *See Gucci II*, 768 F.3d at 138-39. However, in that case, there was an alleged conflict of law between Chinese banking laws and an asset-freeze injunction issued by the district court. *Id.* Here, Defendant does not address the issue of comity, nor is there any suggestion that merely continuing to exercise jurisdiction over Defendant, albeit on a theory of specific jurisdiction rather than general, would conflict with any foreign laws or otherwise infringe on the sovereign interests of a foreign state.

appropriate to exercise pendent personal jurisdiction. Therefore, the Court declines to do so.

## IV. Defendant's Motion for Summary Judgment

Defendant alternatively moves for summary judgment on the basis that the Court can exercise jurisdiction only with respect to the New York Transfers, and Plaintiffs cannot prove Defendant's liability in a case confined just to those five transfers. (*See* Def.'s Mem. at 15-25.) In other words, Plaintiffs purportedly cannot prevail on their claims because they cannot prove that as of July 31, 2001—the date of the last New York Transfer—Defendant acted with the requisite *scienter* and proximately caused Plaintiffs' injuries. However, the Court already has rejected Defendant's arguments seeking to limit the scope of jurisdiction in this manner, including the fallacy that the Court must secure jurisdiction over individual transfers rather than jurisdiction over Defendant itself. Accordingly, Defendant's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss this action, or in the alternative for summary judgment, is denied in its entirety.

SO ORDERED.

Dated:  Brooklyn, New York
        March 31, 2016

_____/s/_____
            DORA L. IRIZARRY
          United States District Judge